**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | |
|---|---|
| MONUMENT PEAK VENTURES, LLC,<br><br>     Plaintiff,<br><br>v.<br><br>ARASHI VISION INC. d/b/a INSTA360,<br><br>     Defendant. | Case No. 2:25-cv-00956-RWS-RSP<br><br>JURY TRIAL DEMANDED |

**MOTION OF ARASHI VISION INC. d/b/a INSTA360
TO DISMISS FOR FAILURE TO STATE A CLAIM**

**TABLE OF CONTENTS**

Page

I.     INTRODUCTION ........................................................................................................ 1

II.    STATEMENT OF THE ISSUES TO BE DECIDED.......................................................... 1

III.   BACKGROUND .......................................................................................................... 1

       A.     The Parties ..................................................................................................... 1

       B.     MPV's Asserted Patents ................................................................................ 2

              1.     The '771 and '544 Automated Videography Patents................................ 2

              2.     The '155 Image Adaption Patent ................................................................ 4

              3.     The '418 Mobile Equipment Resource Sharing Patent............................. 4

              4.     The '158, '612 and '490 Video Trimming Patents ................................... 6

IV.    LEGAL STANDARDS .................................................................................................. 7

V.     LEGAL ARGUMENT................................................................................................... 10

       A.     The Automated Videography Patents Claim Ineligible Subject Matter ............. 10

              1.     Step One: The Patent Claims Are Directed to Abstract Ideas ................ 10

              2.     Step Two: The Patent Claims Lack an Inventive Concept ...................... 13

       B.     The '155 Image Adaption Patent Claims Ineligible Subject Matter.................... 15

              1.     Step One: The Patent Is Directed to Abstract Ideas................................ 15

              2.     Step Two: The Patent Claims Lack an Inventive Concept ...................... 15

       C.     The '418 Mobile Equipment Resource Sharing Patent Claims Ineligible
              Subject Matter................................................................................................ 16

              1.     Step One: The Patent Claims Are Directed to Abstract Ideas ................ 16

              2.     Step Two: The Patent Does Not Claim an Inventive Concept................. 17

D.    The Video Trimming Patents Claim Ineligible Subject Matter ........................... 18

1.    Step One: The Patents Are Directed to Abstract Ideas ........................... 18

2.    Step Two: The Patents Do Not Claim an Inventive Concept .................. 19

VI.    CONCLUSION .................................................................................................... 20

ADDENDUM ................................................................................................................ 21

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alice Corp. Pty. v. CLS Bank Int'l,*
573 U.S. 208 (2014) ................................................................................. 7, 8, 9, 12

*Amdocs (Isr.) Ltd. v. Openet Telecom, Inc.,*
841 F.3d 1288 (Fed. Cir. 2016) ........................................................................... 9

*Art Research & Tech. LLC v. Google, LLC,*
No. 24-CV-04898-AMO, 2025 WL 2772608 (N.D. Cal. Sept. 29, 2025) ........... 19

*BSG Tech LLC v. BuySeasons, Inc.,*
899 F.3d 1281 (Fed. Cir. 2018) ........................................................................... 8

*ChargePoint, Inc. v. SemaConnect, Inc.,*
No. CV MJG-17-3717, 2018 WL 1471685 (D. Md. Mar. 23, 2018), *aff'd*, 920 F.3d
759 (Fed. Cir. 2019) ............................................................................................. 18

*ChargePoint, Inc. v. SemaConnect, Inc.,*
920 F.3d 759 (Fed. Cir. 2019) ...................................................................... 8, 9, 16

*Content Extraction and Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n,*
776 F.3d 1343 (Fed. Cir. 2014) ..................................................................... 9, 10, 16

*Digitech Image Tech's v. Elecs. for Imaging,*
758 F. 3d 1344 (Fed. Cir. 2014) ....................................................................... 14

*Elec. Power Grp., LLC v. Alstom S.A.,*
830 F.3d 1350 (Fed. Cir. 2016) .................................................................. 8, 11, 13

*Ericsson Inc. v. TCL Commc'n Tech. Holdings Ltd.,*
955 F.3d 1317 (Fed. Cir. 2020) ................................................................. 10, 15, 19

*Genetic Techs. Ltd. v. Merial LLC,*
818 F.3d 1369 (Fed. Cir. 2016) ........................................................................... 8

*GoTV Streaming, LLC v. Netflix, Inc.,*
166 F.4th 1053 (Fed. Cir. 2026) ............................................................. 8, 16, 17, 19

*Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co.,*
313 F.3d 305 (5th Cir. 2002) ............................................................................ 20

*Hawk Tech. Sys., LLC v. Castle Retail, LLC,*
60 F.4th 1349 (Fed. Cir. 2023) ........................................................................... 11

*IBM v. Zillow Grp., Inc.*,
  50 F.4th 1371 (Fed. Cir. 2024) ....................................................................... 15, 16

*In re TLI Commc'ns LLC Pat. Litig.*,
  823 F.3d 607 (Fed. Cir. 2016) ...................................................................... 8, 12, 16

*Intell. Ventures I LLC v. Symantec Corp.*,
  838 F.3d 1307 (Fed. Cir. 2016) ............................................................................ 13

*Mobile Acuity Ltd. v. Blippar Ltd.*,
  110 F.4th 1280 (Fed. Cir. 2024) ..................................................................... 9, 11, 12

*Monument Peak Ventures LLC v. Toshiba Am. Bus. Sols., Inc.*,
  No. SA CV 19-02181-DOC-DFM, 2020 WL 6050597 (C.D. Cal. Aug. 12, 2020) ........ 13, 14

*Network Apparel Grp., LP v. Airwave Networks Inc.*,
  154 F. Supp. 3d 467 (W.D. Tex. 2015), *report and recommendation adopted*, No.
  6:15-CV-00134, 2016 WL 4718428 (W.D. Tex. Mar. 30, 2016), *aff'd*, 680 F.
  App'x 1003 (Fed. Cir. 2017) ................................................................................ 18

*P & RO Sols. Grp., Inc. v. CiM Maint., Inc.*,
  273 F. Supp. 3d 699 (E.D. Tex. 2017) .................................................................. 17

*Parker v. Flook*,
  437 U.S. 584 (1978) ........................................................................................... 14

*PerformancePartners LLC v. NextGen Parking LLC*,
  No. 3:23-CV-0564-S, 2024 WL 1317800 (N.D. Tex. Mar. 26, 2024) ................................. 12

*PersonalWeb Techs. LLC v. Google LLC*,
  8 F.4th 1310 (Fed. Cir. 2021) .............................................................................. 12

*Phoenix Licensing, L.L.C. v. Consumer Cellular, Inc.*,
  No. 2:16-cv-152-JRG-RSP, 2017 WL 1065938 (E.D. Tex. Mar. 8, 2017), *report
  and recommendation adopted*, 2017 WL 1177988 (E.D. Tex. Mar. 30, 2017) ..................... 9

*Recentive Analytics, Inc. v. Fox Corp.*,
  134 F.4th 1205 (Fed. Cir. 2025) ........................................................................... 20

*RecogniCorp, LLC v. Nintendo Co.*,
  855 F.3d 1322 (Fed. Cir. 2017) ............................................................................ 13

*SAP Am., Inc. v. InvestPic, LLC*,
  898 F.3d 1161 (Fed. Cir. 2018) ............................................................................ 13

*Secure Cam, LLC v. Tend Insights, Inc.*,
  351 F. Supp. 3d 1249 (N.D. Cal. 2018) ................................................................ 13

iv

*TecSec, Inc. v. Adobe Inc.*,
    978 F.3d 1278 (Fed Cir. 2020) ........................................................................ 12

*Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*,
    874 F.3d 1329 (Fed. Cir. 2017) ................................................................... 9, 15

*Univ. of Fla. Research Found., Inc. v. Gen. Elec. Co.*,
    916 F.3d 1363 (Fed. Cir. 2019) ..................................................................... 17

*USAA v. PNC Bank N.A.*,
    139 F.4th 1332 (Fed. Cir. 2025) .................................................................... 13

*USC IP P'ship, L.P. v. Facebook, Inc.*,
    576 F. Supp. 3d 446 (W.D. Tex. 2021) ......................................................... 19

*Yu v. Apple Inc.*,
    1 F.4th 1040 (Fed. Cir. 2021) ......................................................................... 8

**Statutes**

35 U.S.C. § 101 ............................................................................................... 1, 7, 9

**Rules**

Fed. R. Civ. P. 12(b)(6) ..................................................................................... 7, 8

I.      **INTRODUCTION**

The patents asserted by plaintiff Monument Peak Ventures, LLC ("MPV") claim subject matter—e.g.*,* receiving, analyzing, manipulating, transmitting, and/or storing data—long deemed ineligible for protection under 35 U.S.C. § 101. The patents claim functions such as focusing video, trimming video, cropping images, and connecting devices—all longstanding human practices and all abstract ideas. Further, the patent claims lack any "inventive concept." They are not rooted in new, improved technology. Rather, the claims recite using conventional technology such as computers, cameras, and processors to implement the claimed abstract ideas.

While the "ingenuity" of Eastman Kodak may be reflected in "iconic" products such as the Instamatic camera, the methods and systems claimed in the asserted patents are directed to abstract ideas implemented with generic, conventional computer and camera technology.

The asserted patents are ineligible for protection on their face, and no amendment can cure that defect. As such, MPV's complaint can and should be dismissed with prejudice.

II.     **STATEMENT OF THE ISSUES TO BE DECIDED**

Whether the complaint should be dismissed for failure to state a claim because the asserted patent claims are ineligible for protection under 35 U.S.C. §101 as they (1) are directed to abstract ideas and (2) lack any inventive concept, reciting only well-known, routine, conventional activities performed using generic computer and camera technology.

III.    **BACKGROUND**

A.      **The Parties**

Although the complaint touts "the ingenuity" of the "iconic" Eastman Kodak Company and traces its history back to the first Kodak camera release in 1888 (ECF No. ¶¶ 17-20), MPV itself is a non-practicing Dominion Harbor entity that purports to own the asserted patents by assignment. *Id.* ¶¶ 15, 27; *see also* https://www.dominionharbor.com/portfolio/mpv.

Arashi Vision Inc., operating under the "Insta360" brand, designs innovative camera and related products and apps. Insta360 products have received Time magazine's "Best Invention" recognition and NASA has used Insta360 cameras to live-stream Mars landings, including the 2018 InSight landing and 2021 Perseverance landing.[1] MPV alleges that various Insta360 products infringe its patents, including the "Connect camera system, X5 camera, Insta360 app, and products, software, and services that provide similar functionality." ECF No. ¶ 28 ("Accused Products").

**B.    MPV's Asserted Patents**

MPV asserts seven patents in four patent families: (1) the '771 and '544 "Automated Videography" patents, directed to automated video reframing;[2] (2) the '155 "Image Adaption" patent, directed to cropping digital images;[3] (3) the '418 "Mobile Equipment Resource Sharing" patent, directed to sharing resources of portable multimedia equipment such as mobile phones and cameras;[4] and (4) the '158, '612, and '490 "Video Trimming" patents which, as their titles suggest, are directed to trimming video.[5] *See generally* ECF No. 1.

### 1.    The '771 and '544 Automated Videography Patents

The Automated Videography patents claim a method for "framing [moving] subjects captured on video." Ex. 1 at Abstract. By the time of the claimed invention, video framing

---

[1] *See https://www.insta360.com/blog/enterprise/nasa-360-mars-rover-landing-live-stream.html.*

[2] The "Automated Videography" patents refer to U.S. Patent Nos. 8,237,771 (**Ex. 1**) and 8,274,544 (**Ex. 2**). Each patent incorporates the disclosures of the other. Ex. 1 at 1:22-23; Ex. 2 at 1:19-20. The patents are attached to the Declaration of Timothy J. Carroll, and claims specifically asserted in the complaint are contained in the attached Addendum.

[3] U.S. Patent No. 8,842,155 (**Ex. 3**), entitled "*Portable Video Communication System,*" discloses methods for "adapting [] a displayed image" on a hand-held device. *Id.* at 4:18-19, 36-37.

[4] U.S. Patent No. 8,856,418 (**Ex. 4**), is entitled "*Receiving Station for Mobile Host Equipment, and Method of Sharing Resources Using the Station.*"

[5] The "Video Trimming" Patents refer to U.S. Patent Nos. 9,848,158 (**Ex. 5**); 10,425,612 (**Ex. 6**); and 10,278,490 (**Ex. 7**), all entitled "*Digital Camera User Interface for Video Trimming.*"

technology had long existed. Bell Labs exhibited an "early working videophone system … at the 1964 New York World's Fair." *Id.* at 1:39-43. "AT&T subsequently commercialized this system in various forms." *Id.* at 43-44. By 2009, several companies had developed "technologies for live video phone-cameras, such as face detection and recognition, as well as face tracking." *Id*. at 1:62-64; *see also id.* at 2:10-11 (describing web-cameras with "enhanced audio-capture capability, movement detection, [and] face tracking"). These systems were "adaptive to multi-person conversational dynamics" and could adjust to focus on a speaker, even deciding whether to "follow a current speaker or switch to a new speaker." *Id.* at 3:63-65, 4:33-34. But, supposedly, these systems "develop[ed] for work use" were not "optimized for" residential environments. *Id.* at 5:19-37. The patents purport to provide such "a residentially targeted system." *Id.* at 5:39-40.

In general, the patents claim (1) receiving video of a first subject and determining current shot framing; (2) determining "subject activity" based on "observed movement;" (3) analyzing "scene change probabilities" based on subject "motion" and "activity;" (4) determining and selecting alternate shot options based on such motion and activity; (5) instructing a camera to "re-frame" the subject with new capture and framing settings; and (6) transmitting video using the new settings. *See*, *e.g.,* Ex. 1, cls. 1, 19, 30; Ex. 2, cls. 1, 33, 35, 41, 47. This "automated videography process for providing a system framing and reframing response to user activity" is shown in FIGS. 9 of the patents.



FIG. 9

The claimed "automated videography process" is implemented using a generic "computer," "image capture device, "display device," and "image processor or camera." *E.g.*, Ex. 1, cls. 1, 19.

3

### 2.    The '155 Image Adaption Patent

MPV alleges that Insta360 infringes, in particular, claim 15 of the '155 patent. ECF. No. 1 ¶¶ 118-129 The patent claims a method and device for "adapting" or "adjusting" an image with "poor image" quality to create an enhanced or "modified" image. Ex. 3 at Abstract. This is achieved by (1) capturing a digital image on a first device; (2) adjusting the image by removing "a portion of a background"; (3) transmitting the "adjusted … image" to a second device; and (4) presenting a "verification image" to see what the "adjusted … image looks like." *Id.* at cls. 1, 15. This image adjustment by removing a portion of the background is shown in Figs. 7A and 7B:



FIG. 7A



FIG. 7B

The claimed invention is not implemented with any new technology. The "image capture device" can be any "cellular phone with an embedded camera." Ex. 3 at 1:41-42, 2:50-51. No specific "display device" is required either. The "wireless display and digital capture device" used in the claimed inventions "may comprise any hand held device capable of wireless communication that can capture and display images" such as "digital cameras" and PDAs. *Id.* at 5:52-56. And the connection between the two devices can be accomplished by "any appropriate wireless technology," including "WiFi, Bluetooth or radio." *Id.* at 1:58-60.

### 3.    The '418 Mobile Equipment Resource Sharing Patent

MPV alleges that Insta360 infringes, in particular, claim 17 of the '418 patent which "relates to a receiving station for mobile host equipment such as mobile phones, electronic

4

organizers, or cameras." Ex. 4 at 1:7-9. But the claimed invention is not limited to these devices; it "relates to all sorts of hand-held equipment." *Id.* at 1:14-18. The invention "aims" to combine "the resources of this equipment without having to resort to a personal computer." *Id*. at 1:16-17.

At the time of the claimed invention, handheld devices could generate multimedia data (e.g., text, images, video, sound) using conventional technology such as a keyboard, touch screen, image sensor, or microphone. *Id*. at 1:26-28. Such multimedia "host" equipment could exchange data using a "Bluetooth or WiFi type interface" or a "transmitter/receiver" for "accessing the telephone network or Internet." *Id*. at 1:34-35. The equipment could also be linked via a computer USB port. *Id*. at 1:42-44. But using a computer could be "a fussy operation," and laptops were "expensive and bulky" compared to "handheld portable equipment." *Id*. at 1:63-67. So the claimed invention moved the process of managing resource sharing to a less bulky, but still conventional, medium: a "PC-free" "receiving station." *Id*. at 2:1-3.

The "receiving station" described in the specification connects to handheld devices through ports; detects multimedia or "host" equipment and inventories equipment resources or functions; and then offers "combined use" modes—or ways to use the devices together. The patent describes the "receiving station" this way:

> The invention relates to a receiving station (10) comprising a first physical connection port (20) intended for a first host equipment item and at least one second physical connection port (22) intended for at least one second host equipment item, detection means (24, 34) of host equipment connected to the ports, and the means (30) of automatic selection of combined use modes of the resources of the receiving station and/or connected host equipment, controlled by the detection means (24, 34).

Ex. 4 at Abstract.

The "host" equipment can be any number of devices, including cameras, "Phonecams," "organizers, electronic albums or digital pens." Ex. 4 at 5:48-50. Exchanged data can be "image data, contextual data of time, data and location, software data or even, more generally, multimedia

data" *Id.* at 8:60-63. And it can be exchanged through a "physical connection" or wirelessly. *Id*. at 9:1-31. Lastly, while the specification describes features of the "receiving station 10 of FIG. 1," such as having connection ports (*id.* at 8:37-38), the claims themselves mention no such "station," reciting only a "processor." E.g., cl. 1 (reciting a "processor" detecting, determining and selecting).

The patent's independent claims generally require (1) detecting at least two "handheld" devices; (2) determining an "inventory" of their "available resources," which "are each a functionality" of one device; (3) determining "possible combined use modes based on the inventory" of resources; and (4) selecting "a combined use mode" that accesses the "respective available resources" of both devices at the same time. Ex. 4, cls. 1, 17.

### 4.    The '158, '612 and '490 Video Trimming Patents

MPV specifically alleges the Accused Products infringe claim 23 of the '158 patent (ECF No. 1 ¶¶ 186-207), and claims 12 of the '612 patent (¶¶ 234-244) and '490 patent (¶¶ 269-279). The Video Trimming patents describe the claimed inventions as digital video cameras and "method[s] for trimming a digital video sequence" or "providing trimmed digital video sequences." Ex. 5 ('158 patent) at Abstract; *id.* at 2:7.[6] At the time of the claimed invention, digital cameras could already "provide a video trimming feature which enables videos captured by the digital camera to be shortened." *Id.* at 1:26-29. The inventors simply sought to provide existing video trimming functionality on a "limited size image display" with "a limited number of user controls." *Id*. at 1:66-2:1; *see also id*. at 11:10-21.

---

[6] The '158 patent is expressly incorporated by the '612 and '490 patents. Ex. 2, 3 (Cross-Reference to Related Applications). The '612 patent is a continuation of the '158 patent; and the '490 patent is a continuation of a continuation of the '158 patent. *Id.* (Related U.S. Application Data).

The Video Trimming patents generally claim (1) scrolling through video to select a frame, establishing a "start frame," and storing it; (2) scrolling to and designating an "end frame" and storing it; (3) displaying the selection mode; and (4) storing the "trimmed" video sequence.

The patents note that "image manipulation algorithms and systems are well known," and that "algorithms and systems, and hardware or software" used in the invention "can be selected from such systems, algorithms, components and elements known in the art." Ex. 5 at 3:34-39. The claimed "non-transitory, tangible computer readable storage medium" can be any "physical device or medium" able "to store a computer program having instructions," including "a floppy disk," "optical disc, optical tape," and "solid state electronic storage devices." *Id*. at 3:44-56. No specific camera is claimed but the specification describes the "digital camera" as, preferably, "a portable battery operated device, small enough to be easily handheld." *Id*. at 4:23-26.

Certain claim steps can be performed using any "types of user controls" "well-known in the art." Ex. 5 at 11:60-63; *see also* 12:19-21, 12:48-50 (noting the "select captured video step" and "initiate trimming operation step" "can be performed using any convenient user controls known in the art"). As for the two "storing" video steps, no specific memory is required. The storage limitation can be implemented using internal or external flash memory, magnetic or optical memory, or any other "form of memory known to those skilled in the art." *Id*. at 5:17-28.

## IV.    LEGAL STANDARDS

Section 101 of the Patent Act identifies four categories of patentable subject matter: "any new and useful process, machine, manufacture, or composition of matter." 35 U.S.C. § 101. However, claims directed to "laws of nature, natural phenomena, and abstract ideas" are not eligible for protection. *Alice Corp. Pty. v. CLS Bank Int'l*, 573 U.S. 208, 216-17 (2014).

Patent eligibility, which is analyzed under the now familiar two-step "*Alice*" framework, is a threshold legal issue that "may be determined at the Rule 12(b)(6) stage of a case."

7

*ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 765 (Fed. Cir. 2019). Indeed, "in many cases, it is not just "possible [but] proper to determine patent eligibility … on a Rule 12(b)(6) motion." *Genetic Techs. Ltd. v. Merial LLC*, 818 F.3d 1369, 1373 (Fed. Cir. 2016).

**Step One:** At "step one," courts determine if a patent claim is "directed to" ineligible subject matter, such as an abstract idea. *Alice*, 573 U.S. at 217. How an invention is claimed—e.g., system, apparatus, or method—is "beside the point." *Id.* at 224. Claims reciting "concrete, tangible components" do not "escape[] the reach of the abstract-idea inquiry." *In re TLI Commc'ns LLC Pat. Litig.*, 823 F.3d 607, 611 (Fed. Cir. 2016); *see also Yu v. Apple Inc.*, 1 F.4th 1040, 1043 (Fed. Cir. 2021) (finding digital camera with image sensors directed to abstract idea "of using multiple pictures to enhance each other"); *ChargePoint*, 920 F.3d at 766 (finding claim reciting "apparatus" of a control device, transceiver, and controller directed to an abstract idea).

In deciding if a patent claim is "directed to" an abstract idea, courts consider the "focus" of the claim or its "character as a whole." *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1353 (Fed. Cir. 2016). This "focus [is] on the language of the [a]sserted [c]laims themselves, considered in light of the specification." *Yu*, 1 F.4th at 1043 (citation omitted). But the specification "must always yield to the claim language in identifying th[e] focus" of patent claims. *ChargePoint*, 920 F.3d at 766; *GoTV Streaming, LLC v. Netflix, Inc.*, 166 F.4th 1053, 1061 (Fed. Cir. 2026) ("[O]nly features that are claimed, not unclaimed details that appear in the specification, can supply something beyond ineligible matter.").

Because there is no universal definition of what constitutes "abstract" subject matter, courts use various methods to determine if a claim is directed to an abstract idea. One often used method considers if the patent claim is directed to a longstanding method of "organizing human activity." *Alice*, 573 U.S. at 220; *BSG Tech LLC v. BuySeasons, Inc.*, 899 F.3d 1281, 1285 (Fed. Cir. 2018).

A second method looks to "prior cases" with "similar or parallel" subject matter—examining what they "were about, and which way they were decided." *Amdocs (Isr.) Ltd. v. Openet Telecom, Inc.*, 841 F.3d 1288, 1294 (Fed. Cir. 2016). And a third method considers if a claim uses "result-orientated" language without specifying *how* to achieve the result. *Mobile Acuity Ltd. v. Blippar Ltd.*, 110 F.4th 1280, 1292-93 (Fed. Cir. 2024). A claim using "result-based functional language" that "does not sufficiently describe how to achieve the[] results" is directed to an abstract idea. *Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1339 (Fed. Cir. 2017).

**Step Two:** If directed to an abstract idea, "step two" considers the individual and combined elements of the claim to determine if it "contains an 'inventive concept' sufficient to 'transform' the claimed abstract idea into a patent-eligible application." *Alice*, 573 U.S. at 221 (citation omitted). An "inventive concept" requires more than implementing an abstract idea using "well-understood, routine, [and] conventional activities previously known to the industry," and use of "a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention." *Id.* at 223, 225.

Importantly, the inventive concept "must be evident in the claims" themselves. *Two-Way Media*, 874 F.3d at 1338-39 (affirming ineligibility finding because "the *claim*—as opposed to something purportedly described in the specification—is missing an inventive concept") (emphasis in original). Thus, "details from the specification" cannot supply the inventive concept "if those details are not claimed." *ChargePoint*, 920 F.3d at 769 (noting "§ 101 analysis must always yield to the claim language").

Where, as here, the asserted claims are "substantially similar and linked to the same abstract idea," courts may analyze representative claims. *Content Extraction and Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1349 (Fed. Cir. 2014); *see also Phoenix Licensing,*

9

*L.L.C. v. Consumer Cellular, Inc.*, No. 2:16-cv-152-JRG-RSP, 2017 WL 1065938, at \*8-9 (E.D. Tex. Mar. 8, 2017), *report and recommendation adopted*, 2017 WL 1177988 (E.D. Tex. Mar. 30, 2017) (invalidating 974 claims after analyzing "substantially similar" "representative claims").

## V.      LEGAL ARGUMENT

MPV's patents all fail at step one: they are directed to abstract ideas—*viz*., data processing functions to frame and trim video; crop images; and connect equipment. The patents also fail at step two: the claims lack any inventive concept, using conventional technology such as computers, cameras, and processors to perform the claimed abstract ideas.

### A.      The Automated Videography Patents Claim Ineligible Subject Matter

MPV alleges that "the Accused Products (*e.g.*, Insta360 Connect [video bar])" infringe, in particular, claim 1 of the '771 patent and claim 35 of the '544 patent. ECF No. 1 ¶¶ 40-53, ¶¶ 79-92. These claims generally recite methods for framing a subject by (1) capturing or receiving video with at least one subject in a current shot; (2) analyzing the video images for subject activity or movement; (3) determining "scene change" probability based on subject activity; (4) determining alternate shot options and selecting a next shot; and (5) "re-fram[ing]" the subject and transmitting video to a remove viewer ('771 patent) or "modifying" the video capture "framing" ('554 patent).

#### 1.      Step One: The Patent Claims Are Directed to Abstract Ideas

Simply put, the patents are directed to the idea of framing the subject in an image. What the patents call "corrective reframing" is just the longstanding human activity of focusing video on a moving subject by steps long deemed abstract: receiving, analyzing, and transmitting data.

**The Claims Are Directed to a Longstanding Human Activity—Focusing Video on a Subject**

A process that "is pervasive in human activity" or "can be performed in the human mind" is unpatentable. *Ericsson Inc. v. TCL Commc'n Tech. Holdings Ltd.*, 955 F.3d 1317, 1327 (Fed. Cir. 2020) (citation omitted); *see also Content Extraction*, 776 F.3d at 1347 ("The concept of data

collection, recognition, and storage is undisputedly well-known. Indeed, humans have always performed these functions.").

Focusing video on a moving subject is a longstanding human practice. Consider, for example, a parent focusing (or refocusing) their camcorder on a child playing a sport, performing in a school play, or singing in a musical. Indeed, the patents note that a "musician or a dancer" could record "an informal audition tape" "with a ***conventional human operated*** video camera." Ex. 1 at 43:40-43 (emphasis added). The claimed methods and systems simply purport to "provide a potential better quality video recording without requiring an operator." *Id.* at 43:44-45.

**The Claims Are Directed to Receiving, Analyzing, and Sending Data—All Abstract Ideas**

The asserted claims recite the same basic steps: (1) receive video; (2) analyze video data for subject activity; (3) analyze alternate shot options based on that data; (4) transmit new shot selection instructions (data) to a processor or camera to re-frame the subject; and (5) transmit image data to a remote viewer. While the patents are specific to *video* data, the claims simply recite the routine data processing steps of receiving, analyzing, transmitting, and displaying data. *See Hawk Tech. Sys., LLC v. Castle Retail, LLC*, 60 F.4th 1349, 1356 (Fed. Cir. 2023) (affirming that "method of receiving, displaying, converting, storing, and transmitting digital video" was "directed to the abstract idea of 'storing and displaying video'").

It is long established that claims directed to generic data processing functions—such as "collecting information, analyzing it, and displaying" results of the "collection and analysis"—are "a familiar class of claims 'directed to' a patent-ineligible concept." *Elec. Power Grp.*, 830 F.3d at 1353. The Federal Circuit has "frequently held, claims reciting generalized steps of collecting, analyzing, and presenting information, using nothing other than the conventional operations of generic computer components, are directed to abstract ideas." *Mobile Acuity*, 110 F.4th at 1292

11

(finding claim "directed to the abstract idea of receiving information, associating information with images, comparing the images, and presenting information based on that comparison").

### The Claims Fail to Describe *How* to Achieve the Recited Results

When a claim does not "specify how the computers will accomplish [the recited steps] at a technical level" but "assumes that a computer can be used to perform the requisite tasks," it is directed to an abstract idea. *PerformancePartners LLC v. NextGen Parking LLC*, No. 3:23-CV-0564-S, 2024 WL 1317800, at *8 (N.D. Tex. Mar. 26, 2024).

Here, the asserted patent claims "consist solely of result-orientated, functional language and omit[ted] any specific requirements as to how these steps of information manipulation are performed." *Mobile Acuity*, 110 F.4th at 1292-93. The claims recite analyzing "subject activity" and determining "shot options" for reframing a subject based on motion—but the claims fail to specify *how*. Nor do they claim a particular apparatus that makes an "improvement in computer capabilities or network functionality," instead claiming only a "desirable result or function" produced by generic uses of technology. *TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278, 1293 (Fed Cir. 2020); *see also In re TLI Commc'ns*, 823 F.3d at 611 ("[T]he recited physical components merely provide a generic environment in which to carry out the abstract idea of classifying and storing digital images in an organized manner.").

The technology recited to perform the claimed functions—e.g., "algorithms" and "an image processor and camera"—are classic examples of generic technology that do not avoid a finding of abstractness at step one. *See Alice*, 573 U.S. at 226 (rejecting claims requiring "data processing system" and a "data storage unit" as "purely functional and generic"); *PersonalWeb Techs. LLC v. Google LLC*, 8 F.4th 1310, 1316-17 (Fed. Cir. 2021) (finding "use of an algorithm-generated content-based identifier to perform the claimed data-management functions" directed to

12

an abstract idea); *Intell. Ventures I LLC v. Symantec Corp.,* 838 F.3d 1307, 1313 (Fed. Cir. 2016) (finding that claims for identifying digital data based on "file content identifiers" were abstract).

"A process that start[s] with data, add[s] an algorithm, and end[s] with a new form of data [i]s directed to an abstract idea." *RecogniCorp, LLC v. Nintendo Co.*, 855 F.3d 1322, 1327 (Fed. Cir. 2017); *see also SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1167 (Fed. Cir. 2018) (finding abstract "selecting certain information, analyzing it using mathematical techniques, and reporting or displaying the results of the analysis"); *Monument Peak Ventures LLC v. Toshiba Am. Bus. Sols., Inc.*, No. SA CV 19-02181-DOC-DFM, 2020 WL 6050597, at *4 (C.D. Cal. Aug. 12, 2020) (patent directed to "abstract method for running unspecified algorithms on generic computer").

Under any step one method of analyzing the claims, they are directed to abstract ideas.

### 2.    Step Two: The Patent Claims Lack an Inventive Concept

A patent lacks an inventive concept if nothing in the claims "requires anything other than off-the-shelf, conventional computer, … technology for gathering, sending, and presenting the desired information." *Elec. Power Grp.*, 830 F.3d at 1355; *see also USAA v. PNC Bank N.A.*, 139 F.4th 1332, 1339 (Fed. Cir. 2025) ("Our precedent is clear that computer-mediated implementation of routine or conventional activity is not enough to provide an inventive concept.").

Here, the claims "recite only generic, conventional computer components such as a processor and memory. Nothing in the claims calls for any specific kind of computer architecture, component or data structure." *Secure Cam, LLC v. Tend Insights, Inc.*, 351 F. Supp. 3d 1249, 1256 (N.D. Cal. 2018). Rather, a series of functions—e.g., capturing and analyzing video images and then applying or modifying "video capture settings" is performed using a "data processing system; a camera system" and a "memory system" (Ex. 2, '544 patent, cl. 33); a "videography system" "using one or more cameras" (*id*. cl. 35); an "image processor or camera" (Ex. 1, '771 patent, cl. 1); and a "computer cooperating with … [an] image device and an image processor" (*id.* cl. 19).

13

The specification "emphasize[s]" that the claimed methods can be performed using any "number of different types of systems, using a wide variety of types of supporting hardware and software." Ex. 1 at 43:39-43. Such hardware includes "computer readable media," which "can be any available media that can be accessed by a general purpose or special purpose computer," such as "CD-ROM, DVD, hard disk, or other optical disk storage … that can be used to carry or store software programs which can be accessed by a general purpose or special purpose computer." *Id.* at 43:16-21. The claimed invention does not require specific software either: "Algorithms, program instructions, or software specific or germaine [*sic*] to the [claimed] invention" are used. *Id.* at 43:24-29.

While certain claim steps require determining scene change "probabilities" based on subject activity, "mathematical computation" is not eligible for patent protection. *Monument Peak*, 2020 WL 6050597, at *4 (noting generic algorithms are "nothing more than abstract mathematical computation"); *see also Parker v. Flook*, 437 U.S. 584, 595 (1978) ("If a claim is directed essentially to a method of calculating, using a mathematical formula, even if the solution is for a specific purpose, the claimed method is nonstatutory."); *Digitech Image Tech's v. Elecs. for Imaging*, 758 F. 3d 1344, 1351 (Fed. Cir. 2014) ("employ[ing] mathematical algorithms to manipulate existing information to generate additional information is not patent eligible"). In any case, no specific probability theorem appears in the claims themselves and even the specifications refer to using "approaches and algorithms [] known in the art." Ex. 1 at 27:16-17.

Lastly, nothing in the claim step ordering is inventive. In fact, the claims use the only logical order for reframing a moving subject: receive video data with a subject; analyze the video for subject activity; determine alternate shots; and, if necessary, reframe the subject. To yield an inventive concept in a particular ordered combination requires non-conventional and non-generic

14

arrangement. *See Two-Way Media*, 874 F.3d at 1339. But no such unconventional arrangement is claimed. Because the patents claim well-known processes using conventional technology such as "processors," "memory" and "cameras," they fail at step two.

### B. The '155 Image Adaption Patent Claims Ineligible Subject Matter

#### 1. Step One: The Patent Is Directed to Abstract Ideas

The '155 patent claims "adjusting" an image to create an enhanced or "modified" image. Ex. 3 at Abstract. This is done by (1) capturing an image on one device; (2) adjusting the image to remove "a portion" of the background; (3) sending the adjusted image to a second device; and (4) presenting a "verification image" to see what the adjusted "looks like." *Id.* at cl. 1, 15.

The '155 patent is directed to the abstract idea of manipulating image data, specifically by cropping backgrounds from images. This is a longstanding human activity still performed by using scissors to cut unwanted backgrounds (or persons) from photos. A process that "is pervasive in human activity" is unpatentable. *Ericsson*, 955 F.3d at 1327; *see also IBM v. Zillow Grp., Inc.*, 50 F.4th 1371, 1377 (Fed. Cir. 2024) (affirming step one finding that claim for creating a map "selection area" based on user input, which could be performed using "knife or scissors," was directed to an abstract idea).

#### 2. Step Two: The Patent Claims Lack an Inventive Concept

The abstract idea cropping images is not implemented with generic, conventional technology. The "image capture device" can be any "cellular phone with an embedded camera." Ex. 3 at 1:41-42, 2:50-51. The "wireless display and digital capture device" "may comprise any hand held device capable of wireless communication that can capture and display images" such as "digital cameras" and PDAs. *Id.* at 5:52-56. And the connection between the two devices can be accomplished by "WiFi, Bluetooth or radio." *Id.* at 1:58-60.

15

Further, nothing in the specific ordering of claim steps—capturing an image, adjusting the image, transmitting the adjusted image, and verifying what the adjusted "image looks like"—is unconventional. Indeed, this is the only logical order and thus does not constitute an inventive concept. *See In re TLI Commc'ns*, 823 F.3d at 615 (where "recited physical components behave exactly as expected according to their ordinary use," they do not constitute an inventive concept).

### C. The '418 Mobile Equipment Resource Sharing Patent Claims Ineligible Subject Matter

#### 1. Step One: The Patent Claims Are Directed to Abstract Ideas

The '418 patent is directed to the abstract idea of connecting devices to share functionality. The patent claims are generally directed to using a device with ports to connect with at least two portable devices of any type, from cameras to digital pens, analyzing their respective resources (or functionality), and offering a "combined use" mode for those resources. The concept of "networking [device] capabilities" is an inherently abstract idea. *ChargePoint*, 920 F.3d at 773 ("communicating over a network for device interaction" is directed to the abstract idea).

Further illustrating their abstract nature, the claims recite the data processing steps of receiving data (detecting devices); analyzing data (determining available resources and possible combined use modes); and transmitting data (selecting a use mode). Receiving, analyzing, and transmitting data are all abstract ideas. *See Zillow Grp.*, 50 F.4th at 1377–78 (finding abstract the "collection of information, comprehending the meaning of that collected information, and indication of the results"); *Content Extraction*, 776 F.3d at 1347 (noting humans "have always" performed functions of "data collection, recognition, and storage").

This is *not* "a case of computer/network improvement. ….[T]he claims do not call for any new hardware, whether at the server end, the wireless device end, or the networks that connect them. *GoTV Streaming*, 166 F.4th at 1066. "This case, like many others [the Federal Circuit] ha[s]

16

decided, involves networked computers [and devices], their activities, and their communications with each other." *Id.* at 1064. Because '418 patent claims are directed to "receiving inputs, storing and retrieving, processing, outputting (including displaying), and transmitting," (*id.*) they fail at step one. *See also PersonalWeb*, 8 F.4th at 1317 ("[c]ontrolling access to resources is exactly the sort of process that 'can be performed in the human mind'").

### 2.    Step Two: The Patent Does Not Claim an Inventive Concept

The steps and instructions recited in the '418 patent are implemented with conventional technology. Indeed, the patent itself concedes that the claimed functions could be performed with existing "expensive and bulky" computers. *Id.* at 1:63-6. The patent simply sought to provide the same functionality in a more portable device. It is the "quintessential 'do it on a computer'" claim. *Univ. of Fla. Research Found., Inc. v. Gen. Elec. Co.*, 916 F.3d 1363, 1367 (Fed. Cir. 2019). Or, in this case, a do-it-on-a-*handheld-portable*-computer claim. *Id.* at 1:63-65. Even if the patent offers a less "fussy" way to "synchronize" equipment (*id.* at 1:67), "'merely adding computer functionality to increase the speed or efficiency of [a] process does not confer patent eligibility on an otherwise abstract idea.'" *GoTV Streaming*, 166 F.4th at 1067-68 (citation omitted).

The patent claims no improved computer technology. The titular "receiving station" is a misnomer: although the specification describes features of a "receiving station" such as having ports, the claims require only a generic "processor" and "interface," which are in no way inventive. *See P & RO Sols. Grp., Inc. v. CiM Maint., Inc.*, 273 F. Supp. 3d 699, 710 (E.D. Tex. 2017) (finding claim with "user interface and a computing device in communication with the interface" did "not provide an inventive concept, as it recite[d] generic computer components").

That the claimed interface "is connected" to at least two handheld devices to detect and inventory their "available resources" and then send combine use instructions based on that inventory is likewise not inventive. *See ChargePoint, Inc. v. SemaConnect, Inc.*, No. CV MJG-17-

17

3717, 2018 WL 1471685, at *19 (D. Md. Mar. 23, 2018), *aff'd*, 920 F.3d 759 (Fed. Cir. 2019) ("Introducing networking capabilities to operate an existing device merely serves as a conduit to performing the abstract idea of sending requests, receiving commands, and executing commands over a network."); *Network Apparel Grp., LP v. Airwave Networks Inc.*, 154 F. Supp. 3d 467, 491 (W.D. Tex. 2015), *report and recommendation adopted*, No. 6:15-CV-00134, 2016 WL 4718428 (W.D. Tex. Mar. 30, 2016), *aff'd*, 680 F. App'x 1003 (Fed. Cir. 2017) (finding "network management device" did not supply inventive concept).

Lastly, the ordering of claim steps—detecting handheld devices, determining their "available resources" or functionality, determining possible combined use modes, and then selecting one—is the only logical sequence for performing such steps.

Lacking any inventive concept, the '418 patent also fails at step two.

### D.    The Video Trimming Patents Claim Ineligible Subject Matter

#### 1.    Step One: The Patents Are Directed to Abstract Ideas

The abstract idea claimed in the patents is found in their very titles: "Video Trimming." The patents are directed to the abstract idea of manipulating image data—*viz.*, by trimming video. Trimming images is a longstanding human practice familiar to anyone who received negative film strips before digital cameras existed and then physically cut unwanted images from the film strips. Even the concept of *video* trimming traces back to the early 1920s, when pieces of photographic celluloid film were trimmed and discarded during the editing process in studio "cutting room floors." At the time, physical film strips were cut and spliced using scissors and film cement.[7]

---

[7] *See generally* https://dictionary.cambridge.org/us/dictionary/english/cutting-room; https://www.oed.com/dictionary/cutting-room_n#1334512640.

A process that "is pervasive in human activity," such as trimming captured image data, is unpatentable. *Ericsson*, 955 F.3d at 1327; *see also Art Research & Tech. LLC v. Google, LLC*, No. 24-CV-04898-AMO, 2025 WL 2772608, at \*6 (N.D. Cal. Sept. 29, 2025) (noting "humans make and organize excerpts of media into ordered lists in a variety of contexts, such as how a film editor splices together film reel frames to create a sequence," in finding claims directed to abstract idea).

### 2.    Step Two: The Patents Do Not Claim an Inventive Concept

The abstract ideas claimed in the Video Trimming patents are implemented using generic technology, such as "algorithms and systems, and hardware or software," which "can be selected from such systems, algorithms, components and elements known in the art." Ex. 5 at 3:34-39. The "non-transitory, tangible computer readable storage medium" can be any "physical device or medium" able "to store a computer program having instructions" to practice the claimed method. *Id*. at 3:44-56. And the "digital camera" described (but not claimed) is, preferably, "a portable battery operated device, small enough to be easily handheld." *Id*. at 4:23-26.

Similarly, the "select captured video step" and "initiate trimming operation step" "can be performed using any convenient user controls known in the art." *Id.* at 11:60-63. As for "storing" a "video sequence," this can be done using internal and external flash memory, magnetic or optical memory, or "any form of memory known to those skilled in the art." *Id.* at 5:17-28.

Lastly, the order of claim steps—receiving input, storing and displaying a video sequence, scrolling to and establishing start/end frames, and storing a trimmed sequence—is not inventive. The "claims merely reflect a sequence performed in a logical order dictated by the abstract idea." *USC IP P'ship, L.P. v. Facebook, Inc.*, 576 F. Supp. 3d 446, 457 (W.D. Tex. 2021).

Like the other asserted patents, the Video Trimming patents "flunk the *Alice* step-two requirement, and the claims are invalid for ineligibility." *GoTV Streaming*, 166 F.4th at 1068.

19

## VI.    CONCLUSION

The asserted patents all claim abstract ideas—receiving, analyzing, modifying, sending, and/or displaying data—implemented with "already available [technology], with [its] already available basic functions." *Recentive Analytics, Inc. v. Fox Corp.*, 134 F.4th 1205, 1214 (Fed. Cir. 2025) (alterations in original). As such, the patents are not eligible for protection under § 101. MPV's complaint alleging infringement of ineligible patent claims should be dismissed.

Moreover, dismissal should be with prejudice as "the defects [in the complaint] are incurable." *Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002). On their face, MPV's patents claim ineligible subject matter and no amendment can change this fatal fact.

Dated: March 23, 2026                                  Respectfully submitted,

/s/ *Timothy J. Carroll*
Timothy J. Carroll
Thomas James
**ORRICK, HERRINGTON & SUTCLIFFE LLP**
353 N. Clark Street, Suite 3600
Chicago, Illinois 60654
Telephone: +1 312 924 9800
tim.carroll@orrick.com
tjames@orrick.com

Laura A. Wytsma
**ORRICK, HERRINGTON & SUTCLIFFE LLP**
355 S. Grand Ave., Suite 2700
Los Angeles, CA 90071
Telephone: +1 213 629-2020
lawytsma@orrick.com

*Counsel for Arashi Vision Inc. d/b/a Insta360*

# ADDENDUM

**U.S. Patent No. 8,237,771**
**AUTOMATED VIDEOGRAPHY BASED COMMUNICATIONS**

1. A method for framing one or more subjects captured on video during a video communication event with a remote viewer, the method comprising the steps of:

receiving video of a first subject in an environment from a camera;

determining a current shot framing of the first subject in the video images, with a computer and an associated image processor, relative to a shot selection and subject positioning within the framed shot;

determining at least one subject activity metric for the observed movement of the first subject in the received video, relative to the current framing and level of motion thresholds;

analyzing the subject movement of the first subject, relative to the determined at least one subject activity metric and the current framing, to determine scene change probabilities, relative to the determined subject activity metrics and current shot subject motion thresholds, to determine whether video capture of the at least first subject can continue using modifications to the current subject framing or that framing of the at least first subject can be improved with new subject framing;

determining alternate shot options, including associated shot selection probabilities, based upon associated shot dependent subject motion thresholds and the determined subject activity metrics, if the determined scene change probability for new subject framing is greater than a predetermined value;

selecting a next shot from among the determined alternate shot options based upon the determined shot selection probabilities;

instructing the image processor or camera to re-frame the first subject in accordance with the newly selected next shot, including associated shot framing and any new video capture settings; and

transmitting video images to the remote viewer using the newly instructed shot framing and video capture settings.

22

**U.S. Patent No. 8,274,544**
**AUTOMATED VIDEOGRAPHY SYSTEMS**

35. A method of automated videography, in which video images of at least one subject in a local environment are acquired using an automated videography system, comprising:

capturing video images with the automated videography system according to current video capture settings while using one or more cameras during a videography event consisting of one or more video scenes which involve the at least one subject and the local environment, where the current video capture settings define current subject framing within a selected shot and current camera parameters;

analyzing the captured video images of a current video scene as captured according to the current video capture settings, including determining subject activity using at least one subject activity metric appropriate to the current subject framing;

determining scene change probabilities, relative to the determined at least one subject activity metric and current shot subject motion thresholds, to determine whether video capture of the at least one subject can continue using the current subject framing or that framing of the at least one subject can be improved with new subject framing;

determining alternate shot options, including associated shot selection probabilities, based upon the determined subject activity metrics and associated shot dependent subject motion thresholds, if the determined scene change probability for new subject framing is greater than a predetermined value;

electing a next shot from among the determined alternate shot options based upon the determined shot selection probabilities; and

automatically modifying ongoing video image capture in accordance with the newly selected next shot, including associated new subject framing and any new video capture settings.

23

**U.S. Patent No. 8,842,155**
**PORTABLE VIDEO COMMUNICATION SYSTEM**

15. An apparatus for adapting a displayed image, the apparatus comprising:

a capture device configured to capture a digital video or still image, wherein the digital video or still image is captured based on instructions received from a remote device over a wireless communication network;

a processor operatively coupled to the capture device and configured to adjust an allowed image capture area of the digital video or still image such that at least a portion of a background of the digital video or still image is removed from the digital video or still image;

a transmitter operatively coupled to the processor and configured to transmit the adjusted digital video or still image over the wireless communication network to the remote device; and

a display device configured to present a verification image, wherein the verification image is configured to provide visual verification as to what the transmitted adjusted digital video or still image looks like.

24

**U.S. Patent No. 8,856,418**
**RECEIVING STATION FOR MOBILE HOST EQUIPMENT,**
**AND METHOD OF SHARING RESOURCES USING THE STATION**

17. A non-transitory computer-readable medium having instructions stored thereon, the instructions comprising:

instructions to detect at least two handheld devices, wherein each of the at least two handheld devices is connected to an interface;

instructions to determine an inventory of available resources for each of the at least two handheld devices, wherein the available resources are each a functionality of a handheld device;

instructions to determine a plurality of possible combined use modes based on the inventory of available resources; and

instructions to select a combined use mode from the plurality of possible combined use modes, wherein the combined use mode accesses the available resource of each of the at least two handheld devices, and wherein the combined use mode provides control of the available resources of each of the at least two handheld devices at the same time.

25

**U.S. Patent No. 8,856,418—RECEIVING STATION FOR MOBILE HOST EQUIPMENT, AND METHOD OF SHARING RESOURCES USING THE STATION**

17. A non-transitory computer-readable medium having instructions stored thereon, the instructions comprising:

instructions to detect at least two handheld devices, wherein each of the at least two handheld devices is connected to an interface;

instructions to determine an inventory of available resources for each of the at least two handheld devices, wherein the available resources are each a functionality of a handheld device;

instructions to determine a plurality of possible combined use modes based on the inventory of available resources; and

instructions to select a combined use mode from the plurality of possible combined use modes, wherein the combined use mode accesses the available resource of each of the at least two handheld devices, and wherein the combined use mode provides control of the available resources of each of the at least two handheld devices at the same time.

**U.S. Patent No. 9,848,158**
**DIGITAL CAMERA USER INTERFACE FOR VIDEO TRIMMING**

23. A non-transitory computer readable medium having stored thereon instructions executable by a processor to cause the processor to perform operations comprising:

receiving, from a user interface, at least one of a first input, a second input, a third input, a fourth input, or a confirmation input;

storing a digital video sequence comprising a sequence of frames;

displaying, on a display, a currently selected frame of the digital video sequence;

transitioning to a start frame selection mode in response to the user interface receiving the first input, wherein changing the position of a start frame marker causes the currently selected frame to scroll to a corresponding frame at the position of the start frame marker;

transitioning to an end frame selection mode in response to the user interface receiving the second input, wherein the start frame selection mode is separate from the end frame selection mode, wherein changing the position of an end frame marker causes the currently selected frame to scroll to a corresponding frame at the position of the end frame marker;

scrolling through the digital video sequence in a first temporal direction in response to the user interface receiving the third input;

scrolling through the digital video sequence in a second temporal direction in response to the user interface receiving the fourth input;

establishing a start frame as a currently selected frame in response to the user interface receiving a start frame selection input while the device is in the start frame selection mode, wherein the start frame selection input is separate from the first input;

establishing an end frame as the currently selected frame in response to the user interface receiving an end frame selection input while the device is in the end frame selection mode, wherein the end frame selection input is separate from the second input, and wherein the display is further configured to display an indication of whether the start frame selection mode is selected or the end frame selection mode is selected; and

storing a trimmed digital video sequence comprising frames of the digital video sequence between the start frame and the end frame.

27

**U.S. Patent No. 10,425,612**
**DIGITAL CAMERA USER INTERFACE FOR VIDEO TRIMMING**

**12**. A non-transitory computer readable medium having stored thereon instructions executable by a processor of a processor-based device having a display and a memory accessible to said processor, to cause the processor to perform operations comprising:

during a start frame selection mode, responsive to receipt of a user input changing a position of a start frame marker relative to a timeline via a user interface of the processor-based device, scrolling to and displaying a currently-selected frame of a digital video comprising an original sequence of frames on said display and establishing, in the memory of the processor-based device, the currently-selected frame as a start frame, said digital video being stored in the memory of the processor-based device; and

responsive to one or more subsequent user inputs via the user interface:

facilitating, during an end frame selection mode, user selection of an end frame by permitting a user to scroll to a desired end frame of the sequence of frames by changing a position of an end frame marker relative to the timeline, displaying the end frame, and establishing, in the memory, the user's selection of the end frame as a designated end frame;

during each of selection of the start frame and the designated end frame, presenting on the display an indication of whether the processor-based device is in the start frame selection mode or the end frame selection mode; and

storing, in the memory, a trimmed digital video sequence comprising the start frame and the designated end frame along with other frames of the original sequence of frames.

28

**U.S. Patent No. 10,278,490**
**DIGITAL CAMERA USER INTERFACE FOR VIDEO TRIMMING**

12. A non-transitory computer readable medium having stored thereon instructions executable by a processor of a processor-based device having a display and a memory, to cause the processor to perform operations comprising:

during a start frame selection mode and responsive to receipt of a user input changing a position of a start frame marker relative to a timeline via a user interface of the processor-based device, scrolling to and displaying a currently-selected frame of a digital video comprising an original sequence of frames on the display of said processor-based device, and establishing, in the memory of the processor-based device, the currently-selected frame as a start frame;

during an end frame selection mode and responsive to one or more subsequent user inputs via the user interface, scrolling to and displaying a desired end frame of the sequence of frames by changing a position of an end frame marker relative to the timeline, and establishing, in the memory, the desired end frame as a designated end frame;

during each of scrolling to the start frame and the scrolling to the designated end frame, presenting on the display an indication of whether the processor-based device is in the start frame selection mode or the end frame selection mode; and

storing, in the memory, a trimmed digital video sequence comprising at least the start frame and the designated end frame.

29

**CERTIFICATE OF SERVICE**

I hereby certify that on March 23, 2026, a copy of the foregoing was filed and served on all parties through the Court's CM/ECF filing system.

/s/ Timothy J. Carroll
Timothy J. Carroll

30