IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| MONUMENT PEAK VENTURES, LLC, | § § § § § | |
| Plaintiff, | § § | Case No. 2:25-cv-956-RWS-RSP |
| v. | § § | |
| ARASHI VISION INC. d/b/a INSTA360, | § § | JURY TRIAL |
| Defendant. | § § | |

## AMENDED COMPLAINT AND JURY DEMAND

Plaintiff Monument Peak Ventures, LLC ("MPV") brings this action against

Arashi Vision Inc. d/b/a Insta360, a Chinese Corporation ("Insta360") for

infringement of U.S. Patent Nos. 8,237,771; 8,274,544; 8,842,155; 8,856,418;

9,848,158; 10,425,612; and 10,728,490 and alleges the following:

### THE PARTIES

1.      Monument Peak Ventures, LLC, is a Texas Limited Liability

Company with its principal place of business in Allen, Texas.

2.      On information and belief, Defendant Insta360 is a Chinese

corporation with a principal place of business at 12F, Building T2, Hengyu

Qianhai Financial Center, Nashan District, Shenzhen, P.R. China.

3.     Insta360 manufactures, sells, offers for sale, and/or licenses in the United States, and/or imports into the United States computer software products including Insta360's Connect camera system, X5 camera, Insta360 app, and products, software, and services that provide similar functionality, all of which infringe MPV's patent claims.

4.     Insta360 sells the infringing products for distribution throughout the United States and to customers in this district.

## JURISDICTION AND VENUE

5.     MPV brings this action for patent infringement under the patent laws of the United States, namely 35 U.S.C. §§ 271, 281, and 284-285, among others.  This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

6.     Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(c)(3) which provides that "a defendant not resident in the United States may be sued in any judicial district."

7.     Insta360 is subject to this Court's specific and general personal jurisdiction pursuant to the Texas Long-Arm Statute and consistent with due process, in view of its substantial business in Texas and in this judicial district including: (a) its infringing activities alleged in this complaint by which

Defendant purposefully avails itself of the privilege of conducting business activities in this state and district, and thus, submits itself to the jurisdiction of this Court; and (b) regularly doing or soliciting business, contracting with and engaging in other persistent conduct targeting residents of Texas and this district, or deriving substantial revenue from goods and services offered for sale, sold, and imported to and targeting residents of Texas and this district directly and through or in concert with intermediaries, agents, distributors, importers, customers, subsidiaries and/or consumers.

8. Insta360 transacts business in this judicial district and has committed acts of infringement in this judicial district.

9. Insta360's presence and conduct directed to residents of Texas and into this district is intended to further and advance the development, design, manufacture, importation, distribution, sale, and use (including by inducement) of infringing Insta360 products in Texas and in this district.

10. Insta360 directly or through intermediaries including authorized distributors makes, uses, offers for sale, imports, sells, advertises, or distributes products and services and inducing infringement of MPV's patents in the United States, in Texas, and in this district.

11. Insta360 conducts its business of marketing, distributing, deploying, and selling products and services in Texas and in this district through its agents, representatives, affiliates, related entities, partners, distributors, and retailers.

12. Insta360 continuously and systematically solicits business and contracts with residents of Texas and this district.

13. This Court has personal jurisdiction over Insta360, directly and/or indirectly via the activities of Insta360 and its intermediaries, agents, related entities, affiliates, distributors, importers, customers, subsidiaries, or consumers. Alone and in concert with these entities, Insta360 has committed acts of direct and/or indirect patent infringement within Texas, and elsewhere within the United States, giving rise to this action and/or has established minimum contacts with Texas.

14. The Court's exercise of personal jurisdiction over Insta360 is also appropriate under Federal Rule of Civil Procedure 4(k)(2) because MPV's patent infringement claims arise under federal law; Insta360 is not subject to the jurisdiction of the courts of general jurisdiction of any state; and exercising jurisdiction over Insta360 comports with due process under the U.S. Constitution.

## MONUMENT PEAK VENTURES

15.     MPV owns a portfolio of patents invented by the Eastman Kodak Company.  Since acquiring the Kodak portfolio, MPV has promoted adoption of technologies claimed in Kodak portfolio and has entered into license agreements with over one hundred companies.

16.     MPV asserts that Insta360 infringes, directly and indirectly, certain claims of U.S. Patent Nos. 8,237,771 (the "'771 Patent"); 8,274,544 (the "'544 Patent"); 8,842,155 (the "'155 Patent"); 8,856,418 (the "'418 Patent"); 9,848,158 (the "'158 Patent"); 10,425,612 (the "'612 Patent"); and 10,728,490 (the "'490 Patent") (the "MPV Asserted Patents").

## ASSERTED MPV PATENTS

17.     The MPV Asserted Patents claim inventions born from the ingenuity of the Eastman Kodak Company ("Kodak"), an iconic American imaging technology company that dates back to the late 1800s.



18.    The first model of a Kodak camera was released in 1888.

19.    In 1935 Kodak introduced "Kodachrome," a color reversal stock for movie and slide film.



20.    In 1963 Kodak introduced the Instamatic camera, an easy-to-load point-and-shoot camera.

21.    By 1976 Kodak was responsible for 90% of the photographic film and 85% of the cameras sold in the United States.

22.    At the peak of its domination of the camera industry, Kodak invented the first self-contained digital camera in 1975.



23.     By 1986 Kodak had created the first megapixel sensor that was capable of recording 1,400,000 pixels.

24.     While innovating in the digital imaging space Kodak developed an immense patent portfolio and extensively licensed its technology in the space.

25.     In 2010, Kodak received $838,000,000 in patent licensing revenue.

26.     As part of a reorganization of its business, Kodak sold many of its patents to some of the biggest names in technology including Google, Facebook,

Amazon, Microsoft, Samsung, Adobe Systems, HTC and others for $525,000,000.

27.    While scores of companies have paid to license the Kodak patent portfolio owned by MPV, Insta360 has refused to recognize MPV's patents and license the inventions it has profited from using.

**The '771 claims are patent eligible and are not directed to an abstract idea.**

**A.    The '771 claims are not abstract.**

28.    Application No. 12/411,431, filed on March 26, 2009, issued as the '771 patent, titled "Automated Videography Based Communications," on August 7, 2012.

29.    Claim 1 of the '771 patent does not merely automate the longstanding human activity of a parent using a camcorder. The claim features a specific technological feedback loop that operates "during a video communication event with a remote viewer." *See, E.g.,* '771 Claim 1. This feature imposes a real-time synchronization requirement between the "image processor" and the "camera" that a human cannot replicate. *Id.* These claims do not simply "collect and analyze" data; instead, the claims determine specific "subject activity metrics" and "scene change probabilities" to evaluate whether the "current subject framing" should be modified or replaced with a "new subject framing." *Id.* A parent recording a child does not calculate statistical probability distributions for scene transitions in

milliseconds to optimize a video communications link. The claim provides a technical "how" by specifying a multi-gate decision process: analyzing movement relative to "motion thresholds," determining "alternate shot options" with "associated shot selection probabilities," and selecting the "next shot" based on those probabilities to "instruct" the hardware. *See, E.g.,* '771 Claim 1. This specific machine-directed cinematography method improves the functioning of a live unscripted communication system, moving it beyond the "abstract" collection of data: "unlike cinematography, the present invention anticipates *automated* videography that creates a good viewing experience from video capture of *real time, unscripted events*, and particularly communication events 600 provided by video communication device 300." '771 at 25:55-59 (emphasis added). Ex-1 (Melendez Decl.) at ¶ 25.

30.    Rather than merely claim a "result" using generic technology; the '771 patent claims a specific, limited application of probability-based shot selection within a live transmission pipeline. The feature to "instruct the image processor or camera to re-frame" based on "shot dependent subject motion thresholds" is an example of a particular technical solution to the problem of "robotic" or poorly composed automated video. *See, E.g.,* '771 Claim 1. *See also,*

'771 prior art disclosures at 6:6-7:2. The '771 patent does not merely claim the broad idea of storing and displaying video; instead it features a specialized architecture where a computer evaluates the "risk of subject loss" and "re-framing frequency" (as detailed in the related metrics) to drive physical hardware adjustments. *See, E.g.,* '771 at 7:10-21, 29:1-29 (Table 2-continued), 31:54-63, 32:65-33:8, 33:26-32, 35:55-59, 36:28-33, 36:43-47, 37:5-10, 37:57-65, Claims 4, 5, 8, 31. In this example, the '771 patent teaches very extensive and detailed technical level specificity that informs its claim scope. *Id., See also* '771 Detailed Description of the Invention at 10:41-47:17 inclusive of Figures and Tables. This integration of statistical analysis and hardware control during a live "communication event" is a technological improvement in the field of videography that is fundamentally different from a human simply "focusing" a lens. *See, E.g.,* '771 Claim 1. Ex-1 at ¶ 26.

31.     The '771 patent is directed toward specific approaches to frame subjects in a video feed:

> Briefly, according to one aspect of the present invention A method for framing subjects captured on video includes receiving video of a subject and determining a current shot framing of the subject. A magnitude and a direction of movement of the subject is determined, relative to the current framing and a level of motion threshold. The subject movement is analyzed relative to the determined magnitude, direction of subject movement, and the current framing, to determine that the subject is properly framed by the current shot framing or whether modifications of the current shot framing are required to capture the moving subject, or to determine a new shot selection and new shot framing. The camera reframes the subject if the subject is determined not to be properly framed, in accordance with the determined modifications of the current shot framing, the new shot selection and new shot framing. Video images are provided to a remote viewer.

'771 pat. at 9:31-47; Ex-1 at ¶ 27.

32.   Table 2 describes example system and shot framing metrics.  Ex-1 at ¶ 28.

| TABLE 2 | | |
|---|---|---|
| System and Shot Framing Metrics | | |
| Shot Selection | | Including close-up, medium, medium wide, wide, and intermediate shots |
| Facial Area | ROI | |
| Facial sizing threshold | ΔROI | % variation in facial size allowed within a shot, without triggering a new shot. |
| Action safe area—large central portion of frame, % of frame height and frame width | | See FIGS. 7a and 7b; ~90% frame height, ~90% frame width; provides ~5-7% wide outer band beyond safe zone |
| Camera Movement Speed—The speed the NFOV camera can pan or tilt for a frame rate of 30 fps. | Cs | casual or slow rate: ~0.5-1.0 deg./frame = ~15-30 degrees/sec = ~2-4% frame width/frame time; Quick or fast rate: ~2-4 degrees/frame = ~60-120 degrees/sec. = ~10-20% frame width/frame time |
| Re-Center & Re-Size Time Delay (3) - The subject's ROI is considered out of frame (outside action safe zone) and inter-scene framing will be corrected after this inter-scene reframing time delay has passed. | ΔT3 | For example, ~0-4 seconds delay after a subject moves outside the frame, depending on the current shot, the # of people, and the activity level; time is short to reduce subject loss |
| Shot duration—duration for a current shot | Ts | ~30 seconds minimum, for example; can depend on shot selection |

### TABLE 2-continued

#### System and Shot Framing Metrics

| Scene (shot) change transition time - allotted time for making a transition from current video capture settings (including shot framing) to new settings. | $\Delta T4$ | $\Delta T4 \leqq$ (Cs or Zs time), can depend on current shot framing and the changes needed |
|---|---|---|
| Inactivity Time—When the FOV lacks a subject or significant motion in for a MIN. INACTIVITY TIME, the local environment is considered inactive. | Tn | ~60 seconds |
| Zooming—The maximum amount of digital zoom (or zoom range) that can be applied to the NFOV image. | Zdr | for example, to zoom down to an equivalent to a VGA image ? For 2MP camera, that is ~3x |
| Zoom Rate—The maximum speed in which digital or optical zoom can be applied. | Zs | casual or slow zoom: ~2-4% frame width change/frame time quick zoom: ~10% frame width/frame time |
| Reframing frequency: rate at which reframing (zooming, panning, tilting, cropping, camera switching) is done; for intra-scene or inter-scene reframing, can be tracked separately or combined | $\tau$PTZ | in units of reframing events/minute (or second) or reframing events per (shot or video scene or event) |
| Subject movement factor: a measure of subject movement | $\tau$SUB | a normalized product of subject movement relative to the FOV: for example duration * velocity * movement area/FOV |
| Scene change probability: probability or confidence that capture settings (PTZ, etc . . . ) needs to be changed; intra-scene or inter-scene | $P_{IA}$ or $P_{IE}$ | See FIGS. 11a and 11b |
| Shot selection probability: probability or confidence in determining the next shot or framing | $P_{SF}$ | See FIGS. 11c and 11d |

33.    The patent describes an example of re-framing the image based on decisions made from Tables 2 and 3. Ex-1 at ¶ 29.

> This automated videographic method for changing image framing, whether for intra-scene or inter-scene transitions **635** can be thought of as an algorithm that determines proper framing based on an intelligent decision derived from the metrics in Tables 2 and 3. Different shot framing choices, automatic modes and scene capture choices can be implemented by including or excluding metrics or by giving different priorities to the metrics. The process of changing image framing (PTZ, cropping, shots **428**), whether for intra-scene or inter-scene transitions **635**, can be thought of as a deterministic process enabled by the framing process flowchart **900** depicted in FIG. **9**, or the processes of transition testing **630** and communication event analysis **655** outlined in FIGS. **5A-5C**. In this view, measured levels of user or system activity lead to clear, or intermediate system responses.

36:48-62.

34.     An example flowchart for this re-framing process is shown in Fig. 9.

Ex-1 at ¶ 30.



FIG. 9

35.     Figs. 7A and 7B depict examples reframing for a video

communication device when a single or multiple subjects, respectively, are present.

Ex-1 at ¶ 31.



FIG. 7A



FIG. 7B

36.    As shown in Claim 1 (below), the claims of the '771 patent do not claim an abstract idea (Ex-1 at ¶ 32):

1. A method for framing one or more subjects captured on video during a video communication event with a remote viewer, the method comprising the steps of:

receiving video of a first subject in an environment from a camera;

determining a current shot framing of the first subject in the video images, with a computer and an associated image processor, relative to a shot selection and subject positioning within the framed shot;

determining at least one subject activity metric for the observed movement of the first subject in the received video, relative to the current framing and level of motion thresholds;

analyzing the subject movement of the first subject, relative to the determined at least one subject activity metric and the current framing, to determine scene change probabilities, relative to the determined

subject activity metrics and current shot subject motion thresholds, to determine whether video capture of the at least first subject can continue using modifications to the current subject framing or that framing of the at least first subject can be improved with new subject framing;

determining alternate shot options, including associated shot selection probabilities, based upon associated shot dependent subject motion thresholds and the determined subject activity metrics, if the determined scene change probability for new subject framing is greater than a predetermined value;

selecting a next shot from among the determined alternate shot options based upon the determined shot selection probabilities;

instructing the image processor or camera to re-frame the first subject in accordance with the newly selected next shot, including associated shot framing and any new video capture settings; and

transmitting video images to the remote viewer using the newly instructed shot framing and video capture settings.

37.    The claims of the '771 patent are directed to a specific, automated technological process for videography-based communications. The preamble describes framing subjects "during a video communication event with a remote viewer." '771 at Claim 1. This real-time management of a video telecommunications link is not an abstract concept. The feature for real-time and continuous capture, analysis, and transmission ensures the claim is directed to a functional improvement in communication technology, rather than a disembodied idea. *Id.*; Ex-1 at ¶ 33.

38.     Prior to the invention, multi-source videography was limited to human-mediated switching or static, pre-programmed sequences lacking autonomous adaptability. The technical field lacked a hardware-orchestration architecture capable of the real-time algorithmic coordination of disparate capture units based on dynamic subject metrics. The implementation of autonomous state-management logic to synchronize high bandwidth streams represented an unconventional departure from the art, specifically resolving the latency and synchronization constraints inherent in conventional, manual systems. Independent Claim 8, Independent Claim 19, and Independent Claim 30 of the '771 patent are distinct, and include features corresponding to the automated video communication system of Claim 1 in the practice of methods and video communication systems. The language of the '771 claims include at least the aspects described below which provide inventive, technological solutions to the problems faced by the inventors. None of the elements that comprise the claimed methods and systems are abstract. Ex-1 at ¶ 34.

### B.     The '771 Claims Are Directed to Innovative, Integrated Physical Systems.

39.     Claim 1 makes use of a storage medium ("receiving video"), a "computer and an associated image processor," and a transmitter ("transmitting

video images to the remote viewer"). '771 at Claim 1. The innovative automated videography-based communications method would at least make use of a processor (separately or within the image processor itself) repeatedly, "instructing the image processor or camera to re-frame" and "during the event." *Id.* This requires a physical hardware response—electronically adjusting optical or digital capture parameters to maintain the "video communication event." *Id.* The "remote viewer" feature further necessitates a physical transmitter capable of delivering the modified video stream as it is being produced. *Id.*; *See also* '771 at 16:31-33("The video data streams between sites 362 and 364 can be transmitted over the intervening network 360 in an encrypted form.").  Ex-1 at ¶ 35.

### C. The '771 claimed inventions could not be done manually or in one's head.

40. The temporal constraint of being "during a video communication event" makes manual performance impossible. The system must "analyze subject movement," "determine scene change probabilities," and "select a next shot" within milliseconds to ensure the "remote viewer" sees a seamless video including its transitions. '771 Claim 1. A person cannot mentally calculate complex probability distributions (such as the Bayesian models described in the specification) for every incoming frame while simultaneously managing the

bandwidth and latency requirements of a live stream. *See, E.g.,* '771 at 39:51-55. The '771 patent describes that, "[e]ach video communication device 300 manages the capture, processing, transmission or receipt of video images across a communicative network 360, subject to handshake protocols, privacy protocols, and bandwidth constraints." '771 at 11:27-31. The "during an event" limitation necessitates automated, high-speed execution that is fundamentally non-mental, '771 Claim 1.  Ex-1 at ¶ 36.

> **D.    The '771 claimed inventions provide technological solutions to technological problems.**

41.    The '771 patent solves a specific problem in live telecommunications: a lack of continuous proper image framing during high quality image capture. By determining, in real time, if framing can be "improved with new subject framing" while the event is ongoing, the invention provides a technological solution for "smooth" and precise electronic camera behavior. *E.g.,* '771 Claim 1. It addresses the technical challenge of maintaining high-quality composition in a dynamic environment without the latency that would be introduced by human intervention or non-automated systems. *See, E.g.,* '771 at 25:37-39. The patent teaches that, "[i]n particular, each video communication video communication device 300 is thus intended to provide high quality video that responds seamlessly and gracefully

to changes in the user local environment 415 during video communication events 600," through its claimed methods and systems, *id.*  Ex-1 at ¶ 37.

**E.      The '771 claimed inventions provide unconventional solutions.**

42.      The solution is unconventional because it integrates a statistical predictive decision engine—calculating "shot selection probabilities"—directly into the live transmission pipeline. *E.g.,* '771 Claim 1. Conventional video streams at the time did, "not provide scene transition analysis and shot framing analysis to switch between shots that are appropriate for video capture of one or more users engaged in informal and unscripted activities within a broad, largely unconstrained, environment," and did "not provide a method of shot selection, shot framing, and shot transition management for different amounts of relative subject motion." '771 at 3:15-20, 7:10-21. The '771 patent's use of technically disclosed "subject activity metrics" and "motion thresholds" to statistically predict the best "next shot" during a live session represents a sophisticated, non-routine approach to automated cinematography in real-time, *E.g.,* '771 Claim 1, 9:34-36, 20:28-34. Ex-1 at ¶ 38.

**F.      The '771 claimed inventions provide substantial benefits.**

43.      The technical benefit is a "director-less" high-definition experience

for the "remote viewer." Because the method is performed "during" the video communication event, the remote participant receives a professionally framed feed that adapts to the subject's actions. *E.g.,* '771 Claim 1. This provides a substantial benefit by increasing the "sense of presence" and reducing "viewer fatigue" associated with poorly framed or shaky automated video, effectively improving the utility of the communication hardware, *see, E.g.,* '771 at 33:40-43.  Ex-1 at ¶ 39.

### G.    G. The '771 claimed inventions provide inventive solutions.

44.    One "inventive concept" lies in the closed-loop synchronization of live analysis and live output during an "ongoing video stream." *See, E.g.,* '771 at 23:66-24:17. The specific steps—receiving the live feed, determining probabilities based on live movement, selecting a shot based on those probabilities, and transmitting the newly framed images to a remote viewer—constitutes "significantly more" than an abstract idea. *E.g.,* '771 Claim 1. It is a precise, limited mechanism for camera control that is inextricably tied to the temporal and technical constraints of a live "video communication event," *id.*  Ex-1 at ¶ 40.

### The '544 claims are patent eligible and are not directed to an abstract idea.

### A.    The '544 claims are not abstract.

45.    Application No. 12/408,898, filed on March 23, 2009, issued as the '544 patent, titled "Automated Videography Systems," on September 25, 2012.

46.     The '544 patent features specific structural classification, not result-oriented, functional language.  *See E.g.,* '544 Claim 35. The claim provides a detailed technical roadmap for "automated videography" by quantitatively distinguishing between two distinct categories of movement: "intra-scene transitions" and "inter-scene transitions." *See, E.g.*, '544 at Claim 35, Table 1 at 20:16-27, 23:1-4, 23:5-8 ("*intra-scene* transitions 635 relate to small changes in user activities (below a level of motion threshold) that are consistent with the framing of the present shot 428 or video scene 620."), 23:22-27 ("an *inter-scene* transition 635 relates to changes in the nature or expanse of the communication event, or the user activities therein (for example, relative to a level of-motion threshold) such that a change from one defined video context or shot framing to a subsequent video context or shot framing is required") (emphasis added). This is not a generic analysis of data; it is a specific quantitative technological classification that determines whether the system should "modify the current shot framing" or "continue using the current subject framing." *Id.* The "how," for example, is explicitly defined by the feature to calculate an "inter-scene change probability" and compare it against a "predetermined value" to trigger a hardware state change. *Id.* This probabilistic gate-keeping is a non-routine, unconventional

way to manage "ongoing video image capture" that differs fundamentally from the intuitive, non-mathematical framing performed by a human parent or camera operator, *id.* Ex-1 at ¶ 42.

47.    The '544 patent does not use generic technology to achieve an abstract result. Rather the "automated videography system" is configured to perform a task—dual-layered probabilistic shot selection (scene change probability and contingent shot selection probabilities)—that a general-purpose computer does not perform in its ordinary course. *Id.* The claim does not merely recite receiving and sending video; it features the automated modification of "video capture settings" and "subject framing" based on analyzed "subject activity" metrics. *Id.* This creates a specialized machine-control loop where the claimed method optimizes "video image" quality in real-time. *E.g.,* '544 Claim 35. By specifying the hierarchy of the decision engine (from assessing activity to classifying transition types and implementing shot selection probabilities) the claim provides a specific technological solution to the problem of maintaining cinematic coherence in automated systems. This is an improvement to the functioning of the claimed videography system itself, rather than a pervasive human activity or a generic data processing function. Ex-1 at ¶ 43.

48.    The '544 patent describes detailed examples of how to measure subject activity levels.  Ex-1 at ¶ 44.

> The system and shot framing metrics of Tables 2 and 3 will now be discussed in greater detail. Consider that a single subject has been detected and an initial framing (such as a medium wide shot) determined and initiated. The subject activity levels, relative to current framing, can be monitored using various parameters, including a subject movement factor ($\tau$SUB) that measures the magnitude of subject motion, relative particularly to the range (area), speed (velocity), and frequency of subject motion. For example (see Table 2), the subject movement factor, $\tau$SUB, can be a normalized product of subject movement (for example duration*velocity*movement area (or range)/FOV) relative to the FOV (the WFOV or the current FOV), which thereby directly measures user activity. Other factors, including the acceleration, direction, and position, of the subject movement can also be included in $\tau$SUB. By comparison, the reframing frequency ($\tau$PTZ), which measures the frequency of changes in image framing by PTZ, image cropping, or camera switching, is a measure of the device response to user activity. However, the reframing frequency ($\tau$PTZ) can be a somewhat indirect, or dampened, measure of the magnitude of user activity. For example, if such parameters measure decreasing user motion (settling) relative to the current framing for a sufficient period of time (reframing time delay for settling, $\Delta$T2), then the shot selection can be changed to a tighter shot **428**. As discussed in Table 3, the settling time delay $\Delta$T2 can depend on the current shot selection, with longer periods of stability required to change to a tighter shot. As part of reduc-

'544 pat. at 32:38-65.

49.    An example of image shot captures in response to activities, and other interim or transitional events, is shown in Fig 4D.  *See also,* discussion at '544 pat. at 21:21-66.  Ex-1 at ¶ 45.



FIG. 4D

50.    Table 1 identifies various video capture modes: Ex-1 at ¶ 46.

## TABLE 1

### Video Capture Modes

Video capture modes define a range of settings that describe various operational capture attributes, including: the operation of WFOV cameras, the operation of NFOV cameras, the operation of pan, tilt, and zoom functions, the application of privacy settings, audio settings and processing, uses of video processing, and response (timing, magnitude) to intra-scene and inter-scene transitions.

Manual mode
Preview mode
Default modes - such as WFOV capture only, NFOV capture only, audio only, or initial capture
Defined automatic capture modes - such as user lock & follow or hierarchical (using user classification or identity), or based on event classifications
Behavioral or contextual cue based automatic capture - based on cues such as voice or audio cues, eye gaze, personal relationships, event classifications, gestures, or explicit behaviors
Activity metric based automatic capture - based on metrics of user and system activity, such as range, magnitude, and rate of user activities, number of faces; PTZ frequency, etc . . .
Intermediate or semi-automatic modes - a hybrid of manual and automatic modes or multiple automatic modes
Portable mode (including an outdoors mode)

51.     System shot and framing metrics are provided in Tables 2 and 3 of the '544 patent. Ex-1 at ¶ 47.

52.     As shown in Claim 35 (below), the claims of the '544 patent do not claim an abstract idea.  Ex-1 at ¶ 48.

35. A method of automated videography, in which video images of at least one subject in a local environment are acquired using an automated videography system, comprising:

capturing video images with the automated videography system according to current video capture settings while using one or more cameras during a videography event consisting of one or more video scenes which involve the at least one subject and the local environment, where the current video capture settings define current subject framing within a selected shot and current camera parameters;

analyzing the captured video images of a current video scene as captured according to the current video capture settings, including determining subject activity using at least one subject activity metric appropriate to the current subject framing;

determining scene change probabilities, relative to the determined at least one subject activity metric and current shot subject motion thresholds, to determine whether video capture of the at least one subject can continue using the current subject framing or that framing of the at least one subject can be improved with new subject framing;

determining alternate shot options, including associated shot selection probabilities, based upon the determined subject activity metrics and associated shot dependent subject motion thresholds, if the determined scene change probability for new subject framing is greater than a predetermined value;

electing a next shot from among the determined alternate shot options based upon the determined shot selection probabilities; and

automatically modifying ongoing video image capture in accordance with the newly selected next shot, including associated new subject framing and any new video capture settings.

53.   Claim 35 is directed to a specific, machine-controlled "method of automated videography" performed by an "automated videography system." *E.g.,* '544 at Claim 35. The claim is not directed to an abstract concept such as a parent focusing (or refocusing) their camcorder on a child, but rather to a sophisticated feedback loop that manages "ongoing video image capture." *Id*. The invention requires the system to actively evaluate "scene change probabilities" to determine

if a physical change in "subject framing" is required. *Id.* By tying the process to the real-time modification of "camera parameters," and "video capture settings," the claim defines a technological operation for a specific machine, *e.g.,* '544 at Claim 35. Ex-1 at ¶ 49.

54.    Independent Claim 1, Independent Claim 33, Independent Claim 41, Independent Claim 46, and Independent Claim 47 of the '544 claims are distinct, but share similar features corresponding to the method of automated videography of Claim 35, in the practice of methods and an automated videography system, as claimed. The language of the '544 claims comprise the aspects noted below which provide inventive, technological solutions to the problems faced by the inventors. None of the elements that comprise the claimed methods and systems are abstract. Ex-1 at ¶ 50.

### B.    The '544 Claims Are Directed to Innovative, Integrated Physical Systems.

55.    Claim 35 makes use of a physical architecture involving at least "one or more cameras" and an "automated videography system" operating within a "local environment." *E.g.,* '544 Claim 35. The hardware is not a generic bystander. The hardware must be "configured" to capture images according to "current camera parameters" and then "automatically [modify]" those parameters. *Id.*, *see,*

*E.g.*, '544 at 23:44-62. This physical integration of an image-capture device with a processor-led control engine creates a specialized apparatus capable of adjusting its own mechanical or digital field of view in response to dynamic environmental stimuli, *see, E.g.,* '544 at 23:44-62.  Ex-1 at ¶ 51.

### C.    The '544 claimed inventions could not be done manually or in one's head.

56.    The method features "determining scene change probabilities" relative to "subject activity metrics" and "current shot subject motion thresholds." *E.g.,* '544 at Claim 35. It further features determining "alternate shot options" with "associated shot selection probabilities. While a human operator may rely on artistic intuition, a human cannot mentally calculate statistical probability distributions or apply "shot dependent subject motion thresholds" to high-frame-rate pixel data sufficiently fast for "automatically modifying" an "ongoing video image capture." *Id.* Real-time temporal and mathematical requirements of the claim necessitate an automated electronic process.  Ex-1 at ¶ 52.

### D.    The '544 claimed inventions provide technological solutions to technological problems.

57.    The '544 patent addresses the technical limitation of automated cameras at the time of the invention, that were either too "static" or produced "jerky" transitions. By algorithmically assessing, and re-assessing, whether

framing "can be improved with new subject framing" based on "scene change probabilities" the claim provides a technological solution for "intelligent" real-time automated cinematography. *E.g.,* '544 at Claim 35; Table 1-3. This represents an improvement in the functioning of the videography system itself, enabling it to maintain "ongoing video image capture" quality and professional framing without human intervention, *id.* Ex-1 at ¶ 53.

### E.   The '544 claimed inventions provide unconventional solutions.

58.   The claimed inventions are unconventional at least because they rely on a hierarchical, probability-based triggering system to drive hardware state changes. Instead of simple motion tracking, the claimed methods and systems use a "predetermined value" as a gatekeeper to evaluate "alternate shot options." *E.g.,* '544 at Claim 35. This use of "shot selection probabilities" to automatically and in real-time choose between different framing types (*e.g.,* wide vs. medium shots) based on quantitative "subject activity metrics" was a significant departure from routine or conventional automated camera control at the time of the invention, *Id.* Ex-1 at ¶ 54.

### F.   The '544 claimed inventions provide substantial benefits.

59.   A technical benefit of the '544 patent is the ability to produce high-

quality, dynamically framed video content without the need for a human videographer in real-time video image capture. By "selecting a next shot from among the determined alternate shot options," the system offers a substantial benefit in resource efficiency and video production quality. *E.g.,* '544 at Claim 35. This allows for specialized "videography events," such as solo auditions, to be captured with professional composition that a stationary or basic tracking camera could not achieve. *See, E.g.,* '544 at 43:17-20 ("the video communications system 300 of the present invention can be used for purposes other than personal communications"), 43:27-29 ("As one example, a musician or a dancer can use the automated videography system 300 for recording an informal audition tape during a videography event 600."), 43:29-33 ("While a similar task can be accomplished with a conventional human operated video camera or a web-cam, the scene framing rules and autonomous operation can provide a potential better quality video recording without requiring an operator.").  Ex-1 at ¶ 55.

### G. The '544 claimed inventions provide inventive solutions.

60.    An "inventive solution" in the claims of the '544, for example, is the specific steps of analytical gates that drive the hardware:  (Ex-1 at ¶ 56.)

- Metric-Based Assessment of subject activity (*e.g.,* "subject activity metric"). *E.g.,* '544 Claim 35;

- Probability-Based Comparison of current vs. potential framing (*e.g.,* "current subject framing" and "new subject framing"). *E.g.,* '544 Claim 35;

- Threshold-Triggered Evaluation of "alternate shot options." *E.g.,* '544 Claim 35;

- Automated Hardware Modification of the "ongoing video image capture." *E.g.,* '544 Claim 35;

61. This specific configuration of statistical analysis and predictive algorithmic-based hardware control, extensively detailed technically throughout the '544 patent specification's detailed description of its algorithmic-based hardware control, constitutes "significantly more" than an abstract idea, as it provides a limited and precise technical mechanism for achieving automated real-time cinematography, *see, generally,* '544 at 9:26-47:8 inclusive of Tables and Figures. Ex-1 at ¶ 57.

**The '155 claims are patent eligible and are not directed to an abstract idea.**

    **A.    The '155 claims are not abstract.**

62. Application No. 13/315,773, filed on December 9, 2011, issued as the '155 patent, titled "Portable Video Communication System," on September 23, 2014. The application that issued as the '155 patent was a division of the

application that issued as U.S. Pat. No. 8,174,155.

63.    An example hand-held communication system is shown in Fig. 2:  Ex-1 at ¶ 59.



FIG. 2

64.    As shown in Claim 15 (reproduced below) the claims of the '155 patent do not claim an abstract idea.  Ex-1 at ¶ 60

15. An apparatus for adapting a displayed image, the apparatus comprising:

a capture device configured to capture a digital video or still image, wherein the digital video or still image is captured based on instructions received from a remote device over a wireless communication network;

a processor operatively coupled to the capture device and configured to adjust an allowed image capture area of the digital video or still image such that at least a portion of a background of the digital video or still image is removed from the digital video or still image;

a transmitter operatively coupled to the processor and configured to transmit the adjusted digital video or still image over the wireless communication network to the remote device; and

a display device configured to present a verification image, wherein the verification image is configured to provide visual verification as to what the transmitted adjusted digital video or still image looks like.

65.     Claim 1 of the '155 claims similar limitations in the practice of methods corresponding to the apparatus of Claim 15. The language of the '155 claims comprise the aspects noted below which provide inventive, technological solutions to the problems faced by the inventors. None of the elements that comprise the claimed apparatus are abstract, as the claimed wireless digital video camera communication apparatus requires at least a digital media ("digital video or still image") capture device, an image processor, a wireless transmitter, and a display device that are physical or tangible things known in light of the specification.  Ex-1 at ¶ 61.

66.     The '155 patent does not claim an abstract idea. Instead, the claims of the '155 patent are directed to specific, integrated technological methods and

apparatus that are not abstract ideas or disembodied concepts. Furthermore, the claims are neither directed to nor do they claim a general-purpose computerized system or the use of one. Nor do they claim, using scissors to cut unwanted backgrounds (or persons) from photos. Instead, as described in the '155 patent, the video capture, processing and communication systems that existed at the time of the invention were incapable of performing the methods and lacked the claimed specific configurations of the apparatus claimed in the '155 patent. Ex-1 at ¶ 62.

67.    Based on the disclosures of the '155 patent, this invention is rooted in solving a specific technological problem: the inability of prior art systems to realize high-quality, real-time video interaction in a mobile or resource-constrained environment. At the time of the invention, video communication was often plagued by "bandwidth," "processing power," and "latency" issues that prevented real-time interaction from being truly portable. Traditional systems were typically tethered, bulky, or lacked the integrated architecture necessary to manage the heavy computational load required for simultaneous full video capture, processing, and transmission. These limitations created a "technological gap" where users could not effectively engage in portable video communication with high image quality. Ex-1 at ¶ 63.

68.     To bridge this gap, the '155 patent discloses a specific technological architecture that integrates a capture device, a processor, a transmitter, and a display into a hand-held portable device, while providing for digitally removing portions of a background of the digital media ("a processor operatively coupled to the capture device and configured to adjust an allowed image capture area of the digital video or still image such that at least a portion of a background of the digital video or still image is **removed** from the digital video or still image."). '155 at Claim 15 (emphasis added). The claimed apparatus utilizes a processor to "adjust an allowed image capture area" and "remove" background elements before transmission, thus reducing the amount of data that need be transmitted, constituting a technical improvement in the functioning of the device itself. *Id.* The '155 patent discloses that, "by using a still image to reduce the transmitted data rate of the background, a higher resolution image of the first user 80a face can be transmitted from the first device to the second device without encountering bandwidth limitations." '155 Patent at 9:45-48. The '155 patent explains in citing prior art that previous methods did "not suggest alteration of the background to improve privacy or reduce data transmission rate." Both these limitations of prior art systems are addressed by the '155 claimed invention.  Ex-1 at ¶ 64.

69.    Furthermore, the invention introduces a "verification image" displayed locally, which ensures the user has timely "visual verification" of the modified data that is actually being transmitted over the wireless connection disclosing that, "as shown in FIG.9, a portion of the display may be used in split screen configuration to enable the first user to view verification image composed from the modified image being transmitted to the second user, within a window 148 that forms a portion of the displayed image." '155 Patent at 9:53-57. The '155 claims feature "*a display device* **configured to present a verification image**, *wherein the verification image is configured to provide visual verification as to what the transmitted adjusted digital video or still image looks like,*" '155 Claim 15 (emphasis added).  Ex-1 at ¶ 65.

## B.    The '155 Claims Are Directed to Innovative, Integrated Physical Systems.

70.    The claimed apparatus utilizes a processor to "adjust an allowed image capture area" and "remove" background elements before transmission, thus reducing the amount of data that need be transmitted, constituting a technical improvement in the functioning of the device itself, to beneficially improve over the prior art, "to improve privacy or reduce data transmission rate." '155 at Claim 15 2:32-34.  None of the elements that comprise the claimed methods or apparatus

are abstract, as the claimed wireless digital video camera communication system requires the functional and physical integration of at least a capture device, image processor, wireless transmitter, and display device components providing visual verification of transmitted and processed digital media. These claimed components, together with the disclosed "PARTS LIST" are physical or tangible things known in light of the specification, '155 at 15:22-56, Fig. 2. Ex-1 at ¶ 66.

PARTS LIST

5 Display
10*a*, 10*b*. Image capture device
14*a*, 14*b*. Display
20*a*, 20*b*. User
28. Pointer apparatus
30*a*, 30*b*. Memory
40. Image capture device
45. Microphone
46. Speaker
47. Swivel mount for image capture device
48. Hinge
80*a*, 80*b*. User
60, 62. Communication channel
94. Network
96. Distorted portion
100. Display and digital capture apparatus
110. Two-way communication system
112, 114. Site
120. Image processor
122. Controller
124. Communication control apparatus
126. Prompt detection apparatus
130 Audio components for capture and broadcast
140. Portable communication device
141. Portable communication device with directable capture
142. Controls
144. Background
146. Face
148. Window
150. Nose
164. Measurements
166. Screen cover
168. Controls

PARTS LIST at '155 at 15:22-56.

### C.    The '155 claimed inventions could not be done manually or in one's head.

71.    The claimed apparatus utilizes a processor to "adjust an allowed image capture area" and "remove" background elements before transmission, thus

substantially reducing the amount of data that need be transmitted. '155 at Claim 15; 2:32-34. The invention introduces a "verification image" displayed locally, which ensures the user has timely "visual verification" of the modified data that is actually being transmitted over the wireless connection. Because these operations involve high-speed mathematically complex manipulation of digital video frames and synchronization of wireless data packets for transmission, and the methods cannot be performed by a human manually or in one's head, thereby moving the claims firmly outside the realm of abstract ideas.  Ex-1 at ¶ 67.

### D.     The '155 claimed inventions provide technological solutions to technological problems.

72.     The invention provides a solution to a specific problem in digital media communication: how to allow a remote user of a second device to access and view digital media transmitted by a first local device while ensuring the local user maintains privacy and situational awareness. By allowing the processor to adjust "an allowed image capture area" such that "a portion of a background of the digital video or still image is removed" from digital media to be transmitted, the system provides a technical solution for bandwidth optimization and privacy. '155 at Claim 15. This is a functional improvement in how the device handles "digital video or still image" data, which is a technological challenge unique to the field of

digital video communications. Ex-1 at ¶ 68.

73.    The '155 system manages the remote transmission of video through a specific "verification-image" step. Before the full video stream is sent, the device may generate a verification image that confirms, for example, that a person has been correctly separated from their background. This step acts as an important technical step that ensures the background removal configurations are accurate before the main data is transmitted. By requiring this confirmation, the system creates a specialized technical process for handling video that relies on a structured, multi-step coordination between the devices.  Ex-1 at ¶ 69.

**E.    The '155 claimed inventions provide unconventional solutions.**

74.    The solution recited in the '155 claims is unconventional at least because it creates a closed-loop verification system for remote-controlled capture ("image is captured based on instructions received from a remote device over a wireless communication network"). '155 at Claim 15. Specifically, the display device is "configured to present a verification image... to provide visual verification as to what the transmitted adjusted digital video or still image looks like." '155 at Claim 15. Providing a local user with a real-time preview of a remotely commanded, processor-modified image ensures the user knows exactly

what is being sent over the "wireless communication network," since unconventionally, the image transmitted in the '155 claims is substantively not the image captured, given that, "a portion of a background of the digital video or still image is removed from the digital video or still image," that is actually captured. '155 at Claim 15. This integration of remote control, automated background removal editing, and local verification was not a routine or conventional configuration for communication devices.  Ex-1 at ¶ 70.

### F.    The '155 claimed inventions provide substantial benefits.

75.    A technical benefit of this invention is the mitigation of the privacy and control risks associated with remote-controlled digital cameras, and reduction of transmission bandwidth requirements. By reciting the removal of "at least a portion of a background," the invention offers a tangible benefit in data security and transmission efficiency. '155 at 9:13-10:2; Claim 1 and 15. Furthermore, the "verification image" provides a critical safety benefit, giving the local user the "visual verification" necessary to prevent the accidental transmission of sensitive information that might otherwise be captured by the remote device's instructions, *id.* Ex-1 at ¶ 71.

### G.    The '155 claimed inventions provide inventive solutions.

76.    One example of an "inventive concept" in the '155 claims is the

coordination between the remote-controlled capture and the local processor-led "adjustment" of the capture area. The specific steps—Remote Instruction -> Local Capture -> Automated Modification (Background Removal) -> Local Verification -> Transmission—constitutes a "significantly more" inventive application of communication technology. It moves beyond the abstract idea of "sending a picture" by defining a precise, limited mechanism for managing a digital video stream that integrates local processing power with remote network commands to determine what is in the digital media that is transmitted, rather than simply sending the captured image itself.  Ex-1 at ¶ 72d.

**The '418 claims are patent eligible and are not directed to an abstract idea.**

### A.    The '418 claims are not abstract.

77.    Application No. 12/097,552, filed on November 27, 2002, issued as the '418 patent, titled "Receiving Station for Mobile Host Equipment, and Method of Sharing Resources Using the Station," on October 7, 2014.

78.    In one example, the '418 patent discloses detecting and inventorying the functions equipment and various mixed functional modes of operations of use, *see e.g.*, '418 at 10:60-11:30; Fig. 3 (show below).  Ex-1 at ¶ 74.



FIG. 3

79.     The claims of the '418 patent are not abstract. The '418 patent is directed toward a device that can obtain resources from various devices, pool the resources together, and create various mixed-use modes.  In one example, the '418 patent is directed toward a device (or instructions thereto) that allows selection of resources (such as an audio stream or video stream) from various devices.  Ex-1 at ¶ 75.

80.     Claim 17 of the '418 patent is reproduced below.

17. A non-transitory computer-readable medium having instructions stored thereon, the instructions comprising:

instructions to detect at least two handheld devices, wherein each of the at least two handheld devices is connected to an interface;

instructions to determine an inventory of available resources for each of the at least two handheld devices, wherein the available resources are each a functionality of a handheld device;

instructions to determine a plurality of possible combined use modes based on the inventory of available resources; and

instructions to select a combined use mode from the plurality of possible combined use modes, wherein the combined use mode accesses the available resource of each of the at least two handheld devices, and wherein the combined use mode provides control of the available resources of each of the at least two handheld devices at the same time.

81. Independent Claim 1 and Independent Claim 13 of the '418 claims similar features corresponding to the non-transitory medium of Claim 17 in the practice of methods and a system, respectively. The language of the '418 claims comprise the aspects noted below which provide inventive, technological solutions to the problems faced by the inventors. None of the elements that comprise the claimed methods, systems, and non-transitory medium are abstract. Ex-1 at ¶ 76.

82. The '418 patent does not claim an abstract idea. Instead, the claims of the '418 patent are directed to specific, integrated technological methods, systems, and non-transitory media that are not abstract ideas or disembodied concepts. Furthermore, the claims are neither directed to nor do they claim a general-purpose computerized system or the use of one. The '418 specific discloses, "[t]he object of

the invention is to propose a receiving station and in particular *a receiving station without personal computer (PC-free)*, which allows a user to reap the best of their handheld portable equipment, taken individually or in combination, *e.g.,* '418 at 2:1-5 (emphasis added).  Ex-1 at ¶ 77.

83.    Based on the disclosures of the '418 patent, The claims of the '418 patent are directed to a specific, tangible improvement in the field of distributed computing and mobile hardware integration. Claim 17 recites a "non-transitory computer-readable medium" that executes a precise technical workflow: detecting "at least two handheld devices" connected to an "interface," inventorying their specific "functionality," and establishing a "combined use mode" to control them "at the same time." *E.g.,* '418 at Claim 17. This is not an abstract concept of "sharing," it is a hardware-dependent system for resource pooling and simultaneous synchronization of operations between discrete handheld devices, *id.* Ex-1 at ¶ 78.

### B.    The '418 claims Are Directed to Innovative, Integrated Physical Systems.

84.    Claim 17 is rooted in a physical architecture involving "at least two handheld devices" and a specific "interface."  *E.g.,* '418 at Claim 17. The "available resources" described are not data in the abstract, but are a "functionality

of a handheld device," such as a camera, sensor, or display. *Id.; e.g.,* '418 at 6:5-7. The claim features the integration of these functionalities into a "combined use mode" that "accesses the available resource of each." *E.g.,* '418 at Claim 17. This structural feature for an interface to bridge and control multiple hardware units creates a specialized multi-device machine. The '418 patent discloses that, "[r]esources" means the *components and functions* of acquisition, saving, sharing and reproducing data or multimedia objects." '418 at 2:42-44 (emphasis added). None of the elements that comprise the claimed methods, systems or non-transitory media are abstract, as the claims require the functional and physical integration of components. The '418 patent discloses a variety of examples of physical components including a processor, display screen, loudspeaker, touch-sensitive interface, keyboard, image sensor, microphone, communication interface, Bluetooth or WiFi type interface, transmitter/receiver, *see, e.g.,* 1:20-28, 8:55-59. Ex-1 at ¶ 79.

### C.    The '418 claimed inventions could not be done manually or in one's head.

85.    The instructions "detect" software and hardware connections via an interface and "determine an inventory of available resources" for multiple devices. *E.g.,* '418 at Claim 17. A human cannot mentally "detect" a software and

electronic hardware interface or "inventory" the internal digital functionalities of a handheld device. Providing "control of the available resources... at the same time" requires high-speed digital synchronization and signal processing across an interface to ensure multiple hardware components act in unison. Prior to the invention, the technical field lacked the automated handshaking protocols necessary to achieve this level of simultaneous resource mediation, as conventional systems were limited to static, manually-configured hardware interfaces. This simultaneous electronic control is fundamentally beyond the capacity of human mental or manual coordination.  Ex-1 at ¶ 80.

86.     At the time of the invention, a personal computing device was required to control handheld devices simultaneously, and the '418 invented a system that allowed such control without the involvement of a personal computing device. This transition to a standalone hardware mediated architecture was an unconventional technical shift, as it enabled the receiving station to independently execute the arbitration logic traditionally reserved for a centralized computer's operating system.  Ex-1 at ¶ 81.

**D.     The '418 claimed inventions provide technological solutions to technological problems.**

87.     The '418 patent addresses the technological problem of "resource

isolation" in mobile devices, where the limited screen size, battery, or sensors of a single device constrain its utility. *See, E.g.,* '418 at 2:17-20, 10:65-11.8. By reciting instructions to "determine a plurality of possible combined use modes based on the inventory of available resources" and "to *select a combined use mode from the plurality of possible combined use modes*" the '418 claims provide a technological solution that transforms a collection of independent, constrained devices into a single, high-performance system. *E.g.,* '418 at Claim 17. Furthermore, *controlling the available resources of the combined mixed mode uses of each of the at least two handheld devices at the same time* is another technological improvement.  This is a functional improvement in how "handheld devices" interact with an "interface" to extend their hardware capabilities. Ex-1 at ¶ 82.

### E. The '418 claimed inventions provide unconventional solutions.

88.    The solution recited in Claim 17 is unconventional at least because it moves beyond standard networking (where devices merely swap data) to a "combined use mode" providing "control... at the same time."  *E.g.,* '418 at Claim 17. Conventional systems treat handhelds as autonomous units; the '418 patent introduces a centralized control logic that "accesses the available resource of each"

device to create a new, aggregate functionality "without having to resort to a personal computer." *Id., See also, E.g.,* '418 at 1:14-17. This resource-aware synchronization via an interface was not a routine or conventional way to manage multiple mobile host equipment at the time of the invention.  Ex-1 at ¶ 83.

### F.      The '418 claimed inventions provide substantial benefits.

89.     The technical benefit of the invention is the creation of a "virtual" super-device through the pooling of "available resources." Through the claimed, "select a combined use mode," the system offers substantial benefits in processing power, display area, or sensor range that a single "handheld device" could not achieve alone. *E.g.,* '418 at Claim 17. The '418 specific discloses, "[t]he object of the invention is to propose a receiving station and in particular *a receiving station without personal computer (PC-free)*, which **allows a user to reap the best of their handheld portable equipment, taken individually or in combination**. *E.g.,* '418 at 2:1-5 (emphasis added). This provides a tangible increase in the efficiency and utility of mobile hardware without requiring a physical upgrade to the individual devices themselves.  Ex-1 at ¶ 85.

### G.      The '418 claimed inventions provide inventive solutions.

90.     An "inventive concept" in Claim 17 is the specific coordination between the "inventory of available resources" and the "combined use mode." This

specific sequence of Detecting Hardware -> Inventorying Functionality -> Determining Combined Modes -> Simultaneous Control, constitutes "significantly more" than an abstract idea. It provides a limited and specific mechanism for multi-device resource management that is inextricably tied to the hardware interface, combinable capabilities, and the real-time functional synchronization of the operation of the combined connected handheld devices.  Ex-1 at ¶ 86.

**The '158 claims are patent eligible and are not directed to an abstract idea.**

### A.     The '158 claims are not abstract.

91.     Application No. 13/100,461, filed on May 4, 2011, issued as the '158 patent, titled "Digital Camera User Interface for Video Trimming," on December 19, 2017.

92.     The claims of the '158 patent feature a specific architecture that improves the functionality of the device itself. While the result of the claims of the '158 patent may be a trimmed or cut video, the claims are directed to specific multi-input state-machine architectures that governs how a processor transitions between separate operational modes. *E.g.*, '158 Claim 23. Unlike a physical film editor using scissors, '158 Claim 23, for example, requires a processor to map a specific hierarchy of "first, second, third, and fourth inputs" to discrete internal states. *E.g.*, '158 Claim 23.  The requirement that a "start frame selection input is

separate from the first input" is not a pervasive human activity; it is a technical interlocking of software logic designed to prevent input ambiguity on a digital device. *E.g.*, '158 Claim 23. Physical film cannot replicate the transitioning logic or the automated scrolling to a corresponding frame based on the specific electronic position of a marker. *E.g.*, '158 Claim 23. The '158 claims a "non-abstract" improvement to a user interface functionality. Ex-1 at ¶ 87.

93. The claims of the '158 patent are not abstract. Ex-1 at ¶ 88. Claim 23 is reproduced below.

> 23. A non-transitory computer readable medium having stored thereon instructions executable by a processor to cause the processor to perform operations comprising:
>
> receiving, from a user interface, at least one of a first input, a second input, a third input, a fourth input, or a confirmation input;
>
> storing a digital video sequence comprising a sequence of frames;
>
> displaying, on a display, a currently selected frame of the digital video sequence;
>
> transitioning to a start frame selection mode in response to the user interface receiving the first input, wherein changing the position of a start frame marker causes the currently selected frame to scroll to a corresponding frame at the position of the start frame marker;
>
> transitioning to an end frame selection mode in response to the user interface receiving the second input, wherein the start frame selection mode is separate from the end frame selection mode, wherein changing the position of an end frame marker causes the currently selected frame

to scroll to a corresponding frame at the position of the end frame marker;

scrolling through the digital video sequence in a first temporal direction in response to the user interface receiving the third input;

scrolling through the digital video sequence in a second temporal direction in response to the user interface receiving the fourth input;

establishing a start frame as a currently selected frame in response to the user interface receiving a start frame selection input while the device is in the start frame selection mode, wherein the start frame selection input is separate from the first input;

establishing an end frame as the currently selected frame in response to the user interface receiving an end frame selection input while the device is in the end frame selection mode, wherein the end frame selection input is separate from the second input, and wherein the display is further configured to display an indication of whether the start frame selection mode is selected or the end frame selection mode is selected; and

storing a trimmed digital video sequence comprising frames of the digital video sequence between the start frame and the end frame.

94. The claims are not directed to an abstract concept of manipulating image data. Instead, they are directed to a specific user interface (UI) state-machine architecture. For example, Claim 23 requires a specific sequence of operations: the processor transitions between "separate" modes (Start Frame vs. End Frame) in response to a precise set of discrete inputs (first, second, third, fourth). *E.g.*, '158 Claim 23. By defining the functional relationship between these inputs and the

resulting "temporal direction" of scrolling, the claim provides a "concrete and tangible" improvement to the device's internal logic and user feedback loop, *id.* Ex-1 at ¶ 89.

95.     Fig. 4 of the '158 patent illustrates a flowchart showing steps for providing a digital camera user interface for video trimming operations.  Ex-1 at ¶ 90; *see also, e.g.,* 13:9-14:5.



FIG. 4

96.     Independent Claim 1, Independent Claim 22, and Independent Claim 23, of the '158 patent are distinct, but share similar limitations corresponding to the non-transitory medium of the processor, in the claimed devices and methods. The language of the '158 claims comprise the aspects noted below which provide

inventive, technological solutions to the problems faced by the inventors. None of the elements that comprise the claimed methods and systems are abstract.  Ex-1 at ¶ 91.

### B. The '158 Claims Are Directed to Innovative, Integrated Physical Systems.

97. Unlike a purely software-based logic claim, '158 Claim 23, for example, integrates multiple physical components: a "user interface," a "processor," a "display," and a "non-transitory computer readable medium." *E.g.*, '158 Claim 23. An innovation lies in how the processor is instructed to map the "first input" through the "fourth input" to specific physical changes on the "display." *Id.* The requirement that the display provides a specific "indication of whether the start frame selection mode is selected or the end frame selection mode is selected" links the internal digital state to the physical output in a way that is integrated into the device's hardware functionality, *id.*  Ex-1 at ¶ 92.

### C. The '158 claimed inventions could not be done manually or in one's head.

98. The '158 patent claims involve the high-speed manipulation of a "digital video sequence comprising a sequence of frames." *E.g.*, '158 Claim 23. A human cannot manually "scroll" through a digital file in a "first temporal direction" and "second temporal direction" simultaneously with the precision

required to "establish a start frame." *Id.* This process requires the electronic synchronization of a "start frame marker" with a "currently selected frame," an operation that depends entirely on the high-speed processing capabilities of a digital system, *id.* Ex-1 at ¶ 93.

### D. The '158 claimed inventions provide technological solutions to technological problems.

99. A "problem" to be the inherent difficulty of performing precision video editing on a constrained device (like a digital camera) with limited input options. The '158 patent provides a technological solution by creating a multi-mode architecture where the "start frame selection mode is separate from the end frame selection mode." *E.g.*, '158 Claim 23. By isolating these modes and requiring a "start frame selection input [that] is separate from the first input," the invention solves the technical problem of input ambiguity and accidental edits common in simpler touch or button interfaces. *id.* Ex-1 at ¶ 94.

100. The '158 patent also features a user interface improvement that is not found in the prior art. In one example, the user interface of the '158 patent operates in real time to provide immediate feedback on the start and end frames. This interface is more precise than those of the prior art, and allows selection of the correct start and stop frame, facilitating video editing. Ex-1 at ¶ 95.

101. A problem to be the inherent difficulty of performing precision video editing on a constrained device (like a digital camera) with limited input options. The '158 patent provides a technological solution by creating a multi-mode architecture where the "start frame selection mode is separate from the end frame selection mode." *E.g.*, '158 Claim 23. By isolating these modes and requiring a "start frame selection input [that] is separate from the first input," the invention solves the technical problem of input ambiguity and accidental edits common in simpler touch or button interfaces, *id.* Ex-1 at ¶ 96.

**E.  The '158 claimed inventions provide unconventional solutions.**

102. The specific "four-input," and "confirmation" mapping was an unconventional departure from standard linear video editing. The '158 claims are unique at least because they feature that the "selection input is separate from the [mode] input." *E.g.*, '158 Claim 23. This ensures that a user cannot accidentally finalize a trim while simply trying to enter the mode or scroll. This specific "interlocked" input requirement represents an unconventional UI safety and precision mechanism that is not a "well-understood, routine, or conventional" activity in generic computing. Ex-1 at ¶ 97.

### F.      The '158 claimed inventions provide substantial benefits.

103.   A primary technical benefit is precision and reduced latency in mobile video processing. By configuring the processor to "scroll to a corresponding frame at the position of the start frame marker" immediately upon "changing the position," the system provides real-time visual feedback. The "indication" on the display ensures the user never loses track of their state within the "separate" modes, significantly reducing user error and the computational waste of re-trimming incorrectly cut video sequences.  Ex-1 at ¶ 98.

### G.      The '158 claimed inventions provide inventive solutions.

104.   An inventive concept is also found in the ordered combination of elements. Even if "trimming video" were abstract, the specific combination of transitioning to separate modes based on discrete inputs, directional scrolling based on distinct third and fourth inputs, and the requirement that the selection input be *separate* from the mode-entry input, creates a "significantly more" inventive application. Unlike the '612 and '490 patent claims, the '158 patent claims require this separation. The '158 claimed architecture forces the processor to manage state and memory in a way that is unique to this UI, moving the claim far beyond a "do it on a computer" version of traditional film cutting.  Ex-1 at ¶ 99.

**The '612 claims are patent eligible and are not directed to an abstract idea.**

### A.    The '612 claims are not abstract.

105.    Application No. 15/827,370, filed on November 30, 2017, issued as the '612 patent, titled "Digital Camera User Interface for Video Trimming," on September 24, 2019.  The application that issued as the '612 patent is a continuation of the application that issued as the '158 patent.

106.    '612 Claim 12 describes a non-destructive digital process where a processor must "establish, in the memory...the currently-selected frame as a start frame" responsive to a "marker relative to a timeline." *E.g.*, '612 Claim 12. This is a specific technological solution to the problem of metadata management in a digital environment. Furthermore, the claim requires the device to provide a specific visual "indication" of the internal mode state "during each of selection." *Id.* This is a specific technical protocol for ensuring data integrity between the user interface and the device's physical memory.   Ex-1 at ¶ 101.

107.    One example of a user interface screen is shown in Fig. 5 of the '612 patent.  Ex-1 at ¶ 102; *see also, e.g.,* 12:62-15:16.



FIG. 5A   FIG. 5B   FIG. 5C

FIG. 5D   FIG. 5E   FIG. 5F

108. The claims of the '612 patent do not claim an abstract idea. Ex-1 at ¶

103. Claim 12 reproduced below.

12. A non-transitory computer readable medium having stored thereon instructions executable by a processor of a processor-based device having a display and a memory accessible to said processor, to cause the processor to perform operations comprising:

during a start frame selection mode, responsive to receipt of a user input changing a position of a start frame marker relative to a timeline via a user interface of the processor-based device, scrolling to and displaying a currently-selected frame of a digital video comprising an original sequence of frames on said display and establishing, in the memory of

the processor-based device, the currently-selected frame as a start frame, said digital video being stored in the memory of the processor-based device; and

responsive to one or more subsequent user inputs via the user interface:

facilitating, during an end frame selection mode, user selection of an end frame by permitting a user to scroll to a desired end frame of the sequence of frames by changing a position of an end frame marker relative to the timeline, displaying the end frame, and establishing, in the memory, the user's selection of the end frame as a designated end frame;

during each of selection of the start frame and the designated end frame, presenting on the display an indication of whether the processor-based device is in the start frame selection mode or the end frame selection mode; and

storing, in the memory, a trimmed digital video sequence comprising the start frame and the designated end frame along with other frames of the original sequence of frames.

109.   The '612 claims are directed to a specific improvement in the functional operation of a processor-based device. Claim 12 does not merely describe manipulating image data; it describes a specific technological process of "establishing, in the memory... the currently-selected frame as a start frame" while simultaneously "scrolling to and displaying" that frame based on a "marker relative to a timeline." '612 Claim 12. This creates a specific, technical link between user interaction, visual display, and memory allocation that is not an abstract concept but a concrete UI architecture, *e.g.*, '612 Claim 12. Ex-1 at ¶ 104.

110.   Independent Claim 1 and Independent Claim 12 of the '612 patent are distinct, but share similar limitations corresponding to the non-transitory medium of the processor, in the claimed methods. The language of the '612 claims comprise the aspects noted below which provide inventive, technological solutions to the problems faced by the inventors. None of the elements that comprise the claimed methods and systems are abstract.  Ex-1 at ¶ 105.

**B.     The '612 Claims Are Directed to Innovative, Integrated Physical Systems.**

111.   Claim 12 of the '612 patent is rooted in a physical architecture comprising a "processor," "display," and "memory accessible to said processor." An innovation is the specific way the processor is instructed to bridge these components. *Id.* It translates a physical user input on a "user interface" into a "scrolling" action on the "display" and a simultaneous write-operation to the "memory." *Id.* This integration of hardware components to manage a "digital video comprising an original sequence of frames" constitutes an integrated physical system-level improvement.  Ex-1 at ¶ 106.

**C.     The '612 claimed inventions could not be done manually or in one's head.**

112.   A human cannot "establish, in the memory" a specific frame address within a digital sequence. *E.g.*, '612 Claim 12. The claim requires the real-time

manipulation of a "digital video" and the rendering of a "timeline." *Id.* The precision required to select a single "designated end frame" from a sequence and store it as a new "trimmed digital video sequence" in a memory buffer is a task uniquely suited to, and only possible within, a processor-based environment, *id.* Ex-1 at ¶ 107.

### The '612 claimed inventions provide technological solutions to technological problems.

113.    A technological problem is "mode-uncertainty" and navigation latency in digital video editing on portable devices. The '612 provides a solution by "presenting on the display an indication of whether the processor-based device is in the start frame selection mode or the end frame selection mode" specifically "during each of selection." *E.g.*, '612 Claim 12. This ensures the technical integrity of the data being written to the memory, preventing the processor from overwriting the wrong frame pointers due to user mode confusion, *id.* Ex-1 at ¶ 108.

### D.    The '612 claimed inventions provide unconventional solutions.

114.    While general video editing existed, the '612 provides an unconventional solution by tying the "position of a start frame marker relative to a timeline" directly to the "establishing, in the memory" of the selection. *E.g.*, '612 Claim 12. Unlike conventional systems that might wait for a "save" command, this

claim describes a persistent state where the processor is actively monitoring the "marker" and updating the "memory" in a specific "mode-based" environment. *Id.* This specific interaction between a timeline-marker and immediate memory establishment was not a routine or conventional way of handling mobile video metadata at the time.   Ex-1 at ¶ 109.

### E.      The '612 claimed inventions provide substantial benefits.

115.   A primary technical benefit is computational efficiency and data accuracy. By providing the "indication" of the mode during the selection process, the system reduces the likelihood of "edit-undo-redo" cycles. *E.g.*, '612 Claim 12. This approach reduces the processing overhead required to generate a "trimmed digital video sequence," *id.*  Ex-1 at ¶ 110.

### F.      The '612 claimed inventions provide inventive solutions.

116.   An inventive concept of the '612 claims lie in the specific timing and feedback loop mandated by the claim. *E.g.*, '612 Claim 12. The feature that the device displays the mode indication "during each of selection of the start frame and the designated end frame" ensures that the "memory establishment" operation is synchronized with user intent. *E.g.*, '612 Claim 12. This interlocking of a visual timeline, a marker, a mode-state, and a memory-write operation provides a "significantly more" inventive application of video editing than generic software.

*Id.* Compared to the '158, the '612 is defined by the "timeline" and the "establishing, in the memory of the processor-based device." *E.g.*, '612 Claim 12. While the '158 was focused on specific inputs (1st, 2nd, etc.), the '612 concerns the relationship between the visual marker and the digital storage.  Ex-1 at ¶ 111.

**The '490 claims are patent eligible and are not directed to an abstract idea.**

### A.      The '490 claims are not abstract.

117.    Application No. 16/543,259, filed on August 16, 2019, issued as the '490 patent, titled "Digital Camera User Interface for Video Trimming," on July 28, 2020.  The application that issued as the '490 patent is a continuation of the application that issued as the '612 patent.

118.    While the '158 concerns specific user input components and the '612 focuses more on the moment of selection, the '490 is specifically focused on the dynamic state awareness "during" the act of scrolling. The '490 claims dictate exactly how a display must behave while a processor is handling the high-bandwidth task of video scrolling.  Ex-1 at ¶ 113.

119.    Specific technical features in Claim 12 of the '490 patent of provides a mode indication "during each of scrolling." *E.g.* '490 Claim 12. The physical film editor of the prior art did not have a system that dynamically provided state-aware feedback while the film was in motion. The '490 claims are directed to a

specific improvement in the graphical user interface's responsiveness. *E.g.* '490 Claim 12. By tying the visual "indication" of the mode to the active "scrolling" event, the claim addresses a uniquely digital problem: "mode confusion" during high-speed navigation of digital data. *Id.* This specific "feedback-during-motion" loop is a technical user interface feature that enhances the precision of the device, moving it far beyond the "abstract idea" of trimming and into the realm of patent-eligible technological improvements to human-computer interaction.  Ex-1 at ¶ 114.

120.   The claims of the '490 patent do not claim an abstract idea.  Ex-1 at ¶ 115.  Claim 12 is reproduced below.

12. A non-transitory computer readable medium having stored thereon instructions executable by a processor of a processor-based device having a display and a memory, to cause the processor to perform operations comprising:

during a start frame selection mode and responsive to receipt of a user input changing a position of a start frame marker relative to a timeline via a user interface of the processor-based device, scrolling to and displaying a currently-selected frame of a digital video comprising an original sequence of frames on the display of said processor-based device, and establishing, in the memory of the processor-based device, the currently-selected frame as a start frame;

during an end frame selection mode and responsive to one or more subsequent user inputs via the user interface, scrolling to and displaying a desired end frame of the sequence of frames by changing a position of

an end frame marker relative to the timeline, and establishing, in the memory, the desired end frame as a designated end frame;

during each of scrolling to the start frame and the scrolling to the designated end frame, presenting on the display an indication of whether the processor-based device is in the start frame selection mode or the end frame selection mode; and

storing, in the memory, a trimmed digital video sequence comprising at least the start frame and the designated end frame.

121.   The '490 claims are not directed to the abstract concept of cutting a video. Instead, they are directed to a specific graphical user interface (GUI) control architecture that synchronizes real-time visual feedback with memory-state changes. *See e.g.,* '490 Claim 12. Claim 12 requires the processor to perform a specific sequence of "scrolling," "displaying," and "establishing" frames in memory based on a "marker relative to a timeline." *E.g.,* '490 Claim 12. This is a concrete technical protocol for data manipulation and display management, not a method of organizing human activity, *e.g.,* '490 Claim 12.  Ex-1 at ¶ 116.

122.   Independent Claim 1 and Independent Claim 12 of the '490 patent are distinct, but share similar limitations corresponding to the non-transitory medium of the processor, in the claimed methods. The language of the '490 claims comprise the aspects noted below which provide inventive, technological solutions to the problems faced by the inventors. None of the elements that comprise the

claimed methods and systems are abstract.  Ex-1 at ¶ 117.

### B.     The '490 Claims Are Directed to Innovative, Integrated Physical Systems.

123.   The '490 Claim 12 describes an integrated system where a "processor-based device" utilizes a "display" and "memory" in a non-conventional way. The innovation is the physical integration of the UI state with the display output: the device must present an "indication of whether the processor-based device is in the start frame selection mode or the end frame selection mode" specifically "during each of scrolling." *E.g.*, '490 Claim 12. This requirement forces a hardware-level coordination between the input interface, the frame-rendering engine, and the visual overlay of the mode indicator.  Ex-1 at ¶ 118.

### C.     The '490 claimed inventions could not be done manually or in one's head.

124.   The '490 patent claims are rooted in the high-speed processing of a "digital video comprising an original sequence of frames." A human cannot "scroll" through a digital file or "establish, in the memory" a specific frame address in real-time. *E.g.*, '490 Claim 12. This process requires a processor to translate physical movement (user input) into a precise temporal location on a digital timeline and render those frames instantly - a task that exists solely in the

digital/electronic domain. Ex-1 at ¶ 119.

**D. The '490 claimed inventions provide technological solutions to technological problems.**

125. A technological problem is "mode confusion" during the active navigation of digital media on small-screen devices. The '490 patent provides a technological solution by coupling the "indication" of the mode to the active scrolling event. By providing state-feedback while the user is "scrolling to the start frame" or "scrolling to the designated end frame," the system solves the technical problem of a user losing track of their editing context during high-speed frame navigation, *e.g.*, '490 Claim 12. Ex-1 at ¶ 120.

**E. The '490 claimed inventions provide unconventional solutions.**

126. Conventional video editing software to display a static "Edit Mode" icon or require the user to select a frame before confirming the mode. The '490 is unconventional at least because it mandates that the visual mode indication is tied to the action of scrolling. *E.g.*, '490 Claim 12. This specific "feedback-during-motion" loop ensures that the user is continuously informed of the device's state during the search for a frame, rather than just at the end of the search. *Id.* This is an unconventional improvement to the efficiency of the human-computer interface. Ex-1 at ¶ 121.

**F.      The '490 claimed inventions provide substantial benefits.**

127.   A technical benefit is enhanced precision and reduced cognitive load for the user. By having the display confirm the mode "during each of scrolling," the processor ensures that the user does not accidentally "establish, in the memory" an end-frame while they intended to set a start-frame. *E.g.,* '490 Claim 12. This would lead to fewer user errors, less "undo" processing, and a more streamlined workflow for generating the "trimmed digital video sequence,". *e.g.,* '490 Claim 12.  Ex-1 at ¶ 122.

**G.      The '490 claimed inventions provide inventive solutions.**

128.   One example of an inventive concept is the dynamic synchronization of the mode indicator with the scrolling operation. *E.g.,* '490 Claim 12. Even if one were to argue that "video trimming" is a known concept, the specific combination of a responsive scrolling based on a "marker relative to a timeline," concurrent "establishing, in the memory" of the selected frame, and displaying the mode indicator specifically "during... scrolling" provides a significantly more inventive implementation. *Id.* The '490 transforms a generic video player into a state-aware editing tool where the UI feedback is an integral part of the data-selection process, *id.*  Ex-1 at ¶ 123.

129.   A distinguishing feature of the '490 claims is thus the "during each of

scrolling," limitation. While the '612 patent claims focused on the mode during "selection," the '490 forces the device to maintain that visual feedback while the user is moving through the video, creating a technological improvement to the UI's responsiveness and transparency, *e.g.,* '490 Claim 12.   Ex-1 at ¶ 124.

## THE CLAIMS OF THE '771, '544, '155, '418, '158, '612, AND '490 PATENTS DO NOT UNREASONABLY PREEMPT THEIR FIELDS.

130.   The '771 patent, '544 patent, '155 patent, '418 patent, '158 patent, '612 patent, and '490 patent claim highly specific combinations of features that can be readily avoided while still practicing any alleged abstract idea.  Ex-1 at ¶ 125.

131.   The claims of the '771 and '544 patents do not claim the alleged abstract idea of framing the subject in an image, or any other abstract idea.  Rather, the '771 claims provide a technical "how" by specifying a multi-gate decision process: analyzing movement relative to "motion thresholds," determining "alternate shot options" with "associated shot selection probabilities," and selecting the "next shot" based on those probabilities to "instruct" the hardware. The '544 claims recite a specific quantitative technological classification that determines whether the system should "modify the current shot framing" or "continue using the current subject framing." *Id.* The "how," for example, is explicitly defined by the feature to calculate an "inter-scene change probability"

and compare it against a "predetermined value" to trigger a hardware state change. *Id.* This probabilistic gate-keeping is a non-routine, unconventional way to manage "ongoing video image capture" that differs fundamentally from the intuitive, non-mathematical framing performed by a human parent or camera operator. *Id.* This specific architecture does not preempt this field. Ex-1 at ¶ 126.

132. The claims of the '155 patent do not claim the alleged abstract idea of manipulating image data, specifically by cropping backgrounds from images, or any other abstract idea. Rather, the '155 claims relate a specific technological architecture that integrates a capture device, a processor, a transmitter, and a display into a hand-held portable device, while providing for digitally removing portions of a background of the digital media. This specific architecture does not preempt this field. Ex-1 at ¶ 127.

133. The claims of the '418 patent do not claim the alleged abstract idea of connecting devices to share functionality. Rather, the '418 patent is directed toward a specific device that can obtain resources from various devices, pool the resources together, and create various mixed-use modes using in a very specific way. Ex-1 at ¶ 128.

134. The claims of the '158, '612, and '490 patents do not claim the

alleged abstract idea of manipulating image data—*viz.*, by trimming video, or any other abstract idea. Rather they feature a specific architecture that improves the functionality of the device itself. Ex-1 at ¶ 129.

## THE ACCUSED PRODUCTS

135.   The term "Accused Products" include Insta360 products that feature automated videography, forming video summaries including a particular person, remotely controlled videography, or UI for video trimming including Insta360's Connect camera system, X5 camera, Insta360 app, AntiGravity A1 drone, Insta360 Link Cameras (including Insta360 Link 2, Link 2C, Link 2 Pro, and Link 2C Pro cameras), Insta360 X5 Air cameras with InstaFrame, and Insta360 X4 Air cameras with InstaFrame, and products, software, and services that provide similar functionality.

## NOTICE OF MPV ASSERTED PATENTS

136.   MPV contacted Insta360 on July 23, 2025, regarding potential licensing of the MPV patent portfolio, including the Asserted Patents. Insta360 received notice that it infringed U.S. Patent Nos. 8,237,771; 8,274,544; 8,842,155; 8,856,418; 9,848,158; 10,425,612; and 10,728,490 no later than September 16, 2025.

## COUNT 1
### INFRINGEMENT OF U.S. PATENT NO. 8,237,771

137. MPV realleges and incorporates by reference the allegations set forth above as if restated verbatim here.

138. MPV is the owner, by assignment, of U.S. Patent No. 8,237,771. The '771 Patent was issued by the United States Patent and Trademark Office on August 7, 2012.

139. As the owner of the '771 Patent, MPV holds all substantial rights in and under the '771 Patent, including the right to grant licenses, exclude others, and to enforce, sue, and recover damages for past and future infringement.

140. The '771 Patent is valid, enforceable and was duly issued in full compliance with Title 35 of the United States Code.

141. Insta360 has infringed and continues to infringe at least claim 1 of the '771 Patent by making, using (including its own testing), offering to sell, selling, distributing, licensing and/or importing the Accused Products and all other similar products that infringe the '771 Patent without authorization or license as exemplified below.

142. The Accused Products are designed, manufactured, and intended to be used in normal operation to practice the '771 Patent and feature structures and/or

functionality as shown below.

143.   Insta360 has used and tested the Accused Products in the United States.

144.   Insta360 thus has infringed and continues to infringe the '771 Patent.

145.   Insta360's activities have been and continue without authority of license under the '771 Patent.

146.   Insta360's users, customers, distributors, agents and/or other third parties (collectively, "third-party infringers") have infringed and continue to infringe the asserted claims under 35 U.S.C. § 271(a) by using, making, selling, offering for sale, licensing, and/or importing the Accused Products according to their normal and intended use.

147.   The Accused Products satisfy each and every element of each asserted claim of the '771 Patent either literally or under the doctrine of equivalents.

148.   Claim 1 recites an embodiment of the claimed subject matter:

A method for framing one or more subjects captured on video during a video communication event with a remote viewer, the method comprising the steps of:

receiving video of a first subject in an environment from a camera;

determining a current shot framing of the first subject in the video images, a computer and an associated image processor, relative to a shot selection and subject positioning within the framed shot;

determining at least one subject activity metric for the observed movement of the first subject in the received video, relative to the current framing and level of motion thresholds;

analyzing the subject movement of the first subject, relative to the determined at least one subject activity metric and the current framing, to determine scene change probabilities, relative to the determined subject activity metrics and current shot subject motion thresholds, to determine whether video capture of the at least first subject can continue using modifications to the current subject framing or that framing of the at least first subject can be improved with new subject framing;

determining alternate shot options, including associated shot selection probabilities, based upon associated shot dependent subject motion thresholds and the determined subject activity metrics, if the

determined scene change probability for new subject framing is greater than a predetermined value;

selecting a next shot from among the determined alternate shot options based upon the determined shot selection probabilities;

instructing the image processor or camera to re-frame the first subject in accordance with the newly selected next shot, including associated shot framing and any new video capture settings;

and transmitting video images to the remote viewer using the newly Instructed shot framing and video capture settings.

149.   For example, the Accused Products (*e.g.,* Insta360 Connect) utilizes a method for framing one or more subjects captured on video during a video communication event (*e.g.,* video conference) with a remote viewer.



https://www.insta360.com/blog/enterprise/insta360-connect-new-ai-video-bar.html



https://www.insta360.com/blog/enterprise/insta360-connect-new-ai-video-bar.html

150.   As another example, the AntiGravity A1 drone, when operating in

DeepTrack mode, frames one or more subjects (*e.g.,* tracked objects) captured on video during a video communication event with a remote viewer (*e.g.,* AntiGravity goggles). DeepTrack also receives a video of a first subject in an environment from the AntiGravity drone and determines a current shot framing of the first subject in the video images, with the AntiGravity CPU and associated ISP (*e.g.,* a computer and an associated image processor), relative to a shot selection and subject's positioning within the framed shot.



https://www.antigravity.tech/us/drone/antigravity-a1/buy?





https://www.antigravity.tech/us/drone/antigravity-a1?from=nav

151.   As another example, Insta360 Link 2, Link 2C, Link 2 Pro, and Link 2C Pro cameras ("Link Cameras") frame one or more subjects captured on video during a video communication event with a remote viewer.  Link Cameras also receive a video of a first subject in an environment from the camera and determining a current shot framing of the first subject in the video images with a

computer and image processor, relative to a shot selection and subject's positioning within the framed shot.



https://store.insta360.com/consumer

https://store.insta360.com/product/link-2?c=3401&from=consumer

https://store.insta360.com/product/link-2-pro?c=6524&from=consumer

152.   The Accused Products perform a method that receives video of a first subject in an environment from a camera and determines a current shot framing of the first subject in the video images, with a computer and an associated image processor, relative to a shot selection and subject positioning within the framed

shot.

153.   For example, the Accused Products (*e.g.*, Insta360 Connect) frames one or more subjects captured on video by receiving a video of a first subject in a conference room from the camera and determining a current shot framing of the first subject in the video images with a computer and image processor, relative to a shot selection and subject's positioning within the framed shot.



https://www.youtube.com/watch?v=LT5SLClnnjg

154.   The Accused Products perform a method that determines at least one subject activity metric for the observed movement of the first subject in the received video, relative to the current framing and level of motion thresholds.

155.   For example, the Accused Products determine a subject activity metric

(*e.g.,* minimum movement that triggers camera switching) for the first subject in the received video, relative to the current framing and level of motion thresholds.





https://store.insta360.com/product/connect?c=3519&from=nav

156.    As another example, DeepTrack determines a subject activity metric (*e.g.*, direction/speed of tracked person, etc.) for the first subject in the received video, relative to the current framing and level of motion thresholds.



https://www.antigravity.tech/us/drone/antigravity-a1?from=nav

157.    As another example, Link Cameras determine at least one subject activity metric for the observed movement of the first subject (*e.g.*, subject's face position, direction and speed of movement) in the received video, relative to the current framing and level of motion thresholds (*e.g.*, 3-meter maximum tracking distance, user-configurable tracking area boundaries, and 60-second no-detection

timeout).  Link Cameras determine scene change probabilities by analyzing subject movement relative to the current framing and thresholds. When the tracked subject's movement exceeds the tracking area boundaries, or when additional subjects enter the frame (triggering a switch from single-person to group composition), or when a subject enters a Pause-Track Area, the system determines whether the current framing can continue or requires modification.



https://store.insta360.com/product/link-2?c=3401&from=consumer

https://onlinemanual.insta360.com/link2/en-us/operating-tutorials/track/ai-track



https://store.insta360.com/product/link-2?c=3401&from=consumer

158.   The Accused Products perform a method that analyzes the subject movement of the first subject, relative to the determined at least one subject activity metric and the current framing, to determine scene change probabilities, relative to the determined subject activity metrics and current shot subject motion thresholds, to determine whether video capture of the at least first subject can continue using modifications to the current subject framing or that framing of the at least first subject can be improved with new subject framing.

159.   For example, the Accused Products analyze the subject movement, relative to the subject activity metric and the current framing, and determines scene change probabilities (*e.g.,* the likelihood that a new shot is needed) through its algorithms (*e.g.,* relative to the subject activity and shot motion thresholds) to determine whether the current framing of the shot is sufficient, or whether the other camera view is more suitable.



https://store.insta360.com/product/connect?c=3519&from=nav



https://store.insta360.com/product/connect?c=3519&from=nav





https://www.insta360.com/blog/enterprise/insta360-connect-video-bar-available-now.html

160.   As another example, DeepTrack analyzes the subject movement, relative to the subject activity metric and the current framing, and determines scene change probabilities (*e.g.*, the likelihood that a new shot is needed) through its algorithms (*e.g.*, relative to the subject activity and shot motion thresholds) to determine whether the current framing of the shot is sufficient, or whether a different camera view is more suitable.



https://www.youtube.com/watch?v=JNd96j9VA24&t=636s

161.    As another example, Link Cameras analyze subject movement, relative to the subject activity metric and the current framing, and determines scene change probabilities (*e.g.*, the likelihood that a new shot is needed) through its algorithms (*e.g.*, relative to the subject activity and shot motion thresholds) to determine whether the current framing of the shot is sufficient, or whether the other camera view is more suitable.




Link Cameras change the fields of view depending on the number of people in frame and changes to fit everyone properly within the frame.

https://store.insta360.com/product/link-2?c=3401&from=consumer

162.   The Accused Products perform a method determines alternate shot options, including associated shot selection probabilities, based upon associated shot dependent subject motion thresholds and the determined subject activity metrics, if the determined scene change probability for new subject framing is greater than a predetermined value and selecting a next shot from among the determined alternate shot options based upon the determined shot selection probabilities.

163.   For example, the Accused Products determines alternate shots with the other camera view (e.g., using the gimbal camera), based upon the motion thresholds in the new shot and subject activity metrics in the new shot (e.g., how

much of the face is visible). If the metrics show this new camera view is more suitable, the Insta360 Connect selects the new camera view as the main image of that subject.

 

*See above* the example for the view before and after switching subjects.

# Advanced Imaging, Unmatched Visuals

Connect boasts first-class imaging hardware with a **dual 4K camera**. The setup consists of a **wide-angle camera with a 1/1.3" CMOS sensor** and a **telephoto gimbal camera**. The two work seamlessly together to capture 4K group views and individual close-ups for unparalleled meeting visuals. With a wider angle, 48MP telephoto lens, and integrated gimbal, participants across the room are seen as much as those at the front.

https://www.insta360.com/blog/enterprise/insta360-connect-video-bar-available-

now.html



Powered by proprietary AI algorithms, **8K Gallery Mode** ensures every participant gets an individual window in **industry-leading 8K resolution**, with a maximum of eight windows at a time. Even if a person accidentally moves out of frame in Gallery Mode, Connect will locate them within three seconds and display them on screen.

https://www.insta360.com/blog/enterprise/insta360-connect-video-bar-available-now.html

164.   As another example, DeepTrack determines alternate shots with the other camera view, including associated shot selection probabilities, based upon the motion thresholds in the new shot and subject activity metrics in the new shot (e.g., if a person moves away from the drone). Insta360 selects the new camera view as the main image of that subject based upon the determined shot selection probabilities. If the metrics show this new camera view is more suitable, it selects the new camera view as the main image of that subject.  DeepTrack also reframes the subject in accordance with the new view (*e.g.,* ensuring the person is in the

middle of the frame) (*i.e.*, associated shot framing and any new video capture settings).



https://www.youtube.com/watch?v=JNd96j9VA24&t=636s

165.    As another example, Link Cameras determine alternate shots (*e.g.*, panning, tilting, zooming, etc.), based upon the motion thresholds in the new shot and subject activity metrics in the new shot. If the metrics show this new camera view is more suitable, the Insta360 Link 2 and Link 2C selects the new camera view as the main image of that subject.



Old Camera View          Transition and Tracking          New Camera View

https://store.insta360.com/product/link-2?c=3401&from=consumer

166. The Accused Products perform a method that instructs the image processor or camera to re-frame the first subject in accordance with the newly selected next shot, including associated shot framing and any new video capture settings.

167. For example, the Accused Products instruct the camera to reframe the subject in accordance with the new view (*e.g.,* by tilting the gimbal or switching between cameras) (*e.g.,* associated shot framing and any new video capture settings).





https://www.insta360.com/blog/enterprise/insta360-connect-video-bar-available-

now.html

*See above* the example of the view before and after switching.





https://store.insta360.com/product/connect?c=3519&from=nav

168.   As another example, Link Cameras instruct the camera to reframe the subject in accordance with the new view (*i.e.*, associated shot framing and any new video capture settings).





https://store.insta360.com/product/link-2?c=3401&from=consumer

169.   The Accused Products perform a method that transmits video images to the remote viewer using the newly instructed shot framing and video capture settings.



**1. What video conferencing platforms does Insta360 Connect support?** —

Insta360 Connect works seamlessly with all major platforms, including Zoom, Microsoft Teams, Google Meet, and more. Just plug it into your laptop via USB and you're ready to go.



Group Framing    8K Gallery Mode

A natural, inclusive view that presents the whole team together, for a realistic experience for those joining a meeting remotely.



Group Framing    8K Gallery Mode

Ensure every participant gets their own individual window, no matter who's speaking.

https://store.insta360.com/product/connect?c=3519&from=nav

170. For example, Insta360 transmits video images to the AntiGravity goggles using the newly instructed shot framing and video capture settings.



https://www.antigravity.tech/us/goggles/antigravity-vision?from=nav

171.    As another example, Link Cameras transmits video images to the web conference using the newly instructed shot framing and video capture settings.



https://store.insta360.com/product/link-2?c=3401&from=consumer

172.   Insta360 was provided with notice of the '771 Patent and how it infringes at least claim 1 no later than September 16, 2025.  Insta360's knowledge of the '771 Patent, which covers operating the Accused Products used as intended such that all limitations of the asserted claims of the '771 Patent are met, extends to its knowledge that the third-party infringers' use of the Accused Products that directly infringes the '771 Patent, or, at the very least, rendered Insta360 willfully blind to such infringement.

173.   Insta360 has, since at least as early as September 16, 2025, known or

been willfully blind to the fact that the third-party infringers' use, manufacture, sale, offer for sale, and/or importation of the Accused Products directly infringes the '771 Patent.

174.   With knowledge of or willful blindness to the fact that the third-party infringers' use, manufacture, sale, distribution, offer for sale, license and/or importation of the Accused Products in their intended manner such that all limitations of the asserted claims of the '771 Patent are met directly infringes the '771 Patent, Insta360 has actively encouraged the third-party infringers to directly infringe the '771 Patent by making, using, testing, selling, offering for sale, importing and/or licensing the accused products by, for example: marketing the Accused Products with automated videography capabilities to the third-party infringers; supporting and managing the third-party infringers' use of the automated videography functionalities; and providing technical assistance to the third-party infringers during their continued use of the Accused Products such as by, for example, publishing instructional information on the Insta360 websites (including, without limitation, the knowledge center, instructional videos and on the Insta360 branded website) directing and encouraging third-party infringers how to make and use the automated videography features of the Accused Products.

175.    Insta360 induces the third-party infringers to infringe the asserted claims of the '771 Patent by directing or encouraging them to operate, make, sell, offer to sell, license, and/or import the Accused Products which satisfy all limitations of the asserted claims of the '771 Patent.  Insta360 advertises and promotes the automated videography features of the Accused Products and encourages the third-party infringers to operate them in an infringing manner. Insta360 provides technical assistance directing and instructing third parties how to operate the Accused Products by, for example, publishing instructional materials, videos, knowledge center resources, how-to guides, troubleshooting, manuals, and user guides.

176.    In response, the third-party infringers acquire, make, sell, offer to sell, license, operate, and/or import the Accused Products in an infringing manner.

177.    Insta360 specifically intends to induce, and did induce, the third-party infringers to infringe the asserted claims of the '771 Patent, and Insta360 knew of or was willfully blind to such infringement.

178.    Insta360 advises, encourages, and/or aids the third-party infringers to directly infringe by using the automated videography features of the Accused Products.  With knowledge or willful blindness to the fact that the third-party

infringers' use of the Accused Products in their intended manner such that all limitations of asserted claims of the '771 Patent are met directly infringes the '771 Patent, Insta360 actively encourages and induces the third-party infringers to directly infringe the '771 Patent by making, using, testing, selling, offering for sale, importing and/or licensing said Accused Products, and by, for example: marketing the Accused Products to the third-party infringers; supporting and managing the third-party infringers' use of the Accused Products; and providing technical assistance to the third-party infringers during their continued use of the Accused Products by, for example, publishing the following instructional information on its website directing third-party infringers how to make and use the Accused Products to infringe the asserted claims of the '771 Patent.

179.   Insta360 has induced and continues to induce infringement of the '771 Patent under 35 U.S.C. § 271(b).

180.   Insta360 has sold, provided and/or licensed to the third-party infringers and continues to sell, provide and/or license the Accused Products that are especially made and adapted—and specifically intended by Insta360—to be used as components and material parts of the inventions covered by the '771 Patent.  For example, the Accused Products include automated videography

features identified above which the third-party infringers used in a manner such that all limitations of the asserted claims are met, and without which the third-party infringers would have been unable to use and avail themselves of the intended functionality of the accused products.

181. Insta360 also knew that the accused products are operated in a manner that practices each asserted claim of the '771 Patent.

182. The automated videography features are specially made and adapted to infringe the asserted claims of the '771 Patent.

183. The automated videography features are not a staple article or commodity of commerce, and, because the functionality was designed to work with the Accused Products solely in a manner that is covered by the '771 Patent, it has no substantial non-infringing use. At least by MPV's notice of Insta360's infringement, based upon the foregoing facts, Insta360 knew of or was willfully blind to the fact that such automated videography functionality was especially made and adapted for—and was in fact used in—the accused products in a manner that is covered by the '771 Patent.

184. Insta360 has contributorily infringed and continues to contributorily infringe the asserted claims of the '771 Patent under 35 U.S.C. § 271(c).

185.    Insta360's continuing acts of infringement of the '771 Patent since notice are carried out with knowledge of the '771 Patent and how the Accused Products infringe them.  Rather than take a license to the '771 Patent, Insta360's ongoing infringing conduct reflects a business decision to "efficiently infringe" the asserted claims and in doing so constitutes willful infringement under the standard of *Halo Elecs., Inc. v. Pulse Elecs., Inc*., 136 S. Ct. 1923 (2016).

186.    Insta360's acts of direct and indirect infringement have caused and continue to cause damage to MPV for which MPV is entitled to recover damages sustained as a result of Insta360's infringing acts in an amount subject to proof at trial, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court, pursuant to 35 U.S.C. § 284.

## COUNT 2
## INFRINGEMENT OF U.S. PATENT NO. 8,274,544

187.    MPV realleges and incorporates by reference the allegations set forth above as if restated verbatim here.

188.    MPV is the owner, by assignment, of U.S. Patent No. 8,274,544.  The '544 Patent was issued by the United States Patent and Trademark Office on September 25, 2012.

189.    As the owner of the '544 Patent, MPV holds all substantial rights in and under the '544 Patent, including the right to grant licenses, exclude others, and to enforce, sue, and recover damages for past and future infringement.

190.    The '544 Patent is valid, enforceable and was duly issued in full compliance with Title 35 of the United States Code.

191.    Insta360 has infringed and continues to infringe at least claim 35 of the '544 Patent by making, using (including its own testing), offering to sell, selling, distributing, licensing and/or importing the Accused Products and all other similar products that infringe the '544 Patent without authorization or license as exemplified below.

192.    The Accused Products are designed, manufactured, and intended to be used in normal operation to practice the '544 Patent and feature structures and/or functionality as shown below.

193.    Insta360 has used and tested the Accused Products in the United States.

194.    Insta360 has infringed and continues to infringe the '544 Patent.

195.    Insta360's activities were without authority of license under the '544 Patent.

196.    Insta360's users, customers, distributors, agents and/or other third parties (collectively, "third-party infringers") have infringed and continue to infringe the asserted claims under 35 U.S.C. § 271(a) by using, making, selling, offering for sale, licensing, and/or importing the Accused Products according to their normal and intended use.

197.    The Accused Products satisfy each and every element of each asserted claim of the '544 Patent either literally or under the doctrine of equivalents.

198.    Claim 35 recites an embodiment of the claimed subject matter:

A method of automated videography, in which video images of at least one subject in a local environment are acquired using an automated videography system, comprising:

capturing video images with the automated videography system according to current video capture settings while using one or more cameras during a videography event consisting of one or more video scenes which involve the at least one subject and the local environment, where the current video capture settings define current subject framing within a selected shot and current

camera parameters;

analyzing the captured video images of a current video scene as captured according to the current video capture settings, including determining subject activity using at least one subject activity metric appropriate to the current subject framing;

determining scene change probabilities, relative to the determined at least one subject activity metric and current shot subject motion thresholds, to determine whether video capture of the at least one subject can continue using the current subject framing or that framing of the at least one subject can be improved with new subject framing;

determining alternate shot options, including associated shot selection probabilities, based upon the determined subject activity metrics and associated shot dependent subject motion thresholds, if the determined scene change probability for new subject framing is greater than a predetermined value;

electing a next shot from among the determined alternate shot options based upon the determined shot selection probabilities;

and

automatically modifying ongoing video image capture in accordance with the newly selected next shot, including associated new subject framing and any new video capture settings.

199.    The Accused Products perform a method of automated videography, in which video images of at least one subject in a local environment are acquired using an automated videography system.

200.    For example, the Accused Products performs automated capturing of video for web conferencing, in which video images of a person (*e.g.,* "one subject in a local environment") are acquired using its dual 4K cameras (*e.g.,* "automated videography system").



https://www.insta360.com/blog/enterprise/insta360-connect-new-ai-video-bar.html



https://www.youtube.com/watch?v=LT5SLClnnjg





https://store.insta360.com/product/connect?c=3519&from=nav

> **1. What video conferencing platforms does Insta360 Connect support?** —
>
> Insta360 Connect works seamlessly with all major platforms, including Zoom, Microsoft Teams, Google Meet, and more. Just plug it into your laptop via USB and you're ready to go.

https://store.insta360.com/product/connect?c=3519&from=nav

201. As another example, The AntiGravity A1 drone, when operating in DeepTrack mode, performs automated capturing of video in which the drone follows a selected subject, acquiring video images of that subject (i.e., "one subject in a local environment") using its dual cameras (*e.g.*, "automated videography system").



https://www.antigravity.tech/us/drone/antigravity-a1?from=nav

https://www.antigravity.tech/us/drone/antigravity-a1/buy?

202.   As another example, Insta360 Link 2, Link 2C, Link 2 Pro, and Link 2C Pro cameras ("Link Cameras") perform a method of automated capturing of video for web conferencing, in which video images of a person (*e.g.*, "one subject in a local environment") are acquired using its cameras (*e.g.*, "automated videography system").



https://store.insta360.com/consumer

https://store.insta360.com/product/link-2?c=3401&from=consumer

https://store.insta360.com/product/link-2-pro?c=6524&from=consumer

203.   As yet another example, InstaFrame on the Insta360 X5 and X4 Air cameras performs automated capturing of video, in which video images of a person (*e.g.*, "one subject in a local environment") are acquired (*e.g.*, "automated videography system").

 

https://store.insta360.com/consumer

https://www.insta360.com/blog/news/insta360-2025-winter-update.html

204. The Accused Products perform a method that captures video images with the automated videography system according to current video capture settings while using one or more cameras during a videography event consisting of one or more video scenes which involve the at least one subject and the local environment, where the current video capture settings define current subject framing within a selected shot and current camera parameters.

205. For example, the Accused Products capture video images according to current configured settings such as frame positioning (*e.g.,* "capture settings") while using the cameras during a meeting consisting of a person moving (*e.g.,* "at

least one subject and the local environment"), where the current configured settings define a current field of view (*e.g.,* "current subject framing") within a selected scene (*e.g.,* "shot") and current camera settings.



https://store.insta360.com/product/connect?c=3519&from=nav

*See above* the subject view focused on a single subject and the full camera view in the lower righthand corner and *see below* the same views with a moving subject.



https://store.insta360.com/product/connect?c=3519&from=nav

206.   As another example, DeepTrack captures video images according to current video capture settings while using the cameras during a videography event consisting of a person moving in a scene (*e.g.*, "at least one subject and the local environment"), where the current configured settings define a current field of view (*e.g.*, "current subject framing") within a selected scene (*e.g.*, "shot") and current camera parameters.



https://www.antigravity.tech/us/drone/antigravity-a1?from=nav

207.  As another example, Link Cameras capture video images according to current configured settings such as frame positioning (*e.g.*, "capture settings") while using the cameras during a meeting consisting a person moving (*e.g.*, "at least one subject and the local environment"), where the current configured settings define a current field of view (*e.g.*, "current subject framing") within a selected scene (*e.g.*, "shot") and current camera settings.




https://store.insta360.com/product/link-2?c=3401&from=consumer

208.   In still another example, InstaFrame mode captures video images according to current configured video capture settings while capturing a person in a scene (*e.g.*, "at least one subject and the local environment"), where the current configured settings define a current field of view (*e.g.*, "current subject framing") within a selected scene (*e.g.*, "shot") and current camera settings.



https://www.insta360.com/blog/insta360-x5-tips-shooting-best-settings-guide.html

https://onlinemanual.insta360.com/x5/en-us/operating_tutorials/capture-preview/shooting-mode/instaframe

209.  The Accused Products perform a method that analyzes the captured video images of a current video scene as captured according to the current video capture settings, including determining subject activity using at least one subject activity metric appropriate to the current subject framing.

210.  For example, the Accused Products analyze the captured video images of a current scene as captured according to the current recording settings, including determining the movement of a person's face (*e.g.,* subject activity) and direction of motion (*e.g.,* "at least one subject activity metric") appropriate to the current field of view.



https://store.insta360.com/product/connect?c=3519&from=nav

*See above* the subject-tracked view alongside the full camera view.



https://store.insta360.com/product/connect?c=3519&from=nav

https://store.insta360.com/product/connect?c=3519&from=nav

211.    DeepTrack analyzes the captured video images of a current scene as captured according to the current video capture settings, including determining the movement of a tracked person (*e.g.*, "subject activity) and at least one subject activity metric (*e.g.*, direction/speed of tracked person, etc.) appropriate to the current field of view.



https://www.antigravity.tech/us/drone/antigravity-a1?from=nav

212.    Link Cameras analyze the captured video images of a current scene as captured according to the current recording settings, including determining the movement of a person (*e.g.*, "subject activity") and direction of motion (*e.g.*, "at least one subject activity metric") appropriate to the current field of view (e.g.,

whether the user is moving into a presentation area).



https://store.insta360.com/product/link-2?c=3401&from=consumer

https://onlinemanual.insta360.com/link2/en-us/operating-tutorials/track/ai-track

213.    InstaFrame mode analyzes the captured video images of a current scene as captured according to the current recording settings, including determining the movement of a person (*e.g.*, subject activity) and direction of motion (*e.g.*, "at least one subject activity metric") appropriate to the current field of view.



https://www.insta360.com/support/supportdetail/video/RrCdqzwSgN

https://www.insta360.com/blog/insta360-x5-tips-shooting-best-settings-guide.html

214.   The Accused Products perform a method that determines scene change probabilities, relative to the determined at least one subject activity metric and current shot subject motion thresholds, to determine whether video capture of the at least one subject can continue using the current subject framing or that framing of the at least one subject can be improved with new subject framing.

215.   For example, the Accused Products determine field of view change probabilities (*e.g.,* "scene change probabilities"), relative to the determined amount

of motion and the amount of one's face visible in the shot (*e.g.,* "current shot subject motion thresholds"), to determine whether video recording of the person can be improved with a new field of view (*e.g.,* "new subject framing").



*See above* a shot before switching (poor face visibility) and *see below* a shot after switching featuring everyone's faces in frame.



https://store.insta360.com/product/connect?c=3519&from=nav

216.    As another example, DeepTrack determines field of view change probabilities (*e.g.*, "scene change probabilities") and continuously evaluates whether the drone can maintain its current position and framing relative to the moving subject. When the subject changes direction or speed beyond the system's tracking parameters, DeepTrack determines that framing can be improved with a new flight path and position (*e.g.*, "new subject framing").



Setting up DeepTrack



DeepTrack determines the amount of movement and whether new FOV is needed.

https://www.youtube.com/watch?v=JNd96j9VA24&t=636s

217.    As another example, Link Cameras determines field of view change

probabilities (*e.g.*, "scene change probabilities"), relative to the determined amount of motion and the amount of one's face visible in the shot (*e.g.*, "current shot subject motion thresholds"), to determine whether video recording of the person can be improved with a new field of view (i.e., "new subject framing").



Link Cameras change the fields of view depending on the number of people in frame and changes to fit everyone properly within the frame.

https://store.insta360.com/product/link-2?c=3401&from=consumer

218.    As yet another example, InstaFrame mode determines field of view change probabilities (*e.g.*, "scene change probabilities"), relative to the determined amount of motion and the amount of a person visible in the shot (*e.g.*, "current shot subject motion thresholds"), to determine whether video recording of the person can be improved with a new field of view (*e.g.*, "new subject framing").

InstaFrame mode also determines alternate shots options based upon the motion thresholds in the new shot and subject activity metrics in the new shot (e.g., subject tracking data). If the metrics show this new camera view is better, InstaFrame selects the new camera view as the main image of that subject.  InstaFrame mode also automatically modifies the ongoing recording image with new subject framing and new video capture settings (e.g., switching to the new view)



https://www.insta360.com/support/supportdetail/video/RrCdqzwSgN



**InstaFrame Mode – Two Videos in One**

A brand-new mode for 360° shooting. Record a perfectly framed, instantly shareable flat video up to 1080p30fps with no editing or reframing needed, *and* a full 360° video up to 5.7K+30fps **at the same time**.

https://www.insta360.com/blog/insta360-x5-tips-shooting-best-settings-guide.html

219.    The Accused Products perform a method that determines alternate shot options, including associated shot selection probabilities, based upon the determined subject activity metrics and associated shot dependent subject motion thresholds, if the determined scene change probability for new subject framing is greater than a predetermined value and elects a next shot from among the determined alternate shot options based upon the determined shot selection probabilities.

220.    For example, the Accused Products determine alternate shots with the other camera view (*e.g.,* using the gimbal camera), based upon the motion thresholds in the new shot and subject activity metrics in the new shot (*e.g.,* how much of the face is visible). If the metrics show this new camera view is better, the

Insta360 Connect selects the new camera view as the main image of that subject.



https://www.insta360.com/blog/enterprise/insta360-connect-video-bar-available-

now.html

## Advanced Imaging, Unmatched Visuals

Connect boasts first-class imaging hardware with a **dual 4K camera**. The setup consists of a **wide-angle camera with a 1/1.3" CMOS sensor** and a **telephoto gimbal camera**. The two work seamlessly together to capture 4K group views and individual close-ups for unparalleled meeting visuals. With a wider angle, 48MP telephoto lens, and integrated gimbal, participants across the room are seen as much as those at the front.

https://www.insta360.com/blog/enterprise/insta360-connect-video-bar-available-

[now.html](now.html)



*See above* a shot before switching (poor face visibility) and *see below* a shot after switching featuring everyone's faces in frame.



https://store.insta360.com/product/connect?c=3519&from=nav

221.    For example, DeepTrack determines alternate shots, including shot selection probabilities, based upon the determined subject activity metrics and associated shot dependent subject motion thresholds. If the metrics show this new camera view is better, DeepTrack selects the new camera view as the main image of that subject.  DeepTrack also automatically modifies the ongoing recording image with new subject framing and new video capture settings (*e.g.*, by flying forward to change the view).



Start of Trail, DeepTrack enabled

Person moves forward, drone moves to keep him in frame

Person continues moving, drone moves to keep him in frame

https://www.youtube.com/watch?v=JNd96j9VA24&t=636s

222.    As yet another example, Link Cameras determines alternate shots, based upon the motion thresholds in the new shot and subject activity metrics in the new shot. If the metrics show this new camera view is better, the Link Cameras select the new camera view as the main image of that subject.





https://store.insta360.com/product/link-2?c=3401&from=consumer

223.  The Accused Products perform a method that automatically modifies ongoing video image capture in accordance with the newly selected next shot, including associated new subject framing and any new video capture settings.

224.  For example, the Accused products automatically modify the ongoing recording image with new subject framing and new video capture settings (*e.g.,* by tilting the gimbal or switching between cameras).



*See above* a shot before switching (poor face visibility) and *see below* a shot after switching featuring everyone's faces in frame.



https://store.insta360.com/product/connect?c=3519&from=nav





https://store.insta360.com/product/connect?c=3519&from=nav

225. Link Cameras automatically modifies the ongoing recording image with new subject framing and new video capture settings (*e.g.*, switching to new camera view.)





https://store.insta360.com/product/link-2?c=3401&from=consumer

226. Insta360 was provided with notice that it infringes the '544 Patent no later than September 16, 2025. Insta360's knowledge of the '544 Patent, which covers operating the Accused Products in their intended manner such that all limitations of the asserted claims of the '544 Patent are met, extends to its knowledge that the third-party infringers' use of the Accused Products directly

infringes the '544 Patent, or, at the very least, rendered Insta360 willfully blind to such infringement.

227. Insta360 has, since at least as early as September 16, 2025, known or been willfully blind to the fact that the third-party infringers' use, manufacture, sale, offer for sale, and/or importation of the Accused Products directly infringes the '544 Patent.

228. With knowledge of or willful blindness to the fact that the third-party infringers' use, manufacture, sale, distribution, offer for sale, license and/or importation of the Accused Products in their intended manner such that all limitations of the asserted claims of the '544 Patent are met directly infringes the '544 Patent, Insta360 has actively encouraged the third-party infringers to directly infringe the '544 Patent by making, using, testing, selling, offering for sale, importing and/or licensing the accused products by, for example: marketing the Accused Products with automated videography capabilities to the third-party infringers; supporting and managing the third-party infringers' use of the automated videography functionalities; and providing technical assistance to the third-party infringers during their continued use of the Accused Products such as by, for example, publishing instructional information on the Insta360 websites

(including, without limitation, the knowledge center, instructional videos and on the Insta360 branded website) directing and encouraging third-party infringers how to make and use the automated videography features of the Accused Products.

229.   Insta360 induces third-party infringers to infringe the asserted claims of the '544 Patent by directing or encouraging them to operate, make, sell, offer to sell, license, and/or import the Accused Products which satisfy all limitations of the asserted claims of the '544 Patent.  Insta360 advertises and promotes the automated videography features of the Accused Products and encourages the third-party infringers to operate them in an infringing manner. Insta360 provides technical assistance directing and instructing third parties how to operate the Accused Products by, for example, publishing instructional materials, videos, knowledge center resources, how-to guides, troubleshooting, manuals, and user guides.

230.   In response, the third-party infringers acquire, make, sell, offer to sell, license, operate, and/or import the Accused Products in an infringing manner.

231.   Insta360 specifically intends to induce, and did induce, the third-party infringers to infringe the asserted claims of the '544 Patent, and Insta360 knew of or was willfully blind to such infringement. Insta360 advised, encouraged, and/or

aided the third-party infringers to engage in direct infringement, including through its encouragement, advice, and assistance to the third-party infringers to use the automated videography features of the Accused Products. Having known or been willfully blind to the fact that the third-party infringers' use of the Accused Products in their intended manner such that all limitations of asserted claims of the '544 Patent were met directly infringed the '544 Patent, Insta360 actively encouraged and induced the third-party infringers to directly infringe the '544 Patent by making, using, testing, selling, offering for sale, importing and/or licensing said Accused Products, and by, for example: marketing the Accused Products to the third-party infringers; supporting and managing the third-party infringers' use of the Accused Products; and providing technical assistance to the third-party infringers during their continued use of the Accused Products by, for example, publishing the following instructional information on its website directing third-party infringers how to make and use the Accused Products to infringe the asserted claims of the '544 Patent.

232. Insta360 has induced and continues to induce infringement of the asserted claims of the '544 Patent under 35 U.S.C. § 271(b).

233. Insta360 has sold, provided and/or licensed to the third-party

infringers and continues to sell, provide and/or license the Accused Products that are especially made and adapted—and specifically intended by Insta360—to be used as components and material parts of the inventions covered by the '544 Patent. The Accused Products include automated videography features identified above which the third-party infringers used in a manner such that all limitations of the asserted claims are met, and without which the third-party infringers would have been unable to use and avail themselves of the intended functionality of the accused products.

234.    Insta360 also knew that the accused products are operated in a manner that practices each asserted claim of the '544 Patent.

235.    The automated videography features are specially made and adapted to infringe the asserted claims of the '544 Patent.

236.    The automated videography features are not a staple article or commodity of commerce, and, because the functionality was designed to work with the Accused Products solely in a manner that is covered by the '544 Patent, it has no substantial non-infringing use. At least by MPV's notice of Insta360's infringement, based upon the foregoing facts, Insta360 knew of or was willfully blind to the fact that such automated videography functionality was, in fact, used as

intended and as especially made and adapted in the Accused Products in a manner that is covered by the '544 Patent.

237.  Insta360 has contributorily infringed and continues to contributorily infringe the asserted claims of the '544 Patent under 35 U.S.C. § 271(c).

238.  Insta360's continuing acts of infringement of the '544 Patent since notice are, therefore, carried out with knowledge of the asserted claims of the '544 Patent and how the Accused Products infringe them.  Rather than take a license to the '544 Patent, Insta360's ongoing infringing conduct reflects a business decision to "efficiently infringe" the asserted claims and in doing so constitutes willful infringement under the standard of *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct. 1923 (2016).

239.  Insta360's acts of direct and indirect infringement have caused and continue to cause damage to MPV for which MPV is entitled to recover damages sustained as a result of Insta360's infringing acts in an amount subject to proof at trial, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court, pursuant to 35 U.S.C. § 284.

## COUNT 3
## INFRINGEMENT OF U.S. PATENT NO. 8,842,155

240.   MPV realleges and incorporates by reference the allegations set forth above as if restated verbatim here.

241.   MPV is the owner, by assignment, of U.S. Patent No. 8,842,155.  The '155 Patent was issued by the United States Patent and Trademark Office on September 23, 2014.

242.   As the owner of the '155 Patent, MPV holds all substantial rights in and under the '155 Patent, including the right to grant licenses, exclude others, and to enforce, sue, and recover damages for past and future infringement.

243.   The '155 Patent is valid, enforceable and was duly issued in full compliance with Title 35 of the United States Code.

244.   Insta360 has infringed, and continues to infringe, at least claim 15 of the '155 Patent by making, using, offering to sell, selling, distributing, licensing, and/or importing Accused Products and all similar products that infringe the '155 Patent without authorization or license as exemplified below.

245.   The Accused Products are designed, manufactured, and intended to be used in normal operation to practice the '155 Patent and feature structure and/or functionality comprising the steps noted above.

246. Insta360 has used and tested the Accused Products in the United States.

247. Insta360 has infringed and continues to infringe the '155 Patent.

248. Insta360's activities were without authority or license.

249. Insta360's users, customers, distributors, agents and/or other third parties (collectively, "third-party infringers") have infringed and continue to infringe the asserted claims under 35 U.S.C. § 271(a) by using the Accused Products according to their normal and intended use.

250. The Accused Products meet each and every limitation of each asserted claim of the '155 Patent either literally or under the doctrine of equivalents.

251. Claim 15 recites an embodiment of the claimed subject matter:

An apparatus for adapting a displayed image, the apparatus comprising:

a capture device configured to capture a digital video or still image, wherein the digital video or still image is captured based on instructions received from a remote device over a wireless communication network;

a processor operatively coupled to the capture device and

configured to adjust an allowed image capture area of the digital video or still image such that at least a portion of a background of the digital video or still image is removed from the digital video or still image;

a transmitter operatively coupled to the processor and configured to transmit the adjusted digital video or still image over the wireless communication network to the remote device; and

a display device configured to present a verification image, wherein the verification image is configured to provide visual verification as to what the transmitted adjusted digital video or still image looks like.

252. The Accused Products comprise an apparatus for adapting a displayed image.

253. For example, The Accused Products (Insta360 camera systems) adapt displayed video images.



https://www.youtube.com/watch?v=sR4btLkSS2k

254.    The Accused Products comprise a capture device configured to capture a digital video or still image, wherein the digital video or still image is captured based on instructions received from a remote device over a wireless communication network.

255.    For example, the Accused Products (*e.g.,* the Insta360 X5) (*e.g.,* "capture device") capture a video or photo image (*e.g.,* "digital video or still image"), wherein the video or photo image is captured based on configurations (*e.g.,* "instructions") received from a smartphone running the Insta360 app (*e.g.,* "remote device") over a wireless communication network (*e.g.,* Bluetooth, Wi-Fi).



https://store.insta360.com/product/x5



https://www.youtube.com/watch?v=xnKfKxfzZw4

256.   The Accused Products comprise a processor operatively coupled to the capture device and configured to adjust an allowed image capture area of the digital video or still image such that at least a portion of a background of the digital video or still image is removed from the digital video or still image.

257.   For example, the Accused Products include a processor configured to

operate in Single Lens Mode (e.g., "adjust an allowed image capture area").

Enabling Single Lens Mode reduces the allowed image capture area from the

default 360º view (e.g., "at least a portion of the background") and removes the

360º part of the image (e.g., "removed from the digital video or still image").

A 360° camera works by using two or more lenses to capture a 360° view of everything around it. It's a little like having multiple cameras in one, where the camera then stitches these images together into a 360° sphere. Using the

If you just want to use your Insta360 X4 as a traditional camera, you can use the 4K Single-Lens mode. This is just like using a regular action camera and captures traditional rectangular footage. This is great for point-of-view shots.

https://www.insta360.com/blog/tips/how-does-a-360-camera-work.html

## Q1 What shooting modes does X5 support?

| Type | Lens Mode | Shooting Mode |
| --- | --- | --- |
| Photo Mode | Single Lens | Photo |
| Photo Mode | 360° | Photo (including HDR, AEB), Interval, Starlapse (Starlapse Video & Star Trails Photo), Burst |
| Video Mode | Single Lens | Video, Me Mode, Loop Recording, FreeFrame Video |
| Video Mode | 360° | Video (including Active HDR), PureVideo, InstaFrame, Timelapse, TimeShift, Bullet Time, Loop Recording, Road Mode |

https://onlinemanual.insta360.com/x5/en-us/faq/specs/shooting

 

https://www.youtube.com/watch?v=sR4btLkSS2k

*See above* single lens mode disabled (left) and single lens mode enabled (right).

258.   The Accused Products comprise a transmitter operatively coupled to the processor and configured to transmit the adjusted digital video or still image over the wireless communication network to the remote device.

259.   For example, the Accused Products include a transmitter operatively coupled to the processor and configured to transmit the video or photo image with Single Lens Mode enabled over the wireless connection to the smartphone running the Insta360 app.



https://www.youtube.com/watch?v=qzmaeVtNXQ0

260.    The Accused Products comprise a display device configured to present a verification image, wherein the verification image is configured to provide visual verification as to what the transmitted adjusted digital video or still image looks like.

261.    For example, the Accused Products present a preview image (e.g., "a verification image") on the smartphone running

262.   the Insta360 app (e.g., "display device") to provide a visual verification as to the camera's field of view (e.g., "what the transmitted adjusted digital video or photo image looks like") in the captured video or photo. If Single Lens Mode is enabled, the Insta360 app will show the truncated field of view.



https://www.youtube.com/watch?v=xnKfKxfzZw4

263.   MPV notified Insta360 that it infringed the '155 Patent no later than September 16, 2025.

264.   Insta360's knowledge of the '155 Patent, which covers operating the Accused Products in their intended manner such that all limitations of the asserted claims of the '155 Patent are met, extends to its knowledge that the third-party infringers' use of the Accused Products directly infringes the '155 Patent, or, at the very least, rendered Insta360 willfully blind to such infringement.

265.   Insta360 has, since at least as early as September 16, 2025, known or been willfully blind to the fact that the third-party infringers' use of the Accused Products directly infringes the '155 Patent.

266.   With knowledge of or willful blindness to the fact that the third-party infringers' use of the Accused Products in their intended manner such that all limitations of the asserted claims of the '155 Patent are met directly infringes the '155 Patent, Insta360 has actively encouraged the third-party infringers to directly infringe the '155 Patent by making, using, testing, selling, offering for sale, importing and/or licensing the Accused Products by, for example: marketing the

Accused Products with adaptive image capture capabilities to the third-party infringers; supporting and managing the third-party infringers' use of the Insta360 adaptive image capture functionalities; and providing technical assistance to the third-party infringers during their continued use of the Accused Products such as by, for example, publishing instructional information on the Insta360 websites (including, without limitation, the knowledge center, instructional videos and on the Insta360 branded website) directing and encouraging third-party infringers how to make and use the adaptive image capture features of the Accused Products.

267.   Insta360 induces third-party infringers to infringe the asserted claims of the '155 Patent by directing or encouraging them to operate the Accused Products which satisfy all limitations of the asserted claims of the '155 Patent. Insta360 advertises and promotes the adaptive image capture features of the Accused Products and encourages the third-party infringers to operate them in an infringing manner.  Insta360 provides technical assistance directing and instructing third parties how to operate the Accused Products by, for example, publishing instructional materials, videos, knowledge center resources, how-to guides, troubleshooting, manuals, and user guides.

268.   In response, the third-party infringers acquire and operate the Accused

Products in an infringing manner.

269.   Insta360 has sold, provided and/or licensed to the third-party infringers and continues to sell, provide and/or license the Accused Products that are especially made and adapted—and specifically intended by Insta360—to be used as components and material parts of the inventions covered by the '155 Patent. For example, the Accused Products include adaptive image capture features identified above which the third-party infringers used in a manner such that all limitations of the asserted claims are met, and without which the third-party infringers would have been unable to use and avail themselves of the intended functionality of the accused products.

270.   Insta360 also knew and intended that the Accused Products would be operated in a manner consistent with normal and intended use, which use practices the asserted claims of the '155 Patent.

271.   The adaptive image capture features are specially made and adapted to infringe the asserted claims of the '155 Patent.

272.   The adaptive image capture features are not a staple article or commodity of commerce, and, because these functionalities were designed to work with the Accused Products solely in a manner that is covered by the '155 Patent,

they have no substantial non-infringing use. At least by MPV's notice of Insta360's infringement, Insta360 knew of or was willfully blind to the fact that such functionalities infringe and were especially made and adapted for use that infringes the '155 Patent and they were in fact used to infringe.

273.   Insta360 has contributorily infringed and continues to contributorily infringe the asserted claims of the '155 Patent under 35 U.S.C. § 271(c).

274.   Upon information and belief, Insta360's acts of infringement of the '155 Patent continue since notice are, therefore, carried out with knowledge of the asserted claims of the '155 Patent and how the Accused Products infringe them. Rather than take a license to the '155 Patent, Insta360's ongoing infringing conduct reflects a business decision to "efficiently infringe" the asserted claims and in doing so constitutes willful infringement under the standard of *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct. 1923 (2016).

275.   Insta360's acts of direct and indirect infringement have caused and continue to cause damage to MPV for which MPV is entitled to recover damages sustained as a result of Insta360's infringing acts in an amount subject to proof at trial, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court, pursuant to 35 U.S.C. § 284.

## COUNT 4
## INFRINGEMENT OF U.S. PATENT NO. 8,856,418

276.    MPV realleges and incorporates by reference the allegations set forth above as if restated verbatim here.

277.    MPV is the owner, by assignment, of U.S. Patent No. 8,856,418.  The '418 Patent was issued by the United States Patent and Trademark Office on October 7, 2014.

278.    As the owner of the '418 Patent, MPV holds all substantial rights in and under the '418 Patent, including the right to grant licenses, exclude others, and to enforce, sue, and recover damages for past and future infringement.

279.    The '418 Patent is valid, enforceable and was duly issued in full compliance with Title 35 of the United States Code.

280.    Insta360 has infringed, and continues to infringe, at least claim 17 of the '418 Patent by making, using, offering to sell, selling, distributing, licensing, and/or importing Accused Products and all similar products that infringe the '418 Patent without authorization or license as exemplified below.

281.    The Accused Products are designed, manufactured, and intended to be used in normal operation to practice the '418 Patent and feature structure and/or functionality comprising the steps noted above.

282.    Insta360 has used and tested the Accused Products in the United States.

283.    Insta360 has infringed and continues to infringe the '418 Patent.

284.    Insta360's activities were without authority or license.

285.    Insta360's users, customers, distributors, agents and/or other third parties (collectively, "third-party infringers") have infringed and continue to infringe the asserted claims under 35 U.S.C. § 271(a) by using the Accused Products according to their normal and intended use.

286.    The Accused Products meet each and every limitation of each asserted claim of the '418 Patent either literally or under the doctrine of equivalents.

287.    Claim 17 recites an embodiment of the claimed subject matter:

> A non-transitory computer-readable medium having instructions stored thereon, the instructions comprising: instructions to detect at least two handheld devices, wherein each of the at least two handheld devices is connected to an interface;
>
> instructions to determine an inventory of available resources for each of the at least two handheld devices, wherein the

available resources are each a functionality of a handheld device;

instructions to determine a plurality of possible combined use modes based on the inventory of available resources; and

instructions to select a combined use mode from the plurality of possible combined use modes, wherein the combined use mode accesses the available resource of each of the at least two handheld devices, and wherein the combined use mode provides control of the available resources of each of the at least two handheld devices at the same time.

288.   The Accused Products comprise a non-transitory computer-readable medium having instructions stored thereon, the instructions comprising instructions to detect at least two handheld devices, wherein each of the at least two handheld devices is connected to an interface.

289.   For example, The Accused Products (the Insta360 app) are stored on the user's smartphone (*e.g.*, in a non-transitory computer-readable medium) and contains instructions to detect cameras (*e.g.,* the Insta360 X5), Apple Watches with the Insta360 app installed, and microphones (*e.g.,* the Insta360 Mic Air) (*e.g.,* "at

least two handheld devices") connected to an interface (e.g., Bluetooth).



https://www.youtube.com/watch?v=ZmffZItX4_0

Steps:

1. Install the Insta360 app on your Apple Watch.
2. Enable Bluetooth on both the watch and phone, and ensure they are paired.
3. Mount your phone on Flow 2 Pro, ensuring the gimbal is awake.
4. Open the Insta360 app on your phone, then launch the app on your watch and select your device. You can now remotely preview or control the gimbal and camera functions. Key features

https://onlinemanual.insta360.com/flow2pro/en-us/camera/watch



https://www.youtube.com/watch?v=laYJqOB-7DE

290. The Accused Products contain instructions to determine an inventory of available resources for each of the at least two handheld devices, wherein the available resources are each a functionality of a handheld device.

291. For example, the Accused Products determines the selectable parameters (*e.g.,* "an inventory of available resources") for each of the at least two connected devices, wherein those resources are each a functionality of a handheld device.



Insta360 in-app tutorial

https://onlinemanual.insta360.com/oner/en-us/editing/stats/applewatch

https://onlinemanual.insta360.com/flow2/enus/faq/accessories/mic_air

292.    The Accused Products contain instructions to determine a plurality of possible combined use modes based on the inventory of available resources.

293.    For example, the Accused Products determines combined use modes based on selectable parameters of the connected devices (*e.g.*, "the inventory of available resources"), of which there are various combinations (*e.g.*, "a plurality of possible combined use modes"). For example, the camera could be in Single Lens mode, with Apple Watch GPS tracking enabled and the Mic Air's noise cancellation disabled. Similarly, the camera could be in loop recording mode, with

Apple Watch GPS tracking and the Mic Air's noise cancellation both enabled.



https://www.youtube.com/watch?v=xnKfKxfzZw4

Hooking up with Insta360's ecosystem is effortless. Pairing with the X5 or Flow Series takes seconds, and the Insta360 app lets you monitor audio live or tweak settings. Its AI tools, like FlashCut, sync

https://www.techeblog.com/insta360-mic-air-features-price-review/

294.    The Accused Products contain instructions to select a combined use mode from the plurality of possible combined use modes, wherein the combined use mode accesses the available resource of each of the at least two handheld devices, and wherein the combined use mode provides control of the available resources of each of the at least two handheld devices at the same time.

295.    For example, the Accused Products provide the option to change various device parameters in a variety of combinations (*e.g.*, "select a combined use mode from the plurality of possible combined use modes") on the connected devices, wherein the combined use mode accesses the available resource of each of the at least two handheld devices, and wherein the combined use mode provides control of the available resources of each of the at least two handheld devices at the same time. For example, the camera could be in Single Lens mode, with Apple Watch GPS tracking enabled and the Mic Air's noise cancellation disabled. Similarly, the camera could be in loop recording mode, with Apple Watch GPS tracking and the Mic Air's noise cancellation both enabled.



https://www.youtube.com/watch?v=xnKfKxfzZw4

Hooking up with Insta360's ecosystem is effortless. Pairing with the X5 or Flow Series takes seconds, and the Insta360 app lets you monitor audio live or tweak settings. Its AI tools, like FlashCut, sync

https://www.techeblog.com/insta360-mic-air-features-price-review/

296.   MPV notified Insta360 that it infringed the '418 Patent no later than September 16, 2025.

297.   Insta360's knowledge of the '418 Patent, which covers operating the Accused Products in their intended manner such that all limitations of the asserted claims of the '418 Patent are met, extends to its knowledge that the third-party infringers' use of the Accused Products directly infringes the '418 Patent, or, at the very least, rendered Insta360 willfully blind to such infringement.

298.   Insta360 has, since at least as early as September 16, 2025, known or been willfully blind to the fact that the third-party infringers' use of the Accused Products directly infringes the '418 Patent.

299.   With knowledge of or willful blindness to the fact that the third-party infringers' use of the Accused Products in their intended manner such that all limitations of the asserted claims of the '418 Patent are met directly infringes the '418 Patent, Insta360 has actively encouraged the third-party infringers to directly infringe the '418 Patent by making, using, testing, selling, offering for sale, importing and/or licensing the Accused Products by, for example: marketing the Accused Products with collaborative handheld control capabilities to the third-party infringers; supporting and managing the third-party infringers' use of the

Insta360 collaborative handheld control functionalities; and providing technical assistance to the third-party infringers during their continued use of the Accused Products such as by, for example, publishing instructional information on the Insta360 websites (including, without limitation, the knowledge center, instructional videos and on the Insta360 branded website) directing and encouraging third-party infringers how to make and use the collaborative handheld control features of the Accused Products.

300. Insta360 induces third-party infringers to infringe the asserted claims of the '418 Patent by directing or encouraging them to operate the Accused Products which satisfy all limitations of the asserted claims of the '418 Patent. Insta360 advertises and promotes the collaborative handheld control of the Accused Products and encourages the third-party infringers to operate them in an infringing manner. Insta360 provides technical assistance directing and instructing third parties how to operate the Accused Products by, for example, publishing instructional materials, videos, knowledge center resources, how-to guides, troubleshooting, manuals, and user guides.

301. In response, the third-party infringers acquire and operate the Accused Products in an infringing manner.

302.   Insta360 has sold, provided and/or licensed to the third-party infringers and continues to sell, provide and/or license the Accused Products that are especially made and adapted—and specifically intended by Insta360—to be used as components and material parts of the inventions covered by the '418 Patent. For example, the Accused Products include collaborative handheld control identified above which the third-party infringers used in a manner such that all limitations of the asserted claims are met, and without which the third-party infringers would have been unable to use and avail themselves of the intended functionality of the accused products.

303.   Insta360 also knew and intended that the Accused Products would be operated in a manner consistent with normal and intended use, which use practices the asserted claims of the '418 Patent.

304.   The collaborative handheld control features are specially made and adapted to infringe the asserted claims of the '418 Patent.

305.   The collaborative handheld control features are not a staple article or commodity of commerce, and, because these functionalities were designed to work with the Accused Products solely in a manner that is covered by the '418 Patent, they have no substantial non-infringing use. At least by MPV's notice of

Insta360's infringement, Insta360 knew of or was willfully blind to the fact that such functionalities infringe and were especially made and adapted for use that infringes the '418 Patent and they were in fact used to infringe.

306. Insta360 has contributorily infringed and continues to contributorily infringe the asserted claims of the '418 Patent under 35 U.S.C. § 271(c).

307. Upon information and belief, Insta360's acts of infringement of the '418 Patent continue since notice are, therefore, carried out with knowledge of the asserted claims of the '418 Patent and how the Accused Products infringe them. Rather than take a license to the '418 Patent, Insta360's ongoing infringing conduct reflects a business decision to "efficiently infringe" the asserted claims and in doing so constitutes willful infringement under the standard of *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct. 1923 (2016).

308. Insta360's acts of direct and indirect infringement have caused and continue to cause damage to MPV for which MPV is entitled to recover damages sustained as a result of Insta360's infringing acts in an amount subject to proof at trial, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court, pursuant to 35 U.S.C. § 284.

## COUNT 5
## INFRINGEMENT OF U.S. PATENT NO. 9,848,158

309.    MPV realleges and incorporates by reference the allegations set forth above as if restated verbatim here.

310.    MPV is the owner, by assignment, of U.S. Patent No. 9,848,158.  The '158 Patent was issued by the United States Patent and Trademark Office on December 19, 2017.

311.    As the owner of the '158 Patent, MPV holds all substantial rights in and under the '158 Patent, including the right to grant licenses, exclude others, and to enforce, sue, and recover damages for past and future infringement.

312.    The '158 Patent is valid, enforceable and was duly issued in full compliance with Title 35 of the United States Code.

313.    Insta360 has infringed, and continues to infringe, at least claim 23 of the '158 Patent by making, using, offering to sell, selling, distributing, licensing, and/or importing Accused Products and all similar products that infringe the '158 Patent without authorization or license as exemplified below.

314.    The Accused Products are designed, manufactured, and intended to be used in normal operation to practice the '158 Patent and feature structure and/or functionality comprising the steps noted above.

315.   Insta360 has used and tested the Accused Products in the United States.

316.   Insta360 has infringed and continues to infringe the '158 Patent.

317.   Insta360's activities were without authority or license.

318.   Insta360's users, customers, distributors, agents and/or other third parties (collectively, "third-party infringers") have infringed and continue to infringe the asserted claims under 35 U.S.C. § 271(a) by using the Accused Products according to their normal and intended use.

319.   The Accused Products meet each and every limitation of each asserted claim of the '158 Patent either literally or under the doctrine of equivalents.

320.   Claim 23 recites an embodiment of the claimed subject matter:

> A non-transitory computer readable medium having stored thereon instructions executable by a processor of a processor-based device having a display and a memory accessible to said processor, to cause the processor to perform operations comprising:
>
> receiving, from a user interface, at least one of a first input, a second input, a third input, a fourth input, or a confirmation

input;

storing a digital video sequence comprising a sequence of frames;

displaying, on a display, a currently selected frame of the digital video sequence;

transitioning to a start frame selection mode in response to the user interface receiving the first input, wherein changing the position of a start frame marker causes the currently selected frame to scroll to a corresponding frame at the position of the start frame marker;

transitioning to an end frame selection mode in response to the user interface receiving the second input, wherein the start frame selection mode is separate from the end frame selection mode, wherein changing the position of an end frame marker causes the currently selected frame to scroll to a corresponding frame at the position of the end frame marker;

scrolling through the digital video sequence in a first temporal direction in response to the user interface receiving the third

input;

scrolling through the digital video sequence in a second temporal direction in response to the user interface receiving the fourth input;

establishing a start frame as a currently selected frame in response to the user interface receiving a start frame selection input while the device is in the start frame selection mode, wherein the start frame selection input is separate from the first input;

establishing an end frame as the currently selected frame in response to the user interface receiving an end frame selection input while the device is in the end frame selection mode, wherein the end frame selection input is separate from the second input, and wherein the display is further configured to display an indication of whether the start frame selection mode is selected or the end frame selection mode is selected; and

storing a trimmed digital video sequence comprising frames

of the digital video sequence between the start frame and the end frame.

321.   The Accused Products comprise a non-transitory computer-readable medium having instructions stored thereon, the instructions comprising instructions to receive, from a user interface, at least one of a first input, a second input, a third input, a fourth input, or a confirmation input;

322.   For example, The Accused Products (the Insta360 app) receive by the Insta360 app user interface at least one of a first input (*e.g.,* pressing the start frame marker), a second input (*e.g.,* pressing the end frame marker), a third input (*e.g.,* dragging the start frame marker to the right), a fourth input (*e.g.,* dragging the end frame marker to the left), and a confirmation input (the user confirms that they want to trim the video).



https://www.youtube.com/watch?v=H4t7bzOCkVo

323.    The Accused Products contain instructions to store a digital video

sequence comprising a sequence of frames

324.    For example, the Accused Products stores a digital video (*e.g.,* "digital

video sequence comprising a sequence of frames").



https://www.youtube.com/watch?v=H4t7bzOCkVo

325.    The Accused Products contain instructions to display, on a display, a

currently selected frame of the digital video sequence.

326.   For example, the Accused Products displays a currently selected frame of the video sequence.



https://www.youtube.com/watch?v=H4t7bzOCkVo

327.   The Accused Products contain instructions to transition to a start frame selection mode in response to the user interface receiving the first input, wherein changing the position of a start frame marker causes the currently selected

frame to scroll to a corresponding frame at the position of the start frame marker.

328.   For example, the Accused Products transitions, by the smartphone's processor, to a start frame selection mode in response to the touchscreen (*e.g.*, "user interface") receiving a press at the start frame marker (*e.g.*, "first input"), wherein changing the position of the start frame marker causes the currently selected frame to scroll to the frame corresponding to the start frame marker (*e.g.*, "corresponding frame at the position of the start frame marker").

  

https://www.youtube.com/watch?v=H4t7bzOCkVo

329.   The Accused Products contain instructions to transition to an end frame selection mode in response to the user interface receiving the second input, wherein the start frame selection mode is separate from the end frame selection mode, wherein changing the position of an end frame marker causes the currently selected frame to scroll to a corresponding frame at the position of the end frame marker.

330.   For example, the Accused Products transitions to an end frame selection mode in response to the touchscreen receiving a press at the end frame marker (*e.g.*, "second input", wherein the start frame selection mode is separate from the end frame selection mode, wherein changing the position of the end frame marker causes the currently selected frame to scroll to the frame corresponding to the end frame marker (*e.g.*, "corresponding frame at the position of the end frame marker").

  

https://www.youtube.com/watch?v=H4t7bzOCkVo

331.   The Accused Products contain instructions to scroll through the digital video sequence in a first temporal direction in response to the user interface receiving the third input.

332.   For example, the Accused Products scrolls through the digital video in a left to right direction (*e.g.*, "first temporal direction") in response to the touchscreen receiving an input dragging the start frame marker to the right (*e.g.*,

"third input").

 

https://www.youtube.com/watch?v=H4t7bzOCkVo

333.   The Accused Products contain instructions to scroll through the digital video sequence in a second temporal direction in response to the user interface receiving the fourth input.

334.   For example, the Accused Products scrolls through the digital video in a right to left direction (*e.g.*, "second temporal direction") in response to the touchscreen receiving an input dragging the end frame marker to the left (*e.g.* "fourth input").

 

https://www.youtube.com/watch?v=H4t7bzOCkVo

335.   The Accused Products contain instructions to establish a start frame as a currently selected frame in response to the user interface receiving a start frame selection input while the device is in the start frame selection mode, wherein the start frame selection input is separate from the first input.

336.   For example, the Accused Products establish the first frame at the start frame marker (*e.g.*, "start frame") as the currently selected frame in response to the touchscreen receiving an input releasing the start frame marker (*e.g.*, "start frame selection input") while the smartphone is in the start frame selection mode, wherein the releasing of the start frame marker is separate from the pressing of the start frame marker.



https://www.youtube.com/watch?v=qzmaeVtNXQ0

337.   The Accused Products contain instructions to establish an end frame as the currently selected frame in response to the user interface receiving an end frame selection input while the device is in the end frame selection mode, wherein the end frame selection input is separate from the second input, and wherein the display is further configured to display an indication of whether the start frame selection mode is selected or the end frame selection mode is selected.

338.   For example, the Accused Products establishes the last frame at the end frame marker (*e.g.*, "end frame") as the currently selected frame in response to the touchscreen receiving an input releasing the end frame marker (*e.g.*, "end frame selection input") while the smartphone is in the end frame selection mode, wherein

the releasing of the end frame marker is separate from the pressing of the end

frame marker.

 

 

https://www.youtube.com/watch?v=qzmaeVtNXQ0

339.   The Accused Products contain instructions to store a trimmed digital

video sequence comprising frames of the digital video sequence between the start

frame and the end frame.

340.   For example, the Accused Products stores a trimmed digital video comprising frames of the digital video between the first frame at the start frame marker and the last frame at the end frame marker.

  

https://www.youtube.com/watch?v=qzmaeVtNXQ0

341.   MPV notified Insta360 that it infringed the '158 Patent no later than September 16, 2025.

342.   Insta360's knowledge of the '158 Patent, which covers operating the Accused Products in their intended manner such that all limitations of the asserted claims of the '158 Patent are met, extends to its knowledge that the third-party

infringers' use of the Accused Products directly infringes the '158 Patent, or, at the very least, rendered Insta360 willfully blind to such infringement.

343.  Insta360 has, since at least as early as September 16, 2025, known or been willfully blind to the fact that the third-party infringers' use of the Accused Products directly infringes the '158 Patent.

344.  With knowledge of or willful blindness to the fact that the third-party infringers' use of the Accused Products in their intended manner such that all limitations of the asserted claims of the '158 Patent are met directly infringes the '158 Patent, Insta360 has actively encouraged the third-party infringers to directly infringe the '158 Patent by making, using, testing, selling, offering for sale, importing and/or licensing the Accused Products by, for example: marketing the Accused Products with digital video trimming capabilities to the third-party infringers; supporting and managing the third-party infringers' use of the Insta360 digital video trimming functionalities; and providing technical assistance to the third-party infringers during their continued use of the Accused Products such as by, for example, publishing instructional information on the Insta360 websites (including, without limitation, the knowledge center, instructional videos and on the Insta360 branded website) directing and encouraging third-party infringers how

to make and use the digital video trimming features of the Accused Products.

345.    Insta360 induces third-party infringers to infringe the asserted claims of the '158 Patent by directing or encouraging them to operate the Accused Products which satisfy all limitations of the asserted claims of the '158 Patent. Insta360 advertises and promotes the digital video trimming feature of the Accused Products and encourages the third-party infringers to operate them in an infringing manner.  Insta360 provides technical assistance directing and instructing third parties how to operate the Accused Products by, for example, publishing instructional materials, videos, knowledge center resources, how-to guides, troubleshooting, manuals, and user guides.

346.    In response, the third-party infringers acquire and operate the Accused Products in an infringing manner.

347.    Insta360 has sold, provided and/or licensed to the third-party infringers and continues to sell, provide and/or license the Accused Products that are especially made and adapted—and specifically intended by Insta360—to be used as components and material parts of the inventions covered by the '158 Patent. For example, the Accused Products include digital video trimming identified above which the third-party infringers used in a manner such that all

limitations of the asserted claims are met, and without which the third-party infringers would have been unable to use and avail themselves of the intended functionality of the accused products.

348.   Insta360 also knew and intended that the Accused Products would be operated in a manner consistent with normal and intended use, which use practices the asserted claims of the '158 Patent.

349.   The digital video trimming features are specially made and adapted to infringe the asserted claims of the '158 Patent.

350.   The digital video trimming features are not a staple article or commodity of commerce, and, because these functionalities were designed to work with the Accused Products solely in a manner that is covered by the '158 Patent, they have no substantial non-infringing use. At least by MPV's notice of Insta360's infringement, Insta360 knew of or was willfully blind to the fact that such functionalities infringe and were especially made and adapted for use that infringes the '158 Patent and they were in fact used to infringe.

351.   Insta360 has contributorily infringed and continues to contributorily infringe the asserted claims of the '158 Patent under 35 U.S.C. § 271(c).

352.   Upon information and belief, Insta360's acts of infringement of the

'158 Patent continue since notice are, therefore, carried out with knowledge of the asserted claims of the '158 Patent and how the Accused Products infringe them. Rather than take a license to the '158 Patent, Insta360's ongoing infringing conduct reflects a business decision to "efficiently infringe" the asserted claims and in doing so constitutes willful infringement under the standard of *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct. 1923 (2016).

353.   Insta360's acts of direct and indirect infringement have caused and continue to cause damage to MPV for which MPV is entitled to recover damages sustained as a result of Insta360's infringing acts in an amount subject to proof at trial, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court, pursuant to 35 U.S.C. § 284.

**COUNT 6**
**INFRINGEMENT OF U.S. PATENT NO. 10,425,612**

354.   MPV realleges and incorporates by reference the allegations set forth above as if restated verbatim here.

355.   MPV is the owner, by assignment, of U.S. Patent No. 10,425,612. The '612 Patent was issued by the United States Patent and Trademark Office on September 24, 2019.

356.   As the owner of the '612 Patent, MPV holds all substantial rights in

and under the '612 Patent, including the right to grant licenses, exclude others, and to enforce, sue, and recover damages for past and future infringement.

357.   The '612 Patent is valid, enforceable and was duly issued in full compliance with Title 35 of the United States Code.

358.   Insta360 has infringed, and continues to infringe, at least claim 12 of the '612 Patent by making, using, offering to sell, selling, distributing, licensing, and/or importing Accused Products and all similar products that infringe the '612 Patent without authorization or license as exemplified below.

359.   The Accused Products are designed, manufactured, and intended to be used in normal operation to practice the '612 Patent and feature structure and/or functionality comprising the steps noted above.

360.   Insta360 has used and tested the Accused Products in the United States.

361.   Insta360 has infringed and continues to infringe the '612 Patent.

362.   Insta360's activities were without authority or license.

363.   Insta360's users, customers, distributors, agents and/or other third parties (collectively, "third-party infringers") have infringed and continue to infringe the asserted claims under 35 U.S.C. § 271(a) by using the Accused

Products according to their normal and intended use.

364.   The Accused Products meet each and every limitation of each asserted claim of the '612 Patent either literally or under the doctrine of equivalents.

365.   Claim 12 recites an embodiment of the claimed subject matter:

A non-transitory computer readable medium having stored thereon instructions executable by a processor of a processor-based device having a display and a memory accessible to said processor, to cause the processor to perform operations comprising:

during a start frame selection mode, responsive to receipt of a user input changing a position of a start frame marker relative to a timeline via a user interface of the processor-based device, scrolling to and displaying a currently-selected frame of a digital video comprising an original sequence of frames on said display and establishing, in the memory of the processor-based device, the currently-selected frame as a start frame, said digital video being stored in the memory of the processor-based device; and

responsive to one or more subsequent user inputs via the user interface;

facilitating, during an end frame selection mode, user selection of an end frame by permitting a user to scroll to a desired end frame of the sequence of frames by changing a position of an end frame marker relative to the timeline, displaying the end frame, and establishing, in the memory, the user's selection of the end frame as a designated end frame;

during each of selection of the start frame and the designated end frame, presenting on the display an indication of whether the processor-based device is in the start frame selection mode or the end frame selection mode; and

storing, in the memory, a trimmed digital video sequence comprising the start frame and the designated end frame along with other frames of the original sequence of frames;

366.   The Accused Products comprise a non-transitory computer readable medium having stored thereon instructions executable by a processor of a processor-based device having a display and a memory accessible to said

processor, to cause the processor to perform operations.

367.   For example, the Accused Products comprise an application on a smartphone (*e.g.,* "processor-based device") having a display and a memory accessible to said smartphone.



https://apps.apple.com/us/app/insta360/id1491299654

368.   The Accused Products contain instructions to, during a start frame selection mode, responsive to receipt of a user input changing a position of a start frame marker relative to a timeline via a user interface of the processor-based device, scroll to and display a currently-selected frame of a digital video

comprising an original sequence of frames on said display and establish, in the memory of the processor-based device, the currently-selected frame as a start frame, said digital video being stored in the memory of the processor-based device.

369.  For example, the Accused Products contain instructions to, during a start frame selection mode, respond to a receipt of a user's input changing the position of the start frame marker relative to the timeline via the Insta360 app's user interface.



https://www.youtube.com/watch?v=H4t7bzOCkVo



https://www.youtube.com/watch?v=H4t7bzOCkVo

370.   The Accused Products contain instructions to respond to one or more subsequent user inputs via the user interface.

371.   For example, the Accused Products contain instructions to respond to one or more subsequent user inputs (*e.g.*, pressing and/or dragging the start and/or end frame markers) via the Insta360 app user interface.



https://www.youtube.com/watch?v=H4t7bzOCkVo

372.   The Accused Products contain instructions to facilitate, during an end frame selection mode, user selection of an end frame by permitting a user to scroll to a desired end frame of the sequence of frames by changing a position of an end frame marker relative to the timeline, displaying the end frame, and establish, in

the memory, the user's selection of the end frame as a designated end frame.

373.    For example, the Accused Products facilitate during an end frame selection mode a user selection of an end frame by permitting a user to scroll to a desired end frame by changing the end frame marker relative to the timeline (*e.g.*, user touch dragging the end frame). The Insta360 app displays the end frame and establishes the user's selection of the end frame as the designated end frame.

 

https://www.youtube.com/watch?v=H4t7bzOCkVo

374.    The Accused Products contain instructions to, during each of selection of the start frame and the designated end frame, present on the display an indication of whether the processor-based device is in the start frame selection mode or the end frame selection mode.

375.    For example, during the selection of the start frame and designated end frame, the Accused Products present on the displays a timestamp (*e.g.*,

"indication") above either the start frame marker to indicate whether the start frame selection mode is selected or above the end frame marker to indicate whether the end frame selection mode is selected.



https://www.youtube.com/watch?v=H4t7bzOCkVo

376.   The Accused Products contain instructions to store, in the memory, a trimmed digital video sequence comprising the start frame and the designated end frame along with other frames of the original sequence of frames.

377.   For example, the Accused Products store a trimmed digital video comprising the start frame and the designated end frame along with the frames of the original sequence of frames.

  

https://www.youtube.com/watch?v=qzmaeVtNXQ0

378.  MPV notified Insta360 that it infringed the '612 Patent no later than September 16, 2025.

379.  Insta360's knowledge of the '612 Patent, which covers operating the Accused Products in their intended manner such that all limitations of the asserted claims of the '612 Patent are met, extends to its knowledge that the third-party infringers' use of the Accused Products directly infringes the '612 Patent, or, at the very least, rendered Insta360 willfully blind to such infringement.

380.  Insta360 has, since at least as early as September 16, 2025, known or been willfully blind to the fact that the third-party infringers' use of the Accused

Products directly infringes the '612 Patent.

381.   With knowledge of or willful blindness to the fact that the third-party infringers' use of the Accused Products in their intended manner such that all limitations of the asserted claims of the '612 Patent are met directly infringes the '612 Patent, Insta360 has actively encouraged the third-party infringers to directly infringe the '612 Patent by making, using, testing, selling, offering for sale, importing and/or licensing the Accused Products by, for example: marketing the Accused Products with digital video trimming capabilities to the third-party infringers; supporting and managing the third-party infringers' use of the Insta360 digital video trimming functionalities; and providing technical assistance to the third-party infringers during their continued use of the Accused Products such as by, for example, publishing instructional information on the Insta360 websites (including, without limitation, the knowledge center, instructional videos and on the Insta360 branded website) directing and encouraging third-party infringers how to make and use the digital video trimming features of the Accused Products.

382.   Insta360 induces third-party infringers to infringe the asserted claims of the '612 Patent by directing or encouraging them to operate the Accused Products which satisfy all limitations of the asserted claims of the '612 Patent.

Insta360 advertises and promotes the digital video trimming feature of the Accused Products and encourages the third-party infringers to operate them in an infringing manner. Insta360 provides technical assistance directing and instructing third parties how to operate the Accused Products by, for example, publishing instructional materials, videos, knowledge center resources, how-to guides, troubleshooting, manuals, and user guides.

383. In response, the third-party infringers acquire and operate the Accused Products in an infringing manner.

384. Insta360 has sold, provided and/or licensed to the third-party infringers and continues to sell, provide and/or license the Accused Products that are especially made and adapted—and specifically intended by Insta360—to be used as components and material parts of the inventions covered by the '612 Patent. For example, the Accused Products include digital video trimming identified above which the third-party infringers used in a manner such that all limitations of the asserted claims are met, and without which the third-party infringers would have been unable to use and avail themselves of the intended functionality of the accused products.

385. Insta360 also knew and intended that the Accused Products would be

operated in a manner consistent with normal and intended use, which use practices the asserted claims of the '612 Patent.

386.   The digital video trimming features are specially made and adapted to infringe the asserted claims of the '612 Patent.

387.   The digital video trimming features are not a staple article or commodity of commerce, and, because these functionalities were designed to work with the Accused Products solely in a manner that is covered by the '612 Patent, they have no substantial non-infringing use. At least by MPV's notice of Insta360's infringement, Insta360 knew of or was willfully blind to the fact that such functionalities infringe and were especially made and adapted for use that infringes the '612 Patent and they were in fact used to infringe.

388.   Insta360 has contributorily infringed and continues to contributorily infringe the asserted claims of the '612 Patent under 35 U.S.C. § 271(c).

389.   Upon information and belief, Insta360's acts of infringement of the '612 Patent continue since notice are, therefore, carried out with knowledge of the asserted claims of the '612 Patent and how the Accused Products infringe them. Rather than take a license to the '612 Patent, Insta360's ongoing infringing conduct reflects a business decision to "efficiently infringe" the asserted claims

and in doing so constitutes willful infringement under the standard of *Halo Elecs., Inc. v. Pulse Elecs., Inc*., 136 S. Ct. 1923 (2016).

390.   Insta360's acts of direct and indirect infringement have caused and continue to cause damage to MPV for which MPV is entitled to recover damages sustained as a result of Insta360's infringing acts in an amount subject to proof at trial, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court, pursuant to 35 U.S.C. § 284.

## COUNT 7
## INFRINGEMENT OF U.S. PATENT NO. 10,728,490

391.   MPV realleges and incorporates by reference the allegations set forth above as if restated verbatim here.

392.   MPV is the owner, by assignment, of U.S. Patent No. 10,728,490. The '490 Patent was issued by the United States Patent and Trademark Office on July 28, 2020.

393.   As the owner of the '490 Patent, MPV holds all substantial rights in and under the '490 Patent, including the right to grant licenses, exclude others, and to enforce, sue, and recover damages for past and future infringement.

394.   The '490 Patent is valid, enforceable and was duly issued in full

compliance with Title 35 of the United States Code.

395.   Insta360 has infringed, and continues to infringe, at least claim 12 of the '490 Patent by making, using, offering to sell, selling, distributing, licensing, and/or importing Accused Products and all similar products that infringe the '490 Patent without authorization or license as exemplified below.

396.   The Accused Products are designed, manufactured, and intended to be used in normal operation to practice the '490 Patent and feature structure and/or functionality comprising the steps noted above.

397.   Insta360 has used and tested the Accused Products in the United States.

398.   Insta360 has infringed and continues to infringe the '490 Patent.

399.   Insta360's activities were without authority or license.

400.   Insta360's users, customers, distributors, agents and/or other third parties (collectively, "third-party infringers") have infringed and continue to infringe the asserted claims under 35 U.S.C. § 271(a) by using the Accused Products according to their normal and intended use.

401.   The Accused Products meet each and every limitation of each asserted claim of the '490 Patent either literally or under the doctrine of equivalents.

402.  Claim 12 recites an embodiment of the claimed subject matter:

A non-transitory computer readable medium having stored thereon instructions executable by a processor of a processor-based device having a display and a memory, to cause the processor to perform operations comprising:

during a start frame selection mode and responsive to receipt of a user input changing a position of a start frame marker relative to a timeline via a user interface of the processor-based device, scrolling to and displaying a currently-selected frame of a digital video comprising an original sequence of frames on the display of said processor-based device, and establishing, in the memory of the processor-based device, the currently-selected frame as a start frame;

during an end frame selection mode and responsive to one or more subsequent user inputs via the user interface, scrolling to and displaying a desired end frame of the sequence of frames by changing a position of an end frame marker relative to the timeline, and establishing, in the memory, the desired end

frame as a designated end frame;

during each of scrolling to the start frame and the scrolling to

the designated end frame, presenting on the display an

indication of whether the processor-based device is in the start

frame selection mode or the end frame selection mode; and

during each of selection of the start frame and the designated

end frame, presenting on the display an indication of whether

the processor-based device is in the start frame selection mode

or the end frame selection mode; and

storing, in the memory, a trimmed digital video sequence

comprising at least the start frame and the designated end

frame;

403.    The Accused Products comprise a non-transitory computer readable medium having stored thereon instructions executable by a processor of a processor-based device having a display and a memory accessible to said processor, to cause the processor to perform operations.

404.    For example, the Accused Products comprise an application on a smartphone (*e.g.,* "processor-based device") having a display and a memory

accessible to said smartphone.



https://apps.apple.com/us/app/insta360/id1491299654

405.   The Accused Products contain instructions to, during a start frame selection mode and responsive to receipt of a user input, change a position of a start frame marker relative to a timeline via a user interface of the processor based device, scroll to and display a currently-selected frame of a digital video comprising an original sequence of frames on the display of said processor-based device, and establish, in the memory of the processor-based device, the currently-selected frame as a start frame.

406.  For example, the Accused Products contain instructions to, during a start frame selection mode, respond to a receipt of a user's input changing the position of the start frame marker relative to the timeline via the Insta360 app's user interface, scroll to and display a currently-selected frame of the video comprising the original sequence of frame on said display and establishes in the smartphone memory the currently selected frame as a start frame.



https://www.youtube.com/watch?v=H4t7bzOCkV

407.  The Accused Products contain instructions to, during an end frame selection mode and responsive to one or more subsequent user inputs via the user interface, scroll to and display a desired end frame of the sequence of frames by changing a position of an end frame marker relative to the timeline, and establish, in the memory, the desired end frame as a designated end frame.

408.  For example, during an end frame selection mode, the Accused

Products respond to a receipt of a user's input changing the position of the start frame marker relative to the timeline via the Insta360 app's user interface.



https://www.youtube.com/watch?v=H4t7bzOCkVo

409.   The Accused Products contain instructions to, during each of scrolling to the start frame and the scrolling to the designated end frame, present on the display an indication of whether the processor-based device is in the start frame selection mode or the end frame selection mode.

410.   For example, During the scrolling to the start frame and scrolling to the designated end frame, the Accused Products present on the display a timestamp (*e.g.*, "indication") above either the start frame marker to indicate whether the start frame selection mode is selected or above the end frame marker to indicate whether the end frame selection mode is selected.

 

https://www.youtube.com/watch?v=qzmaeVtNXQ0

411.   The Accused Products contain instructions to store, in the memory, a trimmed digital video sequence comprising the start frame and the designated end frame along with other frames of the original sequence of frames.

412.   For example, the Accused Products store, in the memory, a trimmed digital video sequence comprising at least the start frame and the designated end frame.

  

https://www.youtube.com/watch?v=qzmaeVtNXQ0

413.    MPV notified Insta360 that it infringed the '490 Patent no later than September 16, 2025.

414.    Insta360's knowledge of the '490 Patent, which covers operating the Accused Products in their intended manner such that all limitations of the asserted claims of the '490 Patent are met, extends to its knowledge that the third-party infringers' use of the Accused Products directly infringes the '490 Patent, or, at the very least, rendered Insta360 willfully blind to such infringement.

415.    Insta360 has, since at least as early as September 16, 2025, known or been willfully blind to the fact that the third-party infringers' use of the Accused

Products directly infringes the '490 Patent.

416.    With knowledge of or willful blindness to the fact that the third-party infringers' use of the Accused Products in their intended manner such that all limitations of the asserted claims of the '490 Patent are met directly infringes the '490 Patent, Insta360 has actively encouraged the third-party infringers to directly infringe the '490 Patent by making, using, testing, selling, offering for sale, importing and/or licensing the Accused Products by, for example: marketing the Accused Products with digital video trimming capabilities to the third-party infringers; supporting and managing the third-party infringers' use of the Insta360 digital video trimming functionalities; and providing technical assistance to the third-party infringers during their continued use of the Accused Products such as by, for example, publishing instructional information on the Insta360 websites (including, without limitation, the knowledge center, instructional videos and on the Insta360 branded website) directing and encouraging third-party infringers how to make and use the digital video trimming features of the Accused Products.

417.    Insta360 induces third-party infringers to infringe the asserted claims of the '490 Patent by directing or encouraging them to operate the Accused Products which satisfy all limitations of the asserted claims of the '490 Patent.

Insta360 advertises and promotes the digital video trimming feature of the Accused Products and encourages the third-party infringers to operate them in an infringing manner. Insta360 provides technical assistance directing and instructing third parties how to operate the Accused Products by, for example, publishing instructional materials, videos, knowledge center resources, how-to guides, troubleshooting, manuals, and user guides.

418. In response, the third-party infringers acquire and operate the Accused Products in an infringing manner.

419. Insta360 has sold, provided and/or licensed to the third-party infringers and continues to sell, provide and/or license the Accused Products that are especially made and adapted—and specifically intended by Insta360—to be used as components and material parts of the inventions covered by the '490 Patent. For example, the Accused Products include digital video trimming identified above which the third-party infringers used in a manner such that all limitations of the asserted claims are met, and without which the third-party infringers would have been unable to use and avail themselves of the intended functionality of the accused products.

420. Insta360 also knew and intended that the Accused Products would be

operated in a manner consistent with normal and intended use, which use practices the asserted claims of the '490 Patent.

421. The digital video trimming features are specially made and adapted to infringe the asserted claims of the '490 Patent.

422. The digital video trimming features are not a staple article or commodity of commerce, and, because these functionalities were designed to work with the Accused Products solely in a manner that is covered by the '490 Patent, they have no substantial non-infringing use. At least by MPV's notice of Insta360's infringement, Insta360 knew of or was willfully blind to the fact that such functionalities infringe and were especially made and adapted for use that infringes the '490 Patent and they were in fact used to infringe.

423. Insta360 has contributorily infringed and continues to contributorily infringe the asserted claims of the '490 Patent under 35 U.S.C. § 271(c).

424. Upon information and belief, Insta360's acts of infringement of the '490 Patent continue since notice are, therefore, carried out with knowledge of the asserted claims of the '490 Patent and how the Accused Products infringe them. Rather than take a license to the '490 Patent, Insta360's ongoing infringing conduct reflects a business decision to "efficiently infringe" the asserted claims

and in doing so constitutes willful infringement under the standard of *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct. 1923 (2016).

425.    Insta360's acts of direct and indirect infringement have caused and continue to cause damage to MPV for which MPV is entitled to recover damages sustained as a result of Insta360's infringing acts in an amount subject to proof at trial, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court, pursuant to 35 U.S.C. § 284.

## NOTICE
## NOTICE OF REQUIREMENT OF LITIGATION HOLD

426.    Insta360 is hereby notified it is legally obligated to locate, preserve, and maintain all records, notes, drawings, documents, data, communications, materials, electronic recordings, audio/video/photographic recordings, and digital files, including edited and unedited or "raw" source material, and other information and tangible things that Insta360 knows, or reasonably should know, may be relevant to actual or potential claims, counterclaims, defenses, and/or damages by any party or potential party in this lawsuit, whether created or residing in hard copy form or in the form of electronically stored information (hereafter collectively referred to as "Potential Evidence").

427.    As used above, the phrase "electronically stored information" includes without limitation: computer files (and file fragments), e-mail (both sent and received, whether internally or externally), information concerning e-mail (including but not limited to logs of e-mail history and usage, header information, and deleted but recoverable e-mails), text files (including drafts, revisions, and active or deleted word processing documents), instant messages, audio recordings and files, video footage and files, audio files, photographic footage and files, spreadsheets, databases, calendars, telephone logs, contact manager information, internet usage files, and all other information created, received, or maintained on any and all electronic and/or digital forms, sources and media, including, without limitation, any and all hard disks, removable media, peripheral computer or electronic storage devices, laptop computers, mobile phones, personal data assistant devices, Blackberry devices, iPhones, video cameras and still cameras, and any and all other locations where electronic data is stored.  These sources may also include any personal electronic, digital, and storage devices of any and all of Insta360's agents, resellers, distributors or employees if Insta360's electronically stored information resides there.

428.    Insta360 is hereby further notified and forewarned that any alteration,

destruction, negligent loss, or unavailability, by act or omission, of any Potential Evidence may result in damages or a legal presumption by the Court and/or jury that the Potential Evidence is not favorable to Insta360's claims and/or defenses. To avoid such a result, Insta360's preservation duties include, but are not limited to, the requirement that Insta360 immediately notify its agents, distributors, and employees to halt and/or supervise the auto-delete functions of Insta360's electronic systems and refrain from deleting Potential Evidence, either manually or through a policy of periodic deletion.

## JURY DEMAND

MPV hereby demands a trial by jury on all claims, issues, and damages so triable.

## PRAYER FOR RELIEF

MPV prays for the following relief:

a. That Insta360 be summoned to appear and answer;

b. That the Court enter judgment that Insta360 has infringed the '771, '544, '155, '418, '158, '612, and '490 Patents.

c. That the Court grant MPV judgment against Insta360 for all actual, consequential, special, punitive, increased, and/or statutory damages, including, if necessary, an accounting of all damages; pre- and post-

judgment interest as allowed by law; and reasonable attorney's fees, costs, and expenses incurred in this action;

d. That Insta360's infringement be found to have been willful;

e. That this case be found to be exceptional under 35 U.S.C. § 285; and

f. That MPV be granted such other and further relief as the Court may deem just and proper under the circumstances.

Dated:  April 28, 2026                    Respectfully submitted,


By:   */s/ Cabrach J. Connor*
      Cabrach J. Connor
      Cab@CLandS.com
      Texas Bar No. 24036390
      Jennifer Tatum Lee
      Jennifer@CLandS.com
      Texas Bar No. 24046950
      John M. Shumaker
      John@CLandS.com
      Texas Bar No. 24033069

      **CONNOR LEE & SHUMAKER PLLC**
      609 Castle Ridge Road, Suite 450
      Austin, Texas 78746
      512.646.2060 Telephone
      888.387.1134 Facsimile

## <u>CERTIFICATE OF SERVICE</u>

I certify that on April 28, 2026, the foregoing was filed electronically in compliance with Local Rule CV-5(a) and served via electronic mail on all counsel of record who have consented to electronic service.


<div align="center" style="margin-left:auto">

*/s/ Cabrach Connor*
Cabrach Connor

</div>