**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| **MONUMENT PEAK VENTURES, LLC,** | § | |
| | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | **Case No. 2:25-cv-956-RWS-RSP** |
| **v.** | § | |
| | § | |
| **ARASHI VISION INC. d/b/a** | § | **JURY TRIAL** |
| **INSTA360,** | § | |
| **Defendant.** | § | |

# EXHIBIT 1

# DECLARATION OF DR. JOSE LUIS MELENDEZ

**IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF TEXAS MARSHALL DIVISION**

| | | |
|---|---|---|
| MONUMENT PEAK VENTURES, LLC | § § § | |
| *Plaintiff,* | § | Case No. 2:25-cv-00956-RWS-RSP |
| v. | § § § | |
| ARASHI VISION INC. D/B/A INSTA360, | § § § | |
| *Defendant.* | | |

**DECLARATION OF DR. JOSE LUIS MELENDEZ**

## I.    INTRODUCTION

1.      My name is Dr. Jose Luis Melendez. I am an independent expert at least in the fields of imaging, computing, and communications technologies. I also most recently, until 2023, served as Professor of Computer Science and Engineering, as well as Special Assistant to the Chancellor, at the University of Puerto Rico, in Mayagüez, Puerto Rico where I reside. I have been asked to and have conducted a review of technical issues related to the patentability of Plaintiff's United States Patent Nos. 8,237,771 ("'771 patent"), 8,274,544("'544 patent"), 8,842,155 ("'155 patent"), 8,856,418 ("'418 patent"), 9,848,158 ("'158 patent"), 10,425,612 ("'612 patent"), and 10,728,490 ("'490 patent") (collectively, the "patents-in-suit").

2.      I have been asked to consider, from a technical perspective, technical issues pertaining to subject-matter eligibility including whether claims of the '771 patent, the '544 patent, the '155 patent, the '418 patent, the '158 patent, the '612 patent, or the '490 patent, are directed to abstract ideas and if so, whether the claims amount to significantly more than alleged abstract ideas. I have also been asked to consider, from a technical perspective, whether the claims include inventive concepts beyond what was considered to be conventional at the time period of the invention and the subsequent filing of the patent applications that issued as the '771 patent, the '544 patent, the '155 patent, the '418 patent, the '158 patent, the '612 patent, or the '490 patent.

2

3. This declaration is based upon the information presently available to me. Should additional information become available, I reserve the right to supplement my opinion based upon information that may subsequently become available which may include a review of information that may be produced, or from testimony or depositions that are subsequently taken.

## II. QUALIFICATIONS AND EXPERIENCE

### A. EDUCATION AND WORK EXPERIENCE

4. I hold a Doctor of Philosophy in Electrical Engineering from Stanford University (awarded January 6, 1994) with a Grade Point Average of 4.0/4.0. I have a Bachelor of Science in Electrical Engineering from the Massachusetts Institute of Technology (awarded June 4, 1990) and graduated with a Grade Point Average of 5.0/5.0. I also obtained a Master of Science in Electrical Engineering and Computer Science from the Massachusetts Institute of Technology (awarded February 20, 1991) with a Grade Point Average of 4.8/5.0.

5. My doctoral thesis involved the definition, solution and validation of a stiffly coupled differential equation model for the formation of high-performance imaging devices. In performance of my doctoral thesis, I developed novel algorithms for the solution of the complex equations and implemented those algorithms in computer code. I verified the models and algorithms through experimentation including constructing and characterizing the sensing portions of

the electronic imaging devices, which involved specialized device interfaces. Upon graduation I joined the sensors and infrared imaging research group within the Central Research Laboratories of Texas Instruments as a research scientist where I became an inventor of a variety of novel imaging systems.

6. I am co-inventor of patented technology related to the formation and maintenance of high data rate (optical) wireless data links. Devices exhibiting 100 Mb/sec data rates utilizing the high data rate optical wireless technology were demonstrated publicly in 2001. While at Texas Instruments, I managed research and development efforts regarding technologies for optical cross-connects and optical switches for high-speed data networks, which also involved specialized device interfaces.

7. While at Texas Instruments, I also managed the wireless infrastructure business that designed, tested, and marketed semiconductor components for use within the baseband interface and radio frequency signal chain of high-performance radios used in infrastructure applications such as cellular base stations. The business group I managed designed, developed and sold some of the very first radio components tested in emerging (at the time) generations of cellular systems first capable of transmitting high-speed, high-quality images as data by way of digital transmissions (E.g. Multimedia Messaging Service – MMS). Products also included solutions for non-wireless wide-area networks (WAN).

8.      In 2002, I founded Commoca, Inc. ("Commoca"). Commoca developed hardware, embedded software (or "firmware"), and network services for the deployment of converged voice and data services over wired and wireless communications networks. Commoca devices utilized IEEE 802.11 ("WiFi" or "Wi-Fi") technology to connect touch screen telephones to access points and were believed to have been amongst the first of such devices to do so. These smart phones and network services provided by Commoca were field tested by BellSouth Corporation (now AT&T) at consumer locations in Florida and Georgia in 2006. The devices were managed remotely by Commoca over a wide variety of networks, also involving multiple communication device interfaces.

9.      In 2008, while working as a research consultant for the University of Texas Southwestern Medical Center in Dallas (UTSW), I co-invented a novel multi- wavelength imaging system (US 8,838,211) and worked to develop and produce a product through a university spinoff company which I led (now, NASDAQ:MDAI). In early 2013, following successful clinical studies, the resulting system was cleared by the US Food & Drug Administration for use in the United States. The system captured and analyzed high resolution, uncompressed images and subsequently created pulsatility maps representative of the underlying physiology for use in evaluating deep tissue wounds. Resulting images were compressed and transmitted over a variety of communications networks.

10.      As highlighted above, my professional experience and knowledge areas include advanced imaging and image analysis systems as are relevant to the subject matter of this report. Also as detailed in my CV in Exhibit A attached, I am an inventor of subject matter claimed in 28 U.S. Patents. Additional information concerning my background, qualifications, publications, conferences, honors, and awards are described in my CV.

**B.      COMPENSATION STATEMENT**

11.      My company, DRMTES LLC, is paid for my work in connection with this litigation at the rate of $550 per hour plus reimbursement for travel and any reasonable expenses that I may incur in the course of my work. Neither my company's nor my compensation is dependent upon my opinions, the outcome of the subject litigation, or on any issue in it. I have no personal interest in the outcome of the subject litigation.

12.      The opinions I express in this report are based on my own personal knowledge and professional judgment. If called as a witness during the proceedings, I am prepared to testify competently about my opinions.

**C.      INFORMATION CONSIDERED IN FORMING OPINIONS**

13.      The documents upon which I rely for the opinions expressed in this declaration are documents identified in this declaration, including the '771 patent, the '544 patent, the '155 patent, the '418 patent, the '158 patent, the '612 patent, or the

6

'490 patent. In formulating my analysis and opinions, I have reviewed the '771 patent, the '544 patent, the '155 patent, the '418 patent, the '158 patent, the '612 patent, or the '490 patent, their respective prosecution histories, the prior art discussed in office actions, and the Motion to Dismiss filed by Defendant Insta360; and I have spoken with counsel for Monument Peak Ventures. I also did an abbreviated survey of the prior art cited on the face of each patent.

14. I understand from counsel that the following patent claims at issue in this case, so my analysis and opinions will concern the limitations and subject matter they cover, including the other claims of the Asserted Patents.

8,237,771—claim 1.

8,274,544—claim 35.

8,842,155—claim 15.

8,856,418—claim 17.

9,848,158—claim 23.

10,425,612—claim 12.

10,728,490—claim 12.

15. I also rely on my own experiences and expert knowledge in the relevant technologies and systems that were conventional (or were not conventional) or inventive (or not inventive) at the time of the invention.

## III. STATEMENT OF LEGAL PRINCIPLES

16.     I understand that 35 U.S.C. §101 states that the invention or discovery of "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent". I understand that there are certain judicial exceptions to patent eligible subject matter including claims directed to laws of nature, natural phenomena, and abstract ideas. I understand that claims determined to be directed to an abstract idea may still be patentable provided that there is an inventive concept, or an element or combination of elements resulting in significantly more than the abstract idea itself.

17.     I am informed by counsel for MPV that at step one of the inquiry, courts determine whether the claims are directed to an abstract idea. Here courts look to, among other things, whether the claims focus on a specific means or method that improves the relevant technology or are instead directed to a result or effect that itself is the abstract idea and merely invokes generic processes and machinery. In matters involving software, the inquiry may turn on whether the claims focus on specific asserted technical improvements, which is applicable here, or computers merely as a tool. At step one, one considers the claims in their entirety and in ordered combination to ascertain whether their character as a whole is directed to an abstract idea. This asks whether the claims as a whole are directed to an abstract idea, regardless of whether claimed aspects are generic, routine or conventional. Claims that are directed to specific technological improvements in functionality, and which

do not merely recite generalized steps to be performed using conventional computer activity, may not be directed to abstract ideas, and are patent eligible.

18.    I am informed by counsel for MPV that at step two of the inquiry, one considers whether the elements of a claim, individually and as an ordered combination, include additional features that constitute an inventive concept sufficient to ensure that the claim amounts to significantly more than a patent upon the idea itself. Those additional features must be more than conventional activity.

## IV.    PERSON OF ORDINARY SKILL IN THE ART

19.    It is my understanding that the claims and specification of a patent must be read and construed as a person of ordinary skill in the art at the time of the priority date of the claims ("POSITA"), would understand them.

20.    I further understand that the following factors may be considered in determining the level of ordinary skill in the art: (a) the types of problems encountered by those working in the field and prior art solutions thereto; (b) the sophistication of the technology in question, and the rapidity with which innovations occur in the field; (c) the educational level of active workers in the field; and (d) the educational level of the inventor.

21.    The technical arts associated with the '771, '544, '155, '418, '158, '612, and '490 patents generally relate to integrated hardware and software architectures for the automated orchestration of digital video captures and the

9

synchronized allocation of resources between heterogeneous devices. Specifically, the technical arts of the '771 and '544 patents involve algorithmic, rules-based coordination of multiple capture sources to perform real-time state management and selection of video streams based on dynamic subject metrics. The '418 patent concerns automated technical handshaking protocols for detecting and mediating hardware-level resource sharing between mobile host equipment and receiving stations. The '155 patent relates to high-speed signal processing for real-time foreground-background segmentation and composite rendering in mobile communication environments. Finally, the technical arts of the '158, '612, and '490 patents relate to mode-aware state-machine architectures for non-linear temporal data manipulation, utilizing specific feedback loops between graphical user interface markers and physical memory pointers to ensure data integrity during video editing operations.

22.     It is my belief that a person of ordinary skill in the relevant art (POSITA) of the '771, '544, '155, '158, '612, and the '490 patents would have possessed: (a) a bachelor's degree in computer science or electrical engineering, along with four or more years of experience with image capture, image signal processing, and display, or (b) a master's degree in computer science or electrical engineering, and two or more years of experience with image capture, image signal processing and display. As noted above and on my CV, my qualifications exceed

10

this description.

23.    It is my belief that a person of ordinary skill in the relevant art (POSITA) of the '418 patent would have possessed: (a) a bachelor's degree in computer science or electrical engineering, along with four or more years of experience with device interfaces, or (b) a master's degree in computer science or electrical engineering, and two or more years of experience with device interfaces. As noted above and on my CV, my qualifications exceed this description.

V.    **The '771 claims are patent eligible and are not directed to an abstract idea.**

   A.    **The '771 claims are not abstract.**

24.    Application No. 12/411,431, filed on March 26, 2009, issued as the '771 patent, titled "Automated Videography Based Communications," on August 7, 2012.

25.    Claim 1 of the '771 patent does not merely automate the longstanding human activity of a parent using a camcorder. Unlike a manual operator, the claim features a specific technological feedback loop that operates "during a video communication event with a remote viewer." *See, E.g.,* '771 Claim 1. This feature imposes a real-time synchronization requirement between the "image processor" and the "camera" that a human cannot replicate. *Id.* These claims do not simply "collect and analyze" data; instead, the claims determine specific "subject activity metrics" and "scene change probabilities" to evaluate whether the "current

11

subject framing" should be modified or replaced with a "new subject framing." *Id.* A parent recording a child does not calculate statistical probability distributions for scene transitions in milliseconds to optimize a video communications link. The claim provides a technical "how" by specifying a multi-gate decision process: analyzing movement relative to "motion thresholds," determining "alternate shot options" with "associated shot selection probabilities," and selecting the "next shot" based on those probabilities to "instruct" the hardware. *See, E.g.,* '771 Claim 1. This specific machine-directed cinematography method improves the functioning of a live unscripted communication system, moving it beyond the "abstract" collection of data. The '771 patent discloses that, "unlike cinematography, the present invention anticipates *automated* videography that creates a good viewing experience from video capture of *real time, unscripted events*, and particularly communication events 600 provided by video communication device 300." '771 at 25:55-59 (emphasis added).

26.    Furthermore, the '771 patent does not merely claim a "result" using generic technology; it claims a specific, limited application of probability-based shot selection within a live transmission pipeline. The feature to "instruct the image processor or camera to re-frame" based on "shot dependent subject motion thresholds" is an example of a particular technical solution to the problem of "robotic" or poorly composed automated video. *See, E.g.,* '771 Claim 1. *See also,*

12

'771 prior art disclosures at 6:6-7:2. Rather than claiming the broad concept of storing and displaying video, the '771 patent features a specialized architecture where a computer evaluates the "risk of subject loss" and "re-framing frequency" (as detailed in the related metrics) to drive physical hardware adjustments. *See, E.g.,* '771 at 7:10-21, 29:1-29 (Table 2-continued), 31:54-63, 32:65-33:8, 33:26-32, 35:55-59, 36:28-33, 36:43-47, 37:5-10, 37:57-65, Claims 4, 5, 8, 31. In this example, the '771 patent teaches very extensive and detailed technical level specificity that informs its claim scope. *Id., See also* '771 Detailed Description of the Invention at 10:41-47:17 inclusive of Figures and Tables. This integration of statistical analysis and hardware control during a live "communication event" constitutes a technological improvement in the field of videography that is fundamentally different from a human simply "focusing" a lens. *See, E.g.,* '771 Claim 1.

27.     The '771 patent is directed toward specific approaches to frame subjects in a video feed:

> Briefly, according to one aspect of the present invention A method for framing subjects captured on video includes receiving video of a subject and determining a current shot framing of the subject. A magnitude and a direction of movement of the subject is determined, relative to the current framing and a level of motion threshold. The subject movement is analyzed relative to the determined magnitude, direction of subject movement, and the current framing, to determine that the subject is properly framed by the current shot framing or whether modifications of the current shot framing are required to capture the moving subject, or to determine a new shot selection and new shot framing. The camera reframes the subject if the subject is determined not to be properly framed, in accordance with the determined modifications of the current shot framing, the new shot selection and new shot framing. Video images are provided to a remote viewer.

'771 pat. at 9:31-47.

28.     Table 2 describes example system and shot framing metrics.

| TABLE 2 | | |
|---|---|---|
| System and Shot Framing Metrics | | |
| Shot Selection | | Including close-up, medium, medium wide, wide, and intermediate shots |
| Facial Area | ROI | |
| Facial sizing threshold | ΔROI | % variation in facial size allowed within a shot, without triggering a new shot. |
| Action safe area—large central portion of frame, % of frame height and frame width | | See FIGS. 7a and 7b; ~90% frame height, ~90% frame width; provides ~5-7% wide outer band beyond safe zone |
| Camera Movement Speed—The speed the NFOV camera can pan or tilt for a frame rate of 30 fps. | Cs | casual or slow rate: ~0.5-1.0 deg./frame = ~15-30 degrees/sec = ~2-4% frame width/frame time; Quick or fast rate: ~2-4 degrees/frame = ~60-120 degrees/sec. = ~10-20% frame width/frame time |
| Re-Center & Re-Size Time Delay (3) - The subject's ROI is considered out of frame (outside action safe zone) and inter-scene framing will be corrected after this inter-scene reframing time delay has passed. | ΔT3 | For example, ~0-4 seconds delay after a subject moves outside the frame, depending on the current shot, the # of people, and the activity level; time is short to reduce subject loss |
| Shot duration—duration for a current shot | Ts | ~30 seconds minimum, for example; can depend on shot selection |

14

## TABLE 2-continued

### System and Shot Framing Metrics

| | | |
|---|---|---|
| Scene (shot) change transition time - allotted time for making a transition from current video capture settings (including shot framing) to new settings. | $\Delta T4$ | $\Delta T4 \leqq$ (Cs or Zs time), can depend on current shot framing and the changes needed |
| Inactivity Time—When the FOV lacks a subject or significant motion in for a MIN. INACTIVITY TIME, the local environment is considered inactive. | Tn | ~60 seconds |
| Zooming—The maximum amount of digital zoom (or zoom range) that can be applied to the NFOV image. | Zdr | for example, to zoom down to an equivalent to a VGA image ? For 2MP camera, that is ~3x |
| Zoom Rate—The maximum speed in which digital or optical zoom can be applied. | Zs | casual or slow zoom: ~2-4% frame width change/frame time quick zoom: ~10% frame width/frame time |
| Reframing frequency: rate at which reframing (zooming, panning, tilting, cropping, camera switching) is done; for intra-scene or inter-scene reframing, can be tracked separately or combined | $\tau PTZ$ | in units of reframing events/minute (or second) or reframing events per (shot or video scene or event) |
| Subject movement factor: a measure of subject movement | $\tau SUB$ | a normalized product of subject movement relative to the FOV: for example duration * velocity * movement area/FOV |
| Scene change probability: probability or confidence that capture settings (PTZ, etc . . . ) needs to be changed; intra-scene or inter-scene | $P_{IA}$ or $P_{IE}$ | See FIGS. 11a and 11b |
| Shot selection probability: probability or confidence in determining the next shot or framing | $P_{SF}$ | See FIGS. 11c and 11d |

29.    The patent describes an example of re-framing the image based on decisions made from Tables 2 and 3.

This automated videographic method for changing image framing, whether for intra-scene or inter-scene transitions 635 can be thought of as an algorithm that determines proper framing based on an intelligent decision derived from the metrics in Tables 2 and 3. Different shot framing choices, automatic modes and scene capture choices can be implemented by including or excluding metrics or by giving different priorities to the metrics. The process of changing image framing (PTZ, cropping, shots 428), whether for intra-scene or inter-scene transitions 635, can be thought of as a deterministic process enabled by the framing process flowchart 900 depicted in FIG. 9, or the processes of transition testing 630 and communication event analysis 655 outlined in FIGS. 5A-5C. In this view, measured levels of user or system activity lead to clear, or intermediate system responses.

36:48-62.

15

30.　　An example flowchart for this re-framing process is shown in Fig. 9.



FIG. 9

31.　　Figs. 7A and 7B depict examples reframing for a video communication device when a single or multiple subjects, respectively, are present.

16





32.        The first step in establishing patent eligibility alleging claiming of

an abstract idea, is to determine if the *claims* themselves claim an abstract idea. The

'771 patent does not. Claim 1 is reproduced below:

> 1. A method for framing one or more subjects captured on video during a video communication event with a remote viewer, the method comprising the steps of:
>
> receiving video of a first subject in an environment from a camera;
>
> determining a current shot framing of the first subject in the video images, with a computer and an associated image processor, relative to a shot selection and subject positioning within the framed shot;
>
> determining at least one subject activity metric for the observed movement of the first subject in the received video, relative to the current framing and level of motion thresholds;
>
> analyzing the subject movement of the first subject, relative to the determined at least one subject activity metric and the current framing, to determine scene change probabilities, relative to the determined subject activity metrics and current shot subject motion thresholds, to determine whether video capture of the at least first subject can continue using modifications to the current subject framing or that framing of the at least first subject can be improved with new subject framing;

determining alternate shot options, including associated shot selection probabilities, based upon associated shot dependent subject motion thresholds and the determined subject activity metrics, if the determined scene change probability for new subject framing is greater than a predetermined value;

selecting a next shot from among the determined alternate shot options based upon the determined shot selection probabilities;

instructing the image processor or camera to re-frame the first subject in accordance with the newly selected next shot, including associated shot framing and any new video capture settings; and

transmitting video images to the remote viewer using the newly instructed shot framing and video capture settings.

33.    I will refer to Claim 1 of the '771 patent in my discussion. The claims of the '771 patent are directed to a specific, automated technological process for videography-based communications. The preamble describes framing subjects "during a video communication event with a remote viewer." '771 at Claim 1. This real-time management of a video telecommunications link is not an abstract concept. The feature for real-time and continuous capture, analysis, and transmission ensures the claim is directed to a functional improvement in communication technology, rather than a disembodied idea. *Id.*

34.    Prior to the invention, multi-source videography was limited to human-mediated switching or static, pre-programmed sequences lacking autonomous adaptability. The technical field lacked a hardware-orchestration architecture capable of the real-time algorithmic coordination of disparate capture units based on dynamic subject metrics. The implementation of autonomous state-

18

management logic to synchronize high bandwidth streams represented an unconventional departure from the art, specifically resolving the latency and synchronization constraints inherent in conventional, manual systems. Independent Claim 8, Independent Claim 19, and Independent Claim 30 of the '771 patent are distinct, and include features corresponding to the automated video communication system of Claim 1 in the practice of methods and video communication systems. A POSITA would understand that the language of the '771 claims include at least the aspects described below which provide inventive, technological solutions to the problems faced by the inventors. None of the elements that comprise the claimed methods and systems are abstract.

### B. The '771 Claims Are Directed to Innovative, Integrated Physical Systems.

35. A POSITA would understand that Claim 1 makes use of a storage medium ("receiving video"), a "computer and an associated image processor," and a transmitter ("transmitting video images to the remote viewer"). '771 at Claim 1. A POSITA would understand that the innovative automated videography-based communications method would at least make use of a processor (separately or within the image processor itself) repeatedly, "instructing the image processor or camera to re-frame" and "during the event." *Id.* This requires a physical hardware response—electronically adjusting optical or digital capture parameters to maintain the "video communication event." *Id.* The "remote viewer" feature further necessitates a

physical transmitter capable of delivering the modified video stream as it is being produced. *Id.*; *See also* '771 at 16:31-33("The video data streams between sites 362 and 364 can be transmitted over the intervening network 360 in an encrypted form.").

**C.    The '771 claimed inventions could not be done manually or in one's head.**

36.    The temporal constraint of being "during a video communication event" makes manual performance impossible. The system must "analyze subject movement," "determine scene change probabilities," and "select a next shot" within milliseconds to ensure the "remote viewer" sees a seamless video including its transitions. '771 Claim 1. A person cannot mentally calculate complex probability distributions (such as the Bayesian models described in the specification) for every incoming frame while simultaneously managing the bandwidth and latency requirements of a live stream. *See, E.g.,* '771 at 39:51-55. The '771 patent describes that, "[e]ach video communication device 300 manages the capture, processing, transmission or receipt of video images across a communicative network 360, subject to handshake protocols, privacy protocols, and bandwidth constraints." '771 at 11:27-31. The "during an event" limitation necessitates automated, high-speed execution that is fundamentally non-mental. '771 Claim 1.

**D.    The '771 claimed inventions provide technological solutions to technological problems.**

37.    The    '771    patent    solves    a    specific    problem    in    live

20

telecommunications: a lack of continuous proper image framing during high quality image capture. By determining, in real time, if framing can be "improved with new subject framing" while the event is ongoing, the invention provides a technological solution for "smooth" and precise electronic camera behavior. *E.g.,* '771 Claim 1. It addresses the technical challenge of maintaining high-quality composition in a dynamic environment without the latency that would be introduced by human intervention or non-automated systems. *See, E.g.,* '771 at 25:37-39. The patent teaches that, "[i]n particular, each video communication video communication device 300 is thus intended to provide high quality video that responds seamlessly and gracefully to changes in the user local environment 415 during video communication events 600," through its claimed methods and systems. *Id.*

**E.    The '771 claimed inventions provide unconventional solutions.**

38.    The solution is unconventional because it integrates a statistical predictive decision engine—calculating "shot selection probabilities"—directly into the live transmission pipeline. *E.g.,* '771 Claim 1. Conventional video streams at the time did, "not provide scene transition analysis and shot framing analysis to switch between shots that are appropriate for video capture of one or more users engaged in informal and unscripted activities within a broad, largely unconstrained, environment," and did "not provide a method of shot selection, shot framing, and shot transition management for different amounts of relative subject motion." '771

21

at 3:15-20, 7:10-21. The '771 patent's use of technically disclosed "subject activity metrics" and "motion thresholds" to statistically predict the best "next shot" during a live session represents a sophisticated, non-routine approach to automated cinematography in real-time. *E.g.,* '771 Claim 1, 9:34-36, 20:28-34.

**F.    The '771 claimed inventions provide substantial benefits.**

39.    The technical benefit is a "director-less" high-definition experience for the "remote viewer." Because the method is performed "during" the video communication event, the remote participant receives a professionally framed feed that adapts to the subject's actions. *E.g.,* '771 Claim 1. This provides a substantial benefit by increasing the "sense of presence" and reducing "viewer fatigue" associated with poorly framed or shaky automated video, effectively improving the utility of the communication hardware. *See, E.g.,* '771 at 33:40-43.

**G.    The '771 claimed inventions provide inventive solutions.**

40.    One "inventive concept" lies in the closed-loop synchronization of live analysis and live output during an "ongoing video stream." *See, E.g.,* '771 at 23:66-24:17. The specific steps—receiving the live feed, determining probabilities based on live movement, selecting a shot based on those probabilities, and transmitting the newly framed images to a remote viewer—constitutes "significantly more" than an abstract idea. *E.g.,* '771 Claim 1. It is a precise, limited mechanism for camera control that is inextricably tied to the temporal and technical constraints

22

of a live "video communication event." *Id.*

## VI.    The '544 claims are patent eligible and are not directed to an abstract idea.

### A.    The '544 claims are not abstract.

41.    Application No. 12/408,898, filed on March 23, 2009, issued as the '544 patent, titled "Automated Videography Systems," on September 25, 2012.

42.    The '544 patent features specific structural classification, not result-oriented, functional language. *See E.g.,* '544 Claim 35. The claim provides a detailed technical roadmap for "automated videography" by quantitatively distinguishing between two distinct categories of movement: "intra-scene transitions" and "inter-scene transitions." *See, E.g.,* '544 at Claim 35, Table 1 at 20:16-27, 23:1-4, 23:5-8 ("*intra-scene* transitions 635 relate to small changes in user activities (below a level of motion threshold) that are consistent with the framing of the present shot 428 or video scene 620."), 23:22-27 ("an *inter-scene* transition 635 relates to changes in the nature or expanse of the communication event, or the user activities therein (for example, relative to a level of-motion threshold) such that a change from one defined video context or shot framing to a subsequent video context or shot framing is required") (emphasis added). This is not a generic analysis of data; it is a specific quantitative technological classification that determines whether the system should "modify the current shot framing" or "continue using the current subject framing." *Id.* The "how," for example, is explicitly defined by the feature to

23

calculate an "inter-scene change probability" and compare it against a "predetermined value" to trigger a hardware state change. *Id.* This probabilistic gate-keeping is a non-routine, unconventional way to manage "ongoing video image capture" that differs fundamentally from the intuitive, non-mathematical framing performed by a human parent or camera operator. *Id.*

43.     The '544 patent does not use generic technology to achieve an abstract result. Rather the "automated videography system" is configured to perform a task—dual-layered probabilistic shot selection (scene change probability and contingent shot selection probabilities)—that a general-purpose computer does not perform in its ordinary course. *Id.* The claim does not merely recite receiving and sending video; it features the automated modification of "video capture settings" and "subject framing" based on analyzed "subject activity" metrics. *Id*. This creates a specialized machine-control loop where the claimed method optimizes "video image" quality in real-time. *E.g.*, '544 Claim 35. By specifying the hierarchy of the decision engine (from assessing activity to classifying transition types and implementing shot selection probabilities) the claim provides a specific technological solution to the problem of maintaining cinematic coherence in automated systems. This is an improvement to the functioning of the claimed videography system itself, rather than a pervasive human activity or a generic data processing function.

24

44.    The '544 patent describes detailed examples of how to measure subject activity levels.

> The system and shot framing metrics of Tables 2 and 3 will now be discussed in greater detail. Consider that a single subject has been detected and an initial framing (such as a medium wide shot) determined and initiated. The subject activity levels, relative to current framing, can be monitored using various parameters, including a subject movement factor ($\tau$SUB) that measures the magnitude of subject motion, relative particularly to the range (area), speed (velocity), and frequency of subject motion. For example (see Table 2), the subject movement factor, $\tau$SUB, can be a normalized product of subject movement (for example duration*velocity*movement area (or range)/FOV) relative to the FOV (the WFOV or the current FOV), which thereby directly measures user activity. Other factors, including the acceleration, direction, and position, of the subject movement can also be included in $\tau$SUB. By comparison, the reframing frequency ($\tau$PTZ), which measures the frequency of changes in image framing by PTZ, image cropping, or camera switching, is a measure of the device response to user activity. However, the reframing frequency ($\tau$PTZ) can be a somewhat indirect, or dampened, measure of the magnitude of user activity. For example, if such parameters measure decreasing user motion (settling) relative to the current framing for a sufficient period of time (reframing time delay for settling, $\Delta$T2), then the shot selection can be changed to a tighter shot **428**. As discussed in Table 3, the settling time delay $\Delta$T2 can depend on the current shot selection, with longer periods of stability required to change to a tighter shot. As part of reduc-

'544 pat. at 32:38-65.

45.    An example of image shot captures in response to activities, and other interim or transitional events, is shown in Fig 4D. *See also,* discussion at '544 pat. at 21:21-66.

25



FIG. 4D

46.    Table 1 identifies various video capture modes:

## TABLE 1

### Video Capture Modes

Video capture modes define a range of settings that describe various operational capture attributes, including: the operation of WFOV cameras, the operation of NFOV cameras, the operation of pan, tilt, and zoom functions, the application of privacy settings, audio settings and processing, uses of video processing, and response (timing, magnitude) to intra-scene and inter-scene transitions.

Manual mode

Preview mode

Default modes - such as WFOV capture only, NFOV capture only, audio only, or initial capture

Defined automatic capture modes - such as user lock & follow or hierarchical (using user classification or identity), or based on event classifications

Behavioral or contextual cue based automatic capture - based on cues such as voice or audio cues, eye gaze, personal relationships, event classifications, gestures, or explicit behaviors

Activity metric based automatic capture - based on metrics of user and system activity, such as range, magnitude, and rate of user activities, number of faces; PTZ frequency, etc . . .

Intermediate or semi-automatic modes - a hybrid of manual and automatic modes or multiple automatic modes

Portable mode (including an outdoors mode)

47.    System shot and framing metrics are provided in Tables 2 and 3 of

26

the '544 patent.

48.    The first step in establishing patent eligibility is to determine if the

*claims* themselves claim an abstract idea. In my opinion, the claims are not abstract.

Claim 35 is reproduced below.

> 35. A method of automated videography, in which video images of at
> least one subject in a local environment are acquired using an automated
> videography system, comprising:
>
> capturing video images with the automated videography system
> according to current video capture settings while using one or more
> cameras during a videography event consisting of one or more video
> scenes which involve the at least one subject and the local environment,
> where the current video capture settings define current subject framing
> within a selected shot and current camera parameters;
>
> analyzing the captured video images of a current video scene as captured
> according to the current video capture settings, including determining
> subject activity using at least one subject activity metric appropriate to
> the current subject framing;
>
> determining scene change probabilities, relative to the determined at
> least one subject activity metric and current shot subject motion
> thresholds, to determine whether video capture of the at least one
> subject can continue using the current subject framing or that framing of
> the at least one subject can be improved with new subject framing;
>
> determining alternate shot options, including associated shot selection
> probabilities, based upon the determined subject activity metrics and
> associated shot dependent subject motion thresholds, if the determined
> scene change probability for new subject framing is greater than a
> predetermined value;
>
> electing a next shot from among the determined alternate shot options
> based upon the determined shot selection probabilities; and

automatically modifying ongoing video image capture in accordance with the newly selected next shot, including associated new subject framing and any new video capture settings.

49.      I will refer to Claim 35 of the '544 patent in my discussion. Claim 35 is directed to a specific, machine-controlled "method of automated videography" performed by an "automated videography system." *E.g.,* '544 at Claim 35. The claim is not directed to an abstract concept such as a parent focusing (or refocusing) their camcorder on a child, but rather to a sophisticated feedback loop that manages "ongoing video image capture." *Id*. The invention requires the system to actively evaluate "scene change probabilities" to determine if a physical change in "subject framing" is required. *Id.*   By tying the process to the real-time modification of "camera parameters," and "video capture settings," the claim defines a technological operation for a specific machine. *E.g.,* '544 at Claim 35.

50.      Independent Claim 1, Independent Claim 33, Independent Claim 41, Independent Claim 46, and Independent Claim 47 of the '544 claims are distinct, but share similar features corresponding to the method of automated videography of Claim 35, in the practice of methods and an automated videography system, as claimed. A POSITA would understand that the language of the '544 claims comprise the aspects noted below which provide inventive, technological solutions to the problems faced by the inventors. None of the elements that comprise the claimed methods and systems are abstract.

28

**B.    The '544 Claims Are Directed to Innovative, Integrated Physical Systems.**

51.    A POSITA would understand that Claim 35 makes use of a physical architecture involving at least "one or more cameras" and an "automated videography system" operating within a "local environment." *E.g.,* '544 Claim 35. The hardware is not a generic bystander. A POSITA would understand that the hardware must be "configured" to capture images according to "current camera parameters" and then "automatically [modify]" those parameters. *Id.*, *see, E.g.*, '544 at 23:44-62. This physical integration of an image-capture device with a processor-led control engine creates a specialized apparatus capable of adjusting its own mechanical or digital field of view in response to dynamic environmental stimuli. *See, E.g.,* '544 at 23:44-62.

**C.    The '544 claimed inventions could not be done manually or in one's head.**

52.    The method features "determining scene change probabilities" relative to "subject activity metrics" and "current shot subject motion thresholds." *E.g.,* '544 at Claim 35. It further features determining "alternate shot options" with "associated shot selection probabilities. While a human operator may rely on artistic intuition, a human cannot mentally calculate statistical probability distributions or apply "shot dependent subject motion thresholds" to high-frame-rate pixel data sufficiently fast for "automatically modifying" an "ongoing video image capture."

29

*Id.* A POSITA would understand that the real-time temporal and mathematical requirements of the claim necessitate an automated electronic process.

### D. The '544 claimed inventions provide technological solutions to technological problems.

53.    The '544 patent addresses the technical limitation of automated cameras at the time of the invention, that were either too "static" or produced "jerky" transitions. By algorithmically assessing, and re-assessing, whether framing "can be improved with new subject framing" based on "scene change probabilities" the claim provides a technological solution for "intelligent" real-time automated cinematography. *E.g.,* '544 at Claim 35; Table 1-3. This represents an improvement in the functioning of the videography system itself, enabling it to maintain "ongoing video image capture" quality and professional framing without human intervention. *Id.*

### E. The '544 claimed inventions provide unconventional solutions.

54.    The claimed inventions are unconventional at least because they rely on a hierarchical, probability-based triggering system to drive hardware state changes. Instead of simple motion tracking, the claimed methods and systems use a "predetermined value" as a gatekeeper to evaluate "alternate shot options." *E.g.,* '544 at Claim 35. This use of "shot selection probabilities" to automatically and in real-time choose between different framing types (*e.g.,* wide vs. medium shots)

based on quantitative "subject activity metrics" was a significant departure from routine or conventional automated camera control at the time of the invention. *Id.*

### F.    The '544 claimed inventions provide substantial benefits.

55.    A POSITA would understand that a technical benefit is the ability to produce high-quality, dynamically framed video content without the need for a human videographer in real-time video image capture. By "selecting a next shot from among the determined alternate shot options," the system offers a substantial benefit in resource efficiency and video production quality. *E.g.,* '544 at Claim 35. A POSITA would understand that this allows for specialized "videography events," such as solo auditions, to be captured with professional composition that a stationary or basic tracking camera could not achieve. *See, E.g.,* '544 at 43:17-20 ("the video communications system 300 of the present invention can be used for purposes other than personal communications"), 43:27-29 ("As one example, a musician or a dancer can use the automated videography system 300 for recording an informal audition tape during a videography event 600."), 43:29-33 ("While a similar task can be accomplished with a conventional human operated video camera or a web-cam, the scene framing rules and autonomous operation can provide a potential better quality video recording without requiring an operator.").

### G.    The '544 claimed inventions provide inventive solutions.

56.    An "inventive solution" in the claims of the '544, for example, is the

31

specific steps of analytical gates that drive the hardware:

- Metric-Based Assessment of subject activity (*e.g.,* "subject activity metric"). *E.g.,* '544 Claim 35;

- Probability-Based Comparison of current vs. potential framing (*e.g.,* "current subject framing" and "new subject framing"). *E.g.,* '544 Claim 35;

- Threshold-Triggered Evaluation of "alternate shot options." *E.g.,* '544 Claim 35;

- Automated Hardware Modification of the "ongoing video image capture." *E.g.,* '544 Claim 35;

57.     This specific configuration of statistical analysis and predictive algorithmic-based hardware control, extensively detailed technically throughout the '544 patent specification's detailed description of its algorithmic-based hardware control, constitutes "significantly more" than an abstract idea, as it provides a limited and precise technical mechanism for achieving automated real-time cinematography. *See, generally,* '544 at 9:26-47:8 inclusive of Tables and Figures.

## VII.   The '155 claims are patent eligible and are not directed to an abstract idea.

### A.      The '155 claims are not abstract.

58.     Application No. 13/315,773, filed on December 9, 2011, issued as the '155 patent, titled "Portable Video Communication System," on September 23,

32

2014. The application that issued as the '155 patent was a division of the application that issued as U.S. Pat. No. 8,174,155.

59.       An example hand-held communication system is shown in Fig. 2:



FIG. 2

60.       The first step in establishing patent eligibility alleging claiming of an abstract idea is to determine if the *claims* themselves claim an abstract idea. As shown below, the claims are not abstract. Claim 15 is reproduced below.

15. An apparatus for adapting a displayed image, the apparatus comprising:

a capture device configured to capture a digital video or still image, wherein the digital video or still image is captured based on instructions received from a remote device over a wireless communication network;

33

a processor operatively coupled to the capture device and configured to adjust an allowed image capture area of the digital video or still image such that at least a portion of a background of the digital video or still image is removed from the digital video or still image;

a transmitter operatively coupled to the processor and configured to transmit the adjusted digital video or still image over the wireless communication network to the remote device; and

a display device configured to present a verification image, wherein the verification image is configured to provide visual verification as to what the transmitted adjusted digital video or still image looks like.

61.     I will refer to Claim 15 of the '155 patent in my discussion. Claim 1 of the '155 claims similar limitations in the practice of methods corresponding to the apparatus of Claim 15. A POSITA would understand that the language of the '155 claims comprise the aspects noted below which provide inventive, technological solutions to the problems faced by the inventors. None of the elements that comprise the claimed apparatus are abstract, as the claimed wireless digital video camera communication apparatus requires at least a digital media ("digital video or still image") capture device, an image processor, a wireless transmitter, and a display device that are physical or tangible things known to a POSITA in light of the specification.

62.     The '155 patent does not claim an abstract idea. Instead, the claims of the '155 patent are directed to specific, integrated technological methods and apparatus that are not abstract ideas or disembodied concepts. Furthermore, the claims are neither directed to nor do they claim a general-purpose computerized

34

system or the use of one. Nor do they claim, using scissors to cut unwanted backgrounds (or persons) from photos. Instead, a POSITA would understand, as described in the '155 patent, that video capture, processing and communication systems that existed at the time of the invention were incapable of performing the methods and lacked the claimed specific configurations of the apparatus claimed in the '155 patent.

63.     Based on the disclosures of the '155 patent, a POSITA would understand that its invention is rooted in solving a specific technological problem: the inability of prior art systems to realize high-quality, real-time video interaction in a mobile or resource-constrained environment. At the time of the invention, video communication was often plagued by "bandwidth," "processing power," and "latency" issues that prevented real-time interaction from being truly portable. Traditional systems were typically tethered, bulky, or lacked the integrated architecture necessary to manage the heavy computational load required for simultaneous full video capture, processing, and transmission. These limitations created a "technological gap" where users could not effectively engage in portable video communication with high image quality.

64.     To bridge this gap, the '155 patent discloses a specific technological architecture that integrates a capture device, a processor, a transmitter, and a display into a hand-held portable device, while providing for digitally removing portions of

35

a background of the digital media ("a processor operatively coupled to the capture device and configured to adjust an allowed image capture area of the digital video or still image such that at least a portion of a background of the digital video or still image is **removed** from the digital video or still image."). '155 at Claim 15 (emphasis added). The claimed apparatus utilizes a processor to "adjust an allowed image capture area" and "remove" background elements before transmission, thus reducing the amount of data that need be transmitted, constituting a technical improvement in the functioning of the device itself. *Id.* The '155 patent discloses that, "by using a still image to reduce the transmitted data rate of the background, a higher resolution image of the first user 80a face can be transmitted from the first device to the second device without encountering bandwidth limitations." '155 Patent at 9:45-48. The '155 patent explains in citing prior art that previous methods did "not suggest alteration of the background to improve privacy or reduce data transmission rate." Both these limitations of prior art systems are addressed by the '155 claimed invention.

65.     Furthermore, the invention introduces a "verification image" displayed locally, which ensures the user has timely "visual verification" of the modified data that is actually being transmitted over the wireless connection disclosing that, "as shown in FIG.9, a portion of the display may be used in split screen configuration to enable the first user to view verification image composed

36

from the modified image being transmitted to the second user, within a window 148 that forms a portion of the displayed image." '155 Patent at 9:53-57. The '155 claims feature "*a display device **configured to present a verification image**, wherein the verification image is configured to provide visual verification as to what the transmitted adjusted digital video or still image looks like.*" '155 Claim 15 (emphasis added).

### B. The '155 Claims Are Directed to Innovative, Integrated Physical Systems.

66.    The claimed apparatus utilizes a processor to "adjust an allowed image capture area" and "remove" background elements before transmission, thus reducing the amount of data that need be transmitted, constituting a technical improvement in the functioning of the device itself, to beneficially improve over the prior art, "to improve privacy or reduce data transmission rate." '155 at Claim 15 2:32-34. None of the elements that comprise the claimed methods or apparatus are abstract, as the claimed wireless digital video camera communication system requires the functional and physical integration of at least a capture device, image processor, wireless transmitter, and display device components providing visual verification of transmitted and processed digital media. These claimed components, together with the disclosed "PARTS LIST" are physical or tangible things known to a POSITA in light of the specification. '155 at 15:22-56, Fig. 2.

```
                    PARTS LIST

5 Display
10a, 10b. Image capture device
14a, 14b. Display
20a, 20b. User
28. Pointer apparatus
30a, 30b. Memory
40. Image capture device
45. Microphone
46. Speaker
47. Swivel mount for image capture device
48. Hinge
80a, 80b. User
60, 62. Communication channel
94. Network
96. Distorted portion
100. Display and digital capture apparatus
110. Two-way communication system
112, 114. Site
120. Image processor
122. Controller
124. Communication control apparatus
126. Prompt detection apparatus
130 Audio components for capture and broadcast
140. Portable communication device
141. Portable communication device with directable capture
142. Controls
144. Background
146. Face
148. Window
150. Nose
164. Measurements
166. Screen cover
168. Controls
```

PARTS LIST at '155 at 15:22-56.

**C.     The '155 claimed inventions could not be done manually or in one's head.**

67.     As discussed previously above, the claimed apparatus utilizes a processor to "adjust an allowed image capture area" and "remove" background elements before transmission, thus substantially reducing the amount of data that need be transmitted. '155 at Claim 15; 2:32-34. The invention introduces a "verification image" displayed locally, which ensures the user has timely "visual verification" of the modified data that is actually being transmitted over the wireless connection. A POSITA would understand that because these operations involve high-speed mathematically complex manipulation of digital video frames and

38

synchronization of wireless data packets for transmission, and the methods cannot be performed by a human manually or in one's head, thereby moving the claims firmly outside the realm of abstract ideas.

> **D.    The '155 claimed inventions provide technological solutions to technological problems.**

68.    The invention provides a solution to a specific problem in digital media communication: how to allow a remote user of a second device to access and view digital media transmitted by a first local device while ensuring the local user maintains privacy and situational awareness. By allowing the processor to adjust "an allowed image capture area" such that "a portion of a background of the digital video or still image is removed" from digital media to be transmitted, the system provides a technical solution for bandwidth optimization and privacy. '155 at Claim 15. This is a functional improvement in how the device handles "digital video or still image" data, which is a technological challenge unique to the field of digital video communications.

69.    The '155 system manages the remote transmission of video through a specific "verification-image" step. Before the full video stream is sent, the device may generate a verification image that confirms, for example, that a person has been correctly separated from their background. This step acts as an important technical step that ensures the background removal configurations are accurate before the main data is transmitted. By requiring this confirmation, the system creates a

39

specialized technical process for handling video that relies on a structured, multi-step coordination between the devices.

### E.    The '155 claimed inventions provide unconventional solutions.

70.    The solution recited in the '155 claims is unconventional at least because it creates a closed-loop verification system for remote-controlled capture ("image is captured based on instructions received from a remote device over a wireless communication network"). '155 at Claim 15. Specifically, the display device is "configured to present a verification image... to provide visual verification as to what the transmitted adjusted digital video or still image looks like." '155 at Claim 15. Providing a local user with a real-time preview of a remotely commanded, processor-modified image ensures the user knows exactly what is being sent over the "wireless communication network," since unconventionally, the image transmitted in the '155 claims is substantively not the image captured, given that, "a portion of a background of the digital video or still image is removed from the digital video or still image," that is actually captured.  '155 at Claim 15. This integration of remote control, automated background removal editing, and local verification was not a routine or conventional configuration for communication devices.

### F.    The '155 claimed inventions provide substantial benefits.

71.    A technical benefit of this invention is the mitigation of the privacy and control risks associated with remote-controlled digital cameras, and reduction

of transmission bandwidth requirements. By reciting the removal of "at least a portion of a background," the invention offers a tangible benefit in data security and transmission efficiency. '155 at 9:13-10:2; Claim 1 and 15. Furthermore, the "verification image" provides a critical safety benefit, giving the local user the "visual verification" necessary to prevent the accidental transmission of sensitive information that might otherwise be captured by the remote device's instructions. *Id.*

### G. The '155 claimed inventions provide inventive solutions.

72.     One example of an "inventive concept" in the '155 claims is the coordination between the remote-controlled capture and the local processor-led "adjustment" of the capture area. The specific steps—Remote Instruction -> Local Capture -> Automated Modification (Background Removal) -> Local Verification -> Transmission—constitutes a "significantly more" inventive application of communication technology. It moves beyond the abstract idea of "sending a picture" by defining a precise, limited mechanism for managing a digital video stream that integrates local processing power with remote network commands to determine what is in the digital media that is transmitted, rather than simply sending the captured image itself.

### VIII. The '418 claims are patent eligible and are not directed to an abstract idea.

### A. The '418 claims are not abstract.

73.     Application No. 12/097,552, filed on November 27, 2002, issued as

the '418 patent, titled "Receiving Station for Mobile Host Equipment, and Method

of Sharing Resources Using the Station," on October 7, 2014.

74.    In one example, the '418 patent discloses detecting and inventorying

the functions equipment and various mixed functional modes of operations of use.

*See e.g.*, '418 at 10:60-11:30; Fig. 3 (show below).



FIG. 3

75.    The first step in establishing patent eligibility alleging claiming of

an abstract idea, is to determine if the *claims* themselves claim an abstract idea. In

42

my opinion, the claims of the '418 patent are not abstract. The '418 patent is directed toward a device that can obtain resources from various devices, pool the resources together, and create various mixed-use modes.  In one example, the '418 patent is directed toward a device (or instructions thereto) that allows selection of resources (such as an audio stream or video stream) from various devices.  Claim 17 of the '418 patent is reproduced below.

> 17. A non-transitory computer-readable medium having instructions stored thereon, the instructions comprising:
>
> instructions to detect at least two handheld devices, wherein each of the at least two handheld devices is connected to an interface;
>
> instructions to determine an inventory of available resources for each of the at least two handheld devices, wherein the available resources are each a functionality of a handheld device;
>
> instructions to determine a plurality of possible combined use modes based on the inventory of available resources; and
>
> instructions to select a combined use mode from the plurality of possible combined use modes, wherein the combined use mode accesses the available resource of each of the at least two handheld devices, and wherein the combined use mode provides control of the available resources of each of the at least two handheld devices at the same time.

76.    I will refer to Claim 17 of the '418 patent in my discussion. Independent Claim 1 and Independent Claim 13 of the '418 claims similar features corresponding to the non-transitory medium of Claim 17 in the practice of methods and a system, respectively. A POSITA would understand that the language of the '418 claims comprise the aspects noted below which provide inventive, technological solutions to the problems faced by the inventors. None of the elements

43

that comprise the claimed methods, systems, and non-transitory medium are abstract.

77.      The '418 patent does not claim an abstract idea. Instead, the claims of the '418 patent are directed to specific, integrated technological methods, systems, and non-transitory media that are not abstract ideas or disembodied concepts. Furthermore, the claims are neither directed to nor do they claim a general-purpose computerized system or the use of one. The '418 specific discloses, "[t]he object of the invention is to propose a receiving station and in particular *a receiving station without personal computer (PC-free)*, which allows a user to reap the best of their handheld portable equipment, taken individually or in combination. *E.g.,* '418 at 2:1-5 (emphasis added).

78.      Based on the disclosures of the '418 patent, a POSITA would understand that the claims of the '418 patent are directed to a specific, tangible improvement in the field of distributed computing and mobile hardware integration. Claim 17 recites a "non-transitory computer-readable medium" that executes a precise technical workflow: detecting "at least two handheld devices" connected to an "interface," inventorying their specific "functionality," and establishing a "combined use mode" to control them "at the same time." *E.g.,* '418 at Claim 17. This is not an abstract concept of "sharing," it is a hardware-dependent system for resource pooling and simultaneous synchronization of operations between discrete

44

handheld devices. *Id.*

### B. The '418 claims Are Directed to Innovative, Integrated Physical Systems.

79. Claim 17 is rooted in a physical architecture involving "at least two handheld devices" and a specific "interface." *E.g.,* '418 at Claim 17. The "available resources" described are not data in the abstract, but are a "functionality of a handheld device," such as a camera, sensor, or display. *Id.; e.g.,* '418 at 6:5-7. The claim features the integration of these functionalities into a "combined use mode" that "accesses the available resource of each." *E.g.,* '418 at Claim 17. This structural feature for an interface to bridge and control multiple hardware units creates a specialized multi-device machine. The '418 patent discloses that, "[r]esources" means the *components and functions* of acquisition, saving, sharing and reproducing data or multimedia objects." '418 at 2:42-44 (emphasis added). None of the elements that comprise the claimed methods, systems or non-transitory media are abstract, as the claims require the functional and physical integration of components. The '418 patent discloses a variety of examples of physical components including a processor, display screen, loudspeaker, touch-sensitive interface, keyboard, image sensor, microphone, communication interface, Bluetooth or WiFi type interface, transmitter/receiver. *See, e.g.,* 1:20-28, 8:55-59.

### C. The '418 claimed inventions could not be done manually or in one's head.

45

80.     The instructions "detect" software and hardware connections via an interface and "determine an inventory of available resources" for multiple devices. *E.g.,* '418 at Claim 17. A human cannot mentally "detect" a software and electronic hardware interface or "inventory" the internal digital functionalities of a handheld device. Furthermore, a POSITA would understand that providing "control of the available resources... at the same time" requires high-speed digital synchronization and signal processing across an interface to ensure multiple hardware components act in unison. Prior to the invention, the technical field lacked the automated handshaking protocols necessary to achieve this level of simultaneous resource mediation, as conventional systems were limited to static, manually-configured hardware interfaces. This simultaneous electronic control is fundamentally beyond the capacity of human mental or manual coordination.

81.     At the time of the invention, a personal computing device was required to control handheld devices simultaneously, and the '418 invented a system that allowed such control without the involvement of a personal computing device. This transition to a standalone hardware mediated architecture was an unconventional technical shift, as it enabled the receiving station to independently execute the arbitration logic traditionally reserved for a centralized computer's operating system.

> **D.     The '418 claimed inventions provide technological solutions to technological problems.**

82.     The '418 patent addresses the technological problem of "resource isolation" in mobile devices, where the limited screen size, battery, or sensors of a single device constrain its utility. *See, E.g.,* '418 at 2:17-20, 10:65-11.8. By reciting instructions to "determine a plurality of possible combined use modes based on the inventory of available resources" and "to select a combined use mode from the plurality of possible combined use modes" the '418 claims provide a technological solution that transforms a collection of independent, constrained devices into a single, high-performance system. *E.g.,* '418 at Claim 17. Furthermore, controlling the available resources of the combined mixed mode uses of each of the at least two handheld devices at the same time is another technological improvement.  This is a functional improvement in how "handheld devices" interact with an "interface" to extend their hardware capabilities.

### E.     The '418 claimed inventions provide unconventional solutions.

83.     The solution recited in Claim 17 is unconventional at least because it moves beyond standard networking (where devices merely swap data) to a "combined use mode" providing "control... at the same time." *E.g.,* '418 at Claim 17. Conventional systems treat handhelds as autonomous units; the '418 patent introduces a centralized control logic that "accesses the available resource of each" device to create a new, aggregate functionality "without having to resort to a

personal computer." *Id., See also, E.g.,* '418 at 1:14-17. This resource-aware synchronization via an interface was not a routine or conventional way to manage multiple mobile host equipment at the time of the invention.

### F.    The '418 claimed inventions provide substantial benefits.

84.    The technical benefit of the invention is the creation of a "virtual" super-device through the pooling of "available resources." Through the claimed, "select a combined use mode," the system offers substantial benefits in processing power, display area, or sensor range that a single "handheld device" could not achieve alone. *E.g.,* '418 at Claim 17. The '418 specific discloses, "[t]he object of the invention is to propose a receiving station and in particular *a receiving station without personal computer (PC-free)*, which **allows a user to reap the best of their handheld portable equipment, taken individually or in combination**. *E.g.,* '418 at 2:1-5 (emphasis added). A POSITA would understand that this provides a tangible increase in the efficiency and utility of mobile hardware without requiring a physical upgrade to the individual devices themselves.

### G.    The '418 claimed inventions provide inventive solutions.

85.    An "inventive concept" in Claim 17 is the specific coordination between the "inventory of available resources" and the "combined use mode." This specific sequence of Detecting Hardware -> Inventorying Functionality -> Determining Combined Modes -> Simultaneous Control, constitutes "significantly

48

more" than an abstract idea. It provides a limited and specific mechanism for multi-device resource management that is inextricably tied to the hardware interface, combinable capabilities, and the real-time functional synchronization of the operation of the combined connected handheld devices.

## IX.    The '158 claims are patent eligible and are not directed to an abstract idea.

### A.    The '158 claims are not abstract.

86.    Application No. 13/100,461, filed on May 4, 2011, issued as the '158 patent, titled "Digital Camera User Interface for Video Trimming," on December 19, 2017.

87.    The claims of the '158 patent feature a specific architecture that improves the functionality of the device itself. While the result of the claims of the '158 patent may be a trimmed or cut video, the claims are directed to specific multi-input state-machine architectures that governs how a processor transitions between separate operational modes. *E.g.*, '158 Claim 23. Unlike a physical film editor using scissors, '158 Claim 23, for example, requires a processor to map a specific hierarchy of "first, second, third, and fourth inputs" to discrete internal states. *E.g.*, '158 Claim 23. The requirement that a "start frame selection input is separate from the first input" is not a pervasive human activity; it is a technical interlocking of software logic designed to prevent input ambiguity on a digital device. *E.g.*, '158 Claim 23. Physical film cannot replicate the transitioning logic or the automated

49

scrolling to a corresponding frame based on the specific electronic position of a marker. *E.g.,* '158 Claim 23. The '158 claims a "non-abstract" improvement to a user interface functionality.

88.    The first step in establishing patent eligibility alleging claiming of an abstract idea, is to determine if the *claims* themselves claim an abstract idea. As discussed below, the claims of the '158 patent are not abstract. Claim 23 is reproduced below.

> 23. A non-transitory computer readable medium having stored thereon instructions executable by a processor to cause the processor to perform operations comprising:
>
> receiving, from a user interface, at least one of a first input, a second input, a third input, a fourth input, or a confirmation input;
>
> storing a digital video sequence comprising a sequence of frames;
>
> displaying, on a display, a currently selected frame of the digital video sequence;
>
> transitioning to a start frame selection mode in response to the user interface receiving the first input, wherein changing the position of a start frame marker causes the currently selected frame to scroll to a corresponding frame at the position of the start frame marker;
>
> transitioning to an end frame selection mode in response to the user interface receiving the second input, wherein the start frame selection mode is separate from the end frame selection mode, wherein changing the position of an end frame marker causes the currently selected frame to scroll to a corresponding frame at the position of the end frame marker;
>
> scrolling through the digital video sequence in a first temporal direction in response to the user interface receiving the third input;

scrolling through the digital video sequence in a second temporal direction in response to the user interface receiving the fourth input;

establishing a start frame as a currently selected frame in response to the user interface receiving a start frame selection input while the device is in the start frame selection mode, wherein the start frame selection input is separate from the first input;

establishing an end frame as the currently selected frame in response to the user interface receiving an end frame selection input while the device is in the end frame selection mode, wherein the end frame selection input is separate from the second input, and wherein the display is further configured to display an indication of whether the start frame selection mode is selected or the end frame selection mode is selected; and

storing a trimmed digital video sequence comprising frames of the digital video sequence between the start frame and the end frame.

89.        I will refer to Claim 23 of the '158 patent in my discussion. The claims are not directed to an abstract concept of manipulating image data. Instead, they are directed to a specific user interface (UI) state-machine architecture. For example, Claim 23 requires a specific sequence of operations: the processor transitions between "separate" modes (Start Frame vs. End Frame) in response to a precise set of discrete inputs (first, second, third, fourth). *E.g.*, '158 Claim 23. By defining the functional relationship between these inputs and the resulting "temporal direction" of scrolling, the claim provides a "concrete and tangible" improvement to the device's internal logic and user feedback loop. *Id.*

90.        Fig. 4 of the '158 patent illustrates a flowchart showing steps for

51

providing a digital camera user interface for video trimming operations. *See also, e.g.,* 13:9-14:5.



FIG. 4

91.    Independent Claim 1, Independent Claim 22, and Independent Claim 23, of the '158 patent are distinct, but share similar limitations corresponding to the non-transitory medium of the processor, in the claimed devices and methods. A POSITA would understand that the language of the '158 claims comprise the aspects noted below which provide inventive, technological solutions to the problems faced by the inventors. None of the elements that comprise the claimed methods and systems are abstract.

**B.    The '158 Claims Are Directed to Innovative, Integrated Physical Systems.**

92.    Unlike a purely software-based logic claim, '158 Claim 23, for example, integrates multiple physical components: a "user interface," a "processor," a "display," and a "non-transitory computer readable medium." *E.g.*, '158 Claim 23. An innovation lies in how the processor is instructed to map the "first input" through the "fourth input" to specific physical changes on the "display." *Id.* The requirement that the display provides a specific "indication of whether the start frame selection mode is selected or the end frame selection mode is selected" links the internal digital state to the physical output in a way that is integrated into the device's hardware functionality. *Id.*

**C.    The '158 claimed inventions could not be done manually or in one's head.**

93.    The '158 patent claims involve the high-speed manipulation of a "digital video sequence comprising a sequence of frames." *E.g.*, '158 Claim 23. A human cannot manually "scroll" through a digital file in a "first temporal direction" and "second temporal direction" simultaneously with the precision required to "establish a start frame." *Id.* This process requires the electronic synchronization of a "start frame marker" with a "currently selected frame," an operation that depends entirely on the high-speed processing capabilities of a digital system. *Id.*

**D.    The '158 claimed inventions provide technological solutions to technological problems.**

94.    A POSITA would understand a "problem" to be the inherent difficulty of performing precision video editing on a constrained device (like a digital camera) with limited input options. The '158 patent provides a technological solution by creating a multi-mode architecture where the "start frame selection mode is separate from the end frame selection mode." *E.g.*, '158 Claim 23. By isolating these modes and requiring a "start frame selection input [that] is separate from the first input," the invention solves the technical problem of input ambiguity and accidental edits common in simpler touch or button interfaces. *Id.*

95.    The '158 patent also features a user interface improvement that is not found in the prior art. In one example, the user interface of the '158 patent operates in real time to provide immediate feedback on the start and end frames. This interface is more precise than those of the prior art, and allows selection of the correct start and stop frame, facilitating video editing.

96.    A POSITA would understand a problem to be the inherent difficulty of performing precision video editing on a constrained device (like a digital camera) with limited input options. The '158 patent provides a technological solution by creating a multi-mode architecture where the "start frame selection mode is separate from the end frame selection mode." *E.g.*, '158 Claim 23. By isolating these modes and requiring a "start frame selection input [that] is separate from the first input," the invention solves the technical problem of input ambiguity and accidental edits

54

common in simpler touch or button interfaces. *Id.*

### E.    The '158 claimed inventions provide unconventional solutions.

97.    A POSITA would understand that at the time of the invention, the specific "four-input," and "confirmation" mapping was an unconventional departure from standard linear video editing. The '158 claims are unique at least because they feature that the "selection input is separate from the [mode] input." *E.g.*, '158 Claim 23. This ensures that a user cannot accidentally finalize a trim while simply trying to enter the mode or scroll. This specific "interlocked" input requirement represents an unconventional UI safety and precision mechanism that is not a "well-understood, routine, or conventional" activity in generic computing.

### F.    The '158 claimed inventions provide substantial benefits.

98.    A POSITA would understand that a primary technical benefit is precision and reduced latency in mobile video processing. By configuring the processor to "scroll to a corresponding frame at the position of the start frame marker" immediately upon "changing the position," the system provides real-time visual feedback. The "indication" on the display ensures the user never loses track of their state within the "separate" modes, significantly reducing user error and the computational waste of re-trimming incorrectly cut video sequences.

### G.    The '158 claimed inventions provide inventive solutions.

99.    An "inventive concept" is also found in the ordered combination of

55

elements. Even if "trimming video" were abstract, the specific combination of transitioning to separate modes based on discrete inputs, directional scrolling based on distinct third and fourth inputs, and the requirement that the selection input be *separate* from the mode-entry input, creates a "significantly more" inventive application. Unlike the '612 and '490 patent claims, the '158 patent claims require this separation. The '158 claimed architecture forces the processor to manage state and memory in a way that is unique to this UI, moving the claim far beyond a "do it on a computer" version of traditional film cutting.

X.    **The '612 claims are patent eligible and are not directed to an abstract idea.**

A.    **The '612 claims are not abstract.**

100.    Application No. 15/827,370, filed on November 30, 2017, issued as the '612 patent, titled "Digital Camera User Interface for Video Trimming," on September 24, 2019.  The application that issued as the '612 patent is a continuation of the application that issued as the '158 patent.

101.    '612 Claim 12 describes a non-destructive digital process where a processor must "establish, in the memory...the currently-selected frame as a start frame" responsive to a "marker relative to a timeline." *E.g.*, '612 Claim 12. This is a specific technological solution to the problem of metadata management in a digital environment. Furthermore, the claim requires the device to provide a specific visual "indication" of the internal mode state "during each of selection." *Id.* This is a

specific technical protocol for ensuring data integrity between the user interface and the device's physical memory.

102.    One example of a user interface screen is shown in Fig. 5 of the '612 patent.  *See also, e.g.,* 12:62-15:16.



103.    The first step in establishing patent eligibility alleging claiming of an abstract idea, is to determine if the *claims* themselves claim an abstract idea. They are not.  Claim 12 reproduced below.

12. A non-transitory computer readable medium having stored thereon instructions executable by a processor of a processor-based device having a display and a memory accessible to said processor, to cause the processor to perform operations comprising:

during a start frame selection mode, responsive to receipt of a user input changing a position of a start frame marker relative to a timeline via a user interface of the processor-based device, scrolling to and displaying a currently-selected frame of a digital video comprising an original sequence of frames on said display and establishing, in the memory of the processor-based device, the currently-selected frame as a start frame, said digital video being stored in the memory of the processor-based device; and

responsive to one or more subsequent user inputs via the user interface:

facilitating, during an end frame selection mode, user selection of an end frame by permitting a user to scroll to a desired end frame of the sequence of frames by changing a position of an end frame marker relative to the timeline, displaying the end frame, and establishing, in the memory, the user's selection of the end frame as a designated end frame;

during each of selection of the start frame and the designated end frame, presenting on the display an indication of whether the processor-based device is in the start frame selection mode or the end frame selection mode; and

storing, in the memory, a trimmed digital video sequence comprising the start frame and the designated end frame along with other frames of the original sequence of frames.

104.    A POSITA would understand that the '612 claims are directed to a specific improvement in the functional operation of a processor-based device. Claim 12 does not merely describe manipulating image data; it describes a specific technological process of "establishing, in the memory... the currently-selected frame as a start frame" while simultaneously "scrolling to and displaying" that frame based on a "marker relative to a timeline." '612 Claim 12. This creates a specific, technical link between user interaction, visual display, and memory allocation that is not an

58

abstract concept but a concrete UI architecture. *E.g.*, '612 Claim 12.

105.    Independent Claim 1 and Independent Claim 12 of the '612 patent are distinct, but share similar limitations corresponding to the non-transitory medium of the processor, in the claimed methods. A POSITA would understand that the language of the '612 claims comprise the aspects noted below which provide inventive, technological solutions to the problems faced by the inventors. None of the elements that comprise the claimed methods and systems are abstract.

**B.    The '612 Claims Are Directed to Innovative, Integrated Physical Systems.**

106.    Claim 12 of the '612 patent is rooted in a physical architecture comprising a "processor," "display," and "memory accessible to said processor." An innovation is the specific way the processor is instructed to bridge these components. *Id.* It translates a physical user input on a "user interface" into a "scrolling" action on the "display" and a simultaneous write-operation to the "memory." *Id.* This integration of hardware components to manage a "digital video comprising an original sequence of frames" constitutes an integrated physical system-level improvement.

**C.    The '612 claimed inventions could not be done manually or in one's head.**

107.    A POSITA would understand that a human cannot "establish, in the memory" a specific frame address within a digital sequence. *E.g.*, '612 Claim 12.

59

The claim requires the real-time manipulation of a "digital video" and the rendering of a "timeline." *Id.* A POSITA would understand that the precision required to select a single "designated end frame" from a sequence and store it as a new "trimmed digital video sequence" in a memory buffer is a task uniquely suited to, and only possible within, a processor-based environment. *Id.*

### D. The '612 claimed inventions provide technological solutions to technological problems.

108. A POSITA would understand that a technological problem is "mode-uncertainty" and navigation latency in digital video editing on portable devices. The '612 provides a solution by "presenting on the display an indication of whether the processor-based device is in the start frame selection mode or the end frame selection mode" specifically "during each of selection." *E.g.*, '612 Claim 12. This ensures the technical integrity of the data being written to the memory, preventing the processor from overwriting the wrong frame pointers due to user mode confusion. *Id.*

### E. The '612 claimed inventions provide unconventional solutions.

109. While general video editing existed, the '612 provides an unconventional solution by tying the "position of a start frame marker relative to a timeline" directly to the "establishing, in the memory" of the selection. *E.g.*, '612 Claim 12. Unlike conventional systems that might wait for a "save" command, this

claim describes a persistent state where the processor is actively monitoring the "marker" and updating the "memory" in a specific "mode-based" environment. *Id.* A POSITA would understand that this specific interaction between a timeline-marker and immediate memory establishment was not a routine or conventional way of handling mobile video metadata at the time.

**F.      The '612 claimed inventions provide substantial benefits.**

110.      A POSITA would understand that a primary technical benefit is computational efficiency and data accuracy. By providing the "indication" of the mode during the selection process, the system reduces the likelihood of "edit-undo-redo" cycles. *E.g.*, '612 Claim 12. This approach reduces the processing overhead required to generate a "trimmed digital video sequence." *Id.*

**G.      The '612 claimed inventions provide inventive solutions.**

111.      An inventive concept of the '612 claims lie in the specific timing and feedback loop mandated by the claim. *E.g.*, '612 Claim 12. The feature that the device displays the mode indication "during each of selection of the start frame and the designated end frame" ensures that the "memory establishment" operation is synchronized with user intent. *E.g.*, '612 Claim 12. This interlocking of a visual timeline, a marker, a mode-state, and a memory-write operation provides a "significantly more" inventive application of video editing than generic software. *Id.* Compared to the '158, the '612 is defined by the "timeline" and the "establishing, in

the memory of the processor-based device." *E.g.*, '612 Claim 12. While the '158 was focused on specific inputs (1st, 2nd, etc.), the '612 concerns the relationship between the visual marker and the digital storage.

## XI. The '490 claims are patent eligible and are not directed to an abstract idea.

### A. The '490 claims are not abstract.

112. Application No. 16/543,259, filed on August 16, 2019, issued as the '490 patent, titled "Digital Camera User Interface for Video Trimming," on July 28, 2020. The application that issued as the '490 patent is a continuation of the application that issued as the '612 patent.

113. While the '158 concerns specific user input components and the '612 focuses more on the moment of selection, the '490 is specifically focused on the dynamic state awareness "during" the act of scrolling. The '490 claims dictate exactly how a display must behave while a processor is handling the high-bandwidth task of video scrolling.

114. Specific technical features in Claim 12 of the '490 patent of provides a mode indication "during each of scrolling." *E.g.* '490 Claim 12. The physical film editor of the prior art did not have a system that dynamically provided state-aware feedback while the film was in motion. The '490 claims are directed to a specific improvement in the graphical user interface's responsiveness. *E.g.* '490 Claim 12. By tying the visual "indication" of the mode to the active "scrolling" event, the claim

62

addresses a uniquely digital problem: "mode confusion" during high-speed navigation of digital data. *Id.* A POSITA would understand that this specific "feedback-during-motion" loop is a technical user interface feature that enhances the precision of the device, moving it far beyond the "abstract idea" of trimming and into the realm of patent-eligible technological improvements to human-computer interaction.

115. The first step in establishing patent eligibility alleging claiming of an abstract idea, is to determine if the *claims* themselves claim an abstract idea. In my opinion, the claims are not abstract as discussed below. Claim 12 is reproduced below.

> 12. A non-transitory computer readable medium having stored thereon instructions executable by a processor of a processor-based device having a display and a memory, to cause the processor to perform operations comprising:
>
> during a start frame selection mode and responsive to receipt of a user input changing a position of a start frame marker relative to a timeline via a user interface of the processor-based device, scrolling to and displaying a currently-selected frame of a digital video comprising an original sequence of frames on the display of said processor-based device, and establishing, in the memory of the processor-based device, the currently-selected frame as a start frame;
>
> during an end frame selection mode and responsive to one or more subsequent user inputs via the user interface, scrolling to and displaying a desired end frame of the sequence of frames by changing a position of an end frame marker relative to the timeline, and establishing, in the memory, the desired end frame as a designated end frame;

during each of scrolling to the start frame and the scrolling to the designated end frame, presenting on the display an indication of whether the processor-based device is in the start frame selection mode or the end frame selection mode; and

storing, in the memory, a trimmed digital video sequence comprising at least the start frame and the designated end frame.

116.    A POSITA would understand that the '490 claims are not directed to the abstract concept of cutting a video. Instead, they are directed to a specific graphical user interface (GUI) control architecture that synchronizes real-time visual feedback with memory-state changes. *See e.g.,* '490 Claim 12. Claim 12 requires the processor to perform a specific sequence of "scrolling," "displaying," and "establishing" frames in memory based on a "marker relative to a timeline." *E.g.,* '490 Claim 12. This is a concrete technical protocol for data manipulation and display management, not a method of organizing human activity. *E.g.,* '490 Claim 12.

117.    Independent Claim 1 and Independent Claim 12 of the '490 patent are distinct, but share similar limitations corresponding to the non-transitory medium of the processor, in the claimed methods. A POSITA would understand that the language of the '490 claims comprise the aspects noted below which provide inventive, technological solutions to the problems faced by the inventors. None of the elements that comprise the claimed methods and systems are abstract.

**B.    The '490 Claims Are Directed to Innovative, Integrated Physical Systems.**

64

118. The '490 Claim 12 describes an integrated system where a "processor-based device" utilizes a "display" and "memory" in a non-conventional way. The innovation is the physical integration of the UI state with the display output: the device must present an "indication of whether the processor-based device is in the start frame selection mode or the end frame selection mode" specifically "during each of scrolling." *E.g.*, '490 Claim 12. A POSITA would understand that this requirement forces a hardware-level coordination between the input interface, the frame-rendering engine, and the visual overlay of the mode indicator.

### C. The '490 claimed inventions could not be done manually or in one's head.

119. The '490 patent claims are rooted in the high-speed processing of a "digital video comprising an original sequence of frames." A POSITA would understand that a human cannot "scroll" through a digital file or "establish, in the memory" a specific frame address in real-time. *E.g.*, '490 Claim 12. This process requires a processor to translate physical movement (user input) into a precise temporal location on a digital timeline and render those frames instantly - a task that exists solely in the digital/electronic domain.

### D. The '490 claimed inventions provide technological solutions to technological problems.

120. A POSITA would understand that a technological problem is "mode confusion" during the active navigation of digital media on small-screen devices.

65

The '490 patent provides a technological solution by coupling the "indication" of the mode to the active scrolling event. By providing state-feedback while the user is "scrolling to the start frame" or "scrolling to the designated end frame," the system solves the technical problem of a user losing track of their editing context during high-speed frame navigation. *E.g.*, '490 Claim 12.

### E.   The '490 claimed inventions provide unconventional solutions.

121.    A POSITA would have understood conventional video editing software to display a static "Edit Mode" icon or require the user to select a frame before confirming the mode. The '490 is unconventional at least because it mandates that the visual mode indication is tied to the action of scrolling.  *E.g.*, '490 Claim 12. This specific "feedback-during-motion" loop ensures that the user is continuously informed of the device's state during the search for a frame, rather than just at the end of the search. *Id.* This is an unconventional improvement to the efficiency of the human-computer interface.

### F.   The '490 claimed inventions provide substantial benefits.

122.    A POSITA would understand that a technical benefit is enhanced precision and reduced cognitive load for the user. By having the display confirm the mode "during each of scrolling," the processor ensures that the user does not accidentally "establish, in the memory" an end-frame while they intended to set a start-frame. *E.g.,* '490 Claim 12. A POSITA would understand this to lead to fewer

user errors, less "undo" processing, and a more streamlined workflow for generating the "trimmed digital video sequence.". *E.g.,* '490 Claim 12.

### G.    The '490 claimed inventions provide inventive solutions.

123.    One example of an inventive concept is the dynamic synchronization of the mode indicator with the scrolling operation. *E.g.,* '490 Claim 12. Even if one were to argue that "video trimming" is a known concept, the specific combination of a responsive scrolling based on a "marker relative to a timeline," concurrent "establishing, in the memory" of the selected frame, and displaying the mode indicator specifically "during... scrolling" provides a significantly more inventive implementation. *Id.* A POSITA would understand the '490 transforms a generic video player into a state-aware editing tool where the UI feedback is an integral part of the data-selection process. *Id.*

124.    A distinguishing feature of the '490 claims is thus the "during each of scrolling," limitation. While the '612 patent claims focused on the mode during "selection," the '490 forces the device to maintain that visual feedback while the user is moving through the video, creating a technological improvement to the UI's responsiveness and transparency. *E.g.,* '490 Claim 12.

### XII.    THE CLAIMS OF THE '771, '544, '155, '418, '158, '612, AND '490 PATENTS DO NOT UNREASONABLY PREEMPT THEIR FIELDS.

125.    The '771 patent, '544 patent, '155 patent, '418 patent, '158 patent,

'612 patent, and '490 patent claim highly specific combinations of features that can be readily avoided while still practicing any alleged abstract idea.

126.     The claims of the '771 and '544 patents do not claim the alleged abstract idea of framing the subject in an image, or any other abstract idea.  Rather, the '771 claims provide a technical "how" by specifying a multi-gate decision process: analyzing movement relative to "motion thresholds," determining "alternate shot options" with "associated shot selection probabilities," and selecting the "next shot" based on those probabilities to "instruct" the hardware.  The '544 claims recite a specific quantitative technological classification that determines whether the system should "modify the current shot framing" or "continue using the current subject framing." *Id.* The "how," for example, is explicitly defined by the feature to calculate an "inter-scene change probability" and compare it against a "predetermined value" to trigger a hardware state change. *Id.* This probabilistic gate-keeping is a non-routine, unconventional way to manage "ongoing video image capture" that differs fundamentally from the intuitive, non-mathematical framing performed by a human parent or camera operator. *Id.*  This specific architecture does not preempt this field.

127.     The claims of the '155 patent do not claim the alleged abstract idea of manipulating image data, specifically by cropping backgrounds from images, or any other abstract idea.  Rather, the '155 claims relate a specific technological

architecture that integrates a capture device, a processor, a transmitter, and a display into a hand-held portable device, while providing for digitally removing portions of a background of the digital media. This specific architecture does not preempt this field.

128. The claims of the '418 patent do not claim the alleged abstract idea of connecting devices to share functionality, or any other abstract idea. Rather, the '418 patent is directed toward a specific device that can obtain resources from various devices, pool the resources together, and create various mixed-use modes using in a very specific way.

129. The claims of the '158, '612, and '490 patents do not claim the alleged abstract idea of manipulating image data—*viz.*, by trimming video, or any other abstract idea. Rather they feature a specific architecture that improves the functionality of the device itself.

I hereby declare all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both under 18 U.S.C. §1001.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed on April **24** , 2026 in _____**Boston**___ , **MA**_____

_____
Dr. Jose Luis Melendez

70

**DR. JOSE LUIS MELENDEZ**

Resident of Mayagüez, Puerto Rico, USA
E-Mail: jose@drmtes.com
Mobile: 214-686-8896

## BIOGRAPHICAL DATA

Birthdate:    October 22, 1968

Birthplace:   Fort Dix, United States Army Installation, New Jersey

Citizenship:  United States of America

Personal:     Married with Children

## EDUCATION

Doctor of Philosophy in Electrical Engineering from Stanford University (January 6, 1994) with a Grade Point Average of 4.0/4.0.

Master of Science in Electrical Engineering and Computer Science from the Massachusetts Institute of Technology (February 20, 1991) with a Grade Point Average of 4.8/5.0.

Bachelor of Science in Electrical Engineering from the Massachusetts Institute of Technology (June 4, 1990) with a Grade Point Average of 5.0/5.0.

**PROFESSIONAL CONSULTING AND INTERESTS (Alphabetical Order)**

Computer Networking

Data Visualization

Document Management and Control

E-Commerce

Imaging Devices and Systems

Integrated Photonic Circuit Subsystems

Internet

Mobile Cellular Systems and Devices

Mobile Computing

Micro-Electro Mechanical Systems (MEMS)

Local Area Networks (e.g. WiFi)

Nanotechnology

Optical Systems

Personal Area Networks (e.g. Bluetooth)

Perspective Science (Judgement and Decision Making/Artificial Intelligence)

Radio Frequency Collision Avoidance

Remote Systems Management

Semiconductor Devices and Manufacturing

Solid State Lighting Subsystems

Spectroscopic Analysis and Measurement

Voice Over Internet Systems

Wireless Systems, Devices, and Standards

**Cases (6 Years)**  on behalf of party indicated in bold.
*Retained for reports on infringement/non-infringement, validity/invalidity,
declarations, testimony at depositions, and/or tutorials:*

**Monument Peak Ventures, LLC** v. Open Text Corp.          EDTX
        2:25-CV-00521     2025
**Via Vadis, LLC et al.** v. Amazon.com, Inc.          WDTX
        1-14-cv-813          2020
**Via Vadis, LLC et al.** v. Blizzard Entertainment, Inc.,          WDTX
        1-14-cv-810          2020
**Appliance Computing III, Inc.** v. Redfin Corporation          WDTX
        6-20-cv-00376     2020
**Human Differential Intelligence LLC** v. CVS Health Corp.     WDTX
        6-20-cv-00311     2020
**Human Differential Intelligence LLC** v. Bed Bath & Beyond  WDTX
        6-20-cv-00310     2020
**Human Differential Intelligence LLC** v. The Gap, Inc.          WDTX
        6-20-cv-00307     2020
**Human Differential Intelligence LLC** v. Cigna Corporation    WDTX
        6-20-cv-00305     2020
**Monument Peak Ventures, LLC** v. Hitachi Kokusai Electric   EDTX
        2-20-cv-00098     2020
Verizon Business Network Services v. **Huawei Technologies**   EDTX
        2:20-cv-00030     2020
**Huawei Technologies** v. Verizon Communications Inc.          EDTX
        2:20-cv-00030     2020
**Bandspeed LLC** v. Cypress Semiconductor Corporation          WDTX
        1-19-cv-00936     2019
**Bandspeed, LLC** v. Curtis International Ltd.          WDTX
        1-19-cv-00225     2019
**Parity Networks, LLC** v. Zyxel Communications, Inc.          CDCA
        8:20-cv-00697     2020
**Parity Networks, LLC** v. Moxa Inc. et. al.          CDCA
        8:20-cv-00698     2020
**Parity Networks, LLC** v. Edgecore USA Corporation          CDCA
        8:20-cv-00697     2020

**Parity Networks, LLC** v. D-Link Corporations              WDTX
          6:20-cv-00093      2020

**<u>EX/INTER PARTES REVIEW</u>**
*Have provided expert declarations and/or testimony at depositions.*
**Represented Party:       Keysoft, Inc.**
Requester:   Unified Patents LLC                           Control No. 90019835

**Represented Party:       Bytemark, Inc.**
Petitioner:   Xerox Corp., ACS Transport Solutions, Inc., et al.  IPR2022-00621

**Represented Party:       Rembrandt Wireless Technologies, LP**
Petitioner:   Qualcomm Incorporated                       IPR2020-00510
Petitioner:   Qualcomm Incorporated                       IPR2020-00509

**Represented Party:       Mimzi, LLC**
Petitioner:   Microsoft Corporation, Google LLC, et. al.       IPR2019-01516
Petitioner:   Foursquare Labs, Inc.                        IPR2019-01287
Petitioner:   Tripadvisor, LLC                            IPR2019-01080

**Represented Party:       KOM Software, Inc.**
Petitioner:   NetApp, Inc.; HP Enterprise Company            IPR2019-00608
Petitioner:   NetApp, Inc.; HP Enterprise Company            IPR2019-00607
Petitioner:   NetApp, Inc.; HP Enterprise Company            IPR2019-00606
Petitioner:   NetApp, Inc.; HP Enterprise Company            IPR2019-00605
Petitioner:   NetApp, Inc.; HP Enterprise Company            IPR2019-00604
Petitioner:   NetApp, Inc.; HP Enterprise Company            IPR2019-00603
Petitioner:   NetApp, Inc.; HP Enterprise Company            IPR2019-00601
Petitioner:   NetApp, Inc.; HP Enterprise Company            IPR2019-00600
Petitioner:   NetApp, Inc.; HP Enterprise Company            IPR2019-00598
Petitioner:   NetApp, Inc.; HP Enterprise Company            IPR2019-00597
Petitioner:   NetApp, Inc.; HP Enterprise Company            IPR2019-00594
Petitioner:   NetApp, Inc.; HP Enterprise Company            IPR2019-00592
Petitioner:   NetApp, Inc.; HP Enterprise Company            IPR2019-00591

**Represented Party:        Parity Networks, LLC**

| | | |
|---|---|---|
| Petitioner: | Juniper Networks, Inc. | IPR2018-01587 |
| Petitioner: | Juniper Networks, Inc. | IPR2018-01590 |
| Petitioner: | Juniper Networks, Inc. | IPR2018-01623 |
| Petitioner: | Juniper Networks, Inc. | IPR2018-01635 |
| Petitioner: | Juniper Networks, Inc. | IPR2018-01644 |
| Petitioner: | RPX Corporation et al | IPR2018-00099 |
| Petitioner: | RPX Corporation et al | IPR2018-00100 |

**Represented Party:        Bandspeed, Inc.**

| | | |
|---|---|---|
| Petitioner: | Qualcomm Incorporated | IPR2016-00620 |
| Petitioner: | Qualcomm Incorporated | IPR2016-00623 |

## WORK EXPERIENCE

2018-Present: DRMTES LLC (Expert Consulting Services)

2018–2023: Professor, Department of Computer Science and Engineering, University of Puerto Rico at Mayagüez

2019-2022: Special Assistant of Chancellor, University of Puerto Rico Mayagüez

2015-2022: DRMArts LLC, Managing Member (Artistic Endeavors)

2010-2022:  Chief Executive Officer, Patent Calls, Inc. (Analytics)

2002-2018:  Professional Consulting (Technology)

2013-2014:  Patentiquity, Inc. (Patent Analytics)

2009-2013:  Founder & Chief Scientist, Spectral MD, Inc. (publicly traded company - medical imaging systems)

2007-2011:    Board Director, Sand 9, Inc. (Nanotechnology)

2002-2007:    Co-Founder and Executive, Commoca Inc., (smart phones, applications, networks, and services).

2001-2002:  General Manager, Wireless Infrastructure, Texas Instruments, Inc. (wireless infrastructure systems, devices and software)

1999-2001:    General Manager, Optical Products, High Performance Analog, Texas Instruments, Inc. (wireless communications, sensors, storage, and micro-electromechanical systems)

1997-2000: Affiliate Professor, Department of Electrical Engineering and Computer Science, University of Washington.

1997-1999:  Director/Department Manager, Microcomponents Technology Center, Texas Instruments, Inc. (semiconductor devices, sensors and manufacturing).

1988-1996:    Branch Manager / Member Technical Staff / Intern, Sensor and Infrared Laboratory, Central Research Laboratory, Texas Instruments, Inc. (sensors, devices, process development).

1987: Intern – Data Center, Honeywell Electro-Optics Division, Massachusetts.

## PATENTS ISSUED – NAMED INVENTOR

US 8,838,211 Multi-wavelength diagnostic imager

US 8,606,344  Integrated Patient Bed System

US 7,203,425 Optical wireless link

US 7,035,546 Optical wireless multiport hub

US 6,813,446 System for acquiring and maintaining reliable optical wireless links

US 6,752,962 Miniaturized integrated sensor platform

US 6,714,336 Packaged micromirror assembly with in-package mirror position feedback

US 6,692,697 Versatile flow cell front-end for optically-based integrated sensors

US 6,690,888 Method for establishing and maintaining optical, open-air communications link

US 6,657,832 Mechanically assisted restoring force support for micromachined membranes

US 6,635,919 High Q large tuning range Micro-Electro Mechanical System (MEMS) varactor for broadband applications

US 6,525,396 Selection of materials and dimensions for a micro-electromechanical switch for use in the RF regime

US 6,415,235 Fixed optic sensor system and distributed sensor network

US 6,376,787 Microelectromechanical switch with fixed metal electrode/dielectric interface with a protective cap layer

US 6,374,845 System and method for sensing and controlling beverage quality

US 6,326,612 System and method for optical sensing utilizing portable, detachable sensor cartridge

US 6,326,210 Method of making and connecting a miniaturized integrated sensor

US 6,191,847 Fixed optic sensor system and distributed sensor network

US 6,183,696 Optically based miniaturized sensor with integrated fluidics

US 6,111,652 High throughput surface plasmon resonance analysis system

US 6,111,248 Self-contained optical sensor system

US 6,097,479 Critical angle sensor

US 6,045,756 Miniaturized integrated sensor platform

US 6,024,923 Integrated fluorescence-based biochemical sensor

US 5,946,083 Fixed optic sensor system and distributed sensor network

US 5,922,285 Integrated fluorescence-based biochemical sensor

US 5,912,456 Integrally formed surface plasmon resonance sensor

US 5,898,503 Surface plasmon resonance sensor with interchangeable optical element

## PROFESSIONAL AND SOCIETY MEMBERSHIPS (Past & Present)

Association for the Advancement of Artificial Intelligence

Member, IEEE Engineering in Medicine and Biology Society

Member, Society of Photo-Optical Instrumentation Engineers

## OTHER HONORS

Panelist, Taking your Expertise Beyond the Job, IP Summit, SHPE National Convention, 2020.

Moderator, Intellectual Property Panel, Hispanic National Bar Association National Conference, Dallas, Texas, 2011

Moderator, Non Practicing Entity Panel, TechNet IP Forum, New York, New York, 2010

Invited Speaker: "Increasing Developing Countries' Local and International Investments in Innovative Technologies", Association of University Technology Managers, San Juan, Puerto Rico, June 2009

Wireless Design and Development Technology Award – 100Mbps Wireless Reference Design

HISPANIC BUSINESS® Magazine: Youngest person named to Hispanic Corporate Elite featuring Hispanic executives from Fortune 500 companies

Electronics Design Magazine – 1999 New Product of Year - Spreeta®

Popular Science® Cover Story – June 1998 – TI Sensors

Luminary Panelist - Electronic Design Automation's Executive Business Forum 2000

Forbes, May 28, 2001, p. 89, "...Jose Meléndez...helping TI move up to the next generation."

USA Today, February 16, 1998, Cover of Business Section, "Hot Tech …"

Hispanic Engineering National Achievement Award for Most Promising Scientist of 1997

National Science Foundation Fellow

Stanford Center for Integrated Systems Fellow

## CIVIC ACTIVITIES

Sponsor of Perspectivas Globales, 2019-Present

School Board Trustee, Texas CAN! Academy, 2009-2012

Board Member, Puerto Rico Research and Commercialization Alliance, 2004-2005